**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
J.P. MORGAN SECURITIES LLC,                  :
                                             :
                  Plaintiff,                 :
                                             :
            vs.                              :
                                             :
QUINNIPIAC UNIVERSITY,                       :
                                             :
                  Defendant.                 :
                                             :
                                             :
-----------------------------------------------------------x
```

14 CV No. 0429

RECEIVED
JAN 23 2014
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff J.P. Morgan Securities LLC ("JPMS"), by its attorneys, Simpson

Thacher & Bartlett LLP, for its complaint against Defendant Quinnipiac University

("Quinnipiac"), respectfully alleges as follows:

### NATURE OF ACTION

1.      This is an action to enjoin an arbitration that defendant Quinnipiac

initiated against JPMS before the Financial Industry Regulatory Authority ("FINRA") on

December 3, 2013, captioned *Quinnipiac University v. J.P. Morgan Securities, LLC*, FINRA No.

13-03552 (the "FINRA Arbitration").

2.      Quinnipiac's allegations against JPMS in the FINRA Arbitration are

contained in its Statement of Claim filed with FINRA on December 3, 2013.[1]  Quinnipiac's

claims relate to damages that it purportedly sustained arising out of JPMS's role as the

---

[1]      The Statement of Claim is attached as Exhibit 1.

underwriter for a 2007 issuance of auction rate securities ("ARS") by Quinnipiac and role as the broker-dealer in ensuing auctions relating to the ARS.

3.     This Court has recently addressed three similar FINRA arbitrations in which issuers of ARS sought to obtain damages from the investment banks that served as underwriters and broker-dealers for the bonds.  In all three cases, this Court enjoined the pending FINRA arbitrations in light of the forum selection clauses in the agreements the parties in those cases executed.  *See Goldman, Sachs & Co. v. N. Car. Mun. Power Agency No. 1*, No. 13-cv-1319(PAC), 2013 WL 6409348 (S.D.N.Y. Dec. 9, 2013) ("*NCMPA1*"); *Goldman, Sachs & Co. v. Golden Empire Schools Fin. Auth.*, 922 F. Supp. 2d 435 (S.D.N.Y. 2013) ("*Golden Empire*"); *Citigroup Global Markets, Inc. v. N. Car. E. Mun. Power Agency*, No. 13-cv-1703(JMF) (S.D.N.Y. May 10, 2013) (Judgment and Order for a Permanent Injunction) ("*NCEMPA*").[2] Like the three previous ARS issuer cases this Court has enjoined, all of Quinnipiac's claims are subject to a forum selection clause requiring Quinnipiac to bring any disputes with JPMS before a court, not before FINRA.

4.     FINRA is an improper forum for Quinnipiac to bring its claims against JPMS for the same reasons determined by this Court in *NCMPA1*, *Golden Empire*, and *NCEMPA*.  The agreement governing the relationship between the parties giving rise to Quinnipiac's claims contains a forum selection clause that provides that "***all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in a New York State Court or United States District Court, in each case, in the County of New York***[.]"[3]  Accordingly, because the exclusive forum

---

[2]     These three decisions are attached as Exhibits 2, 3, and 4, respectively.

[3]     The Broker-Dealer Agreement is attached as Exhibit 5.

selection clause in the Broker-Dealer Agreement does not allow for any of Quinnipiac's claims to be arbitrated before FINRA, this Court should declare that the dispute is not arbitrable before FINRA and enjoin the FINRA Arbitration.

## THE PARTIES

5.     Plaintiff J.P. Morgan Securities LLC is a corporation incorporated in Delaware, with its principal place of business in New York, New York.

6.     Plaintiff Quinnipiac is, upon information and belief, a non-profit corporation incorporated in Connecticut, with its principal place of business in Hamden, Connecticut.

## JURISDICTION & VENUE

7.     This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Federal Rule of Civil Procedure 57 and for injunctive relief pursuant to Federal Rule of Civil Procedure 65(a).

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy, exclusive of interest and costs, exceeds $75,000.  Specifically, the FINRA Arbitration seeks "to recover in excess of $20 million."  Ex. 1 ¶ 3.

9.     This Court has personal jurisdiction over Quinnipiac because Quinnipiac contractually consented to the Court's jurisdiction in Quinnipiac's Broker-Dealer Agreement with JPMS.  Ex. 5 at 14.  Additionally, this Court has personal jurisdiction over Quinnipiac because this action arises out of activities undertaken by Quinnipiac within this District in connection with the issuance of ARS, including but not limited to entering into underwriter and broker-dealer agreements with JPMS.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because Quinnipiac contractually consented to venue within this District.  In addition, venue is proper because JPMS is located in this judicial district and a substantial part of the events giving rise to this lawsuit occurred within this judicial district.

## FACTUAL BACKGROUND

### Quinnipiac's 2007 Bond Issuance

11.     On December 20, 2007, Quinnipiac elected to issue approximately $116.35 million in ARS debt to refund a portion of its outstanding debt.  Quinnipiac chose JPMS to be the underwriter and broker-dealer for the ARS.  The ARS were issued pursuant to an underwriting agreement between Quinnipiac and JPMS, dated December 19, 2007 (the "Purchase Contract").  Pursuant to the Purchase Contract, JPMS agreed to purchase a portion of the bonds and resell them to interested investors.[4]

12.     Quinnipiac and JPMS also agreed that JPMS would serve as broker-dealer for the ARS, and those services were provided pursuant to a contract, dated December 1, 2007 (the "Broker-Dealer Agreement").  The Broker-Dealer Agreement sets forth JPMS's duties to work with an auction agent to manage the auctions for the ARS, to communicate buy and sell orders to the auction agent, and to perform other limited duties in connection with the management and conduct of the auctions.  Ex. 5.

13.     The Broker-Dealer Agreement contains a specific forum selection clause providing that the parties will bring any disputes arising out of the contract or any transactions contemplated by the contract in court:

> The parties agree that ***all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be***

---

[4]     The Purchase Contract is attached as Exhibit 6.

> ***brought in a New York State Court or United States District Court, in each
> case, in the County of New York*** *and*, in connection with any such actions or
> proceeding, submit to the jurisdiction of, and venue in, such County.

*Id.* at 14.

14.     The Purchase Contract contains no agreement to arbitrate and provides

that the laws of the State of Connecticut shall govern its interpretation.

15.     The Purchase Contract and the Broker-Dealer Agreement were executed

as part of the same transaction that governed Quinnipiac's ARS issuance.  These contracts were

the product of arm's-length negotiations between JPMS and Quinnipiac, as well as Quinnipiac's

counsel.

16.     The Broker-Dealer Agreement also contains a merger clause providing as

follows:

> This Broker-Dealer Agreement, and the other agreements and instruments
> executed and delivered in connection with the issuance of the Bonds, contain the
> entire agreement between the parties relating to the subject matter hereof, and
> there are no other representations, endorsements, promises, agreements or
> understandings, oral, written or inferred, between the parties relating to the
> subject matter hereof.

*Id.* at 13.

**The FINRA Arbitration**

17.     On December 3, 2013—nearly six years years after the first ARS auctions

began to fail, and long past the expiration of the two- and three-year statutes of limitation

governing its claims[5]—Quinnipiac instituted arbitration proceedings against JPMS by filing a

---

[5]     Quinnipiac's Statement of Claim asserts five counts: breach of fiduciary duty; violation
of FINRA Rules, breach of contract and negligence; negligent supervision; fraud; and
negligent misrepresentation.  Quinnipiac's breach of fiduciary duty claim as well as its
claims sounding in negligence or fraud are governed by statutes of limitations of either
two or three years.  While a breach of contract claim is governed by a six year statute of
limitations, the Statement of Claim does not mention any contract in bringing its count

Statement of Claim with FINRA.  FINRA sent the Statement of Claim to JPMS on December 10, 2013.  In the FINRA Arbitration, Quinnipiac seeks actual, compensatory, punitive, and consequential damages, among other forms of relief.  *Id.* at 19.

18.     The deadline for JPMS to answer Quinnipiac's Statement of Claim in the FINRA Arbitration is January 29, 2014.  The FINRA Arbitration is in its initial stages.  No panel has been appointed.

## The *NCMPA1, Golden Empire,* and *NCEMPA* Cases

19.     On June 11, 2012, Goldman, Sachs & Co. commenced a similar action in this Court, captioned *Goldman, Sachs & Co. v. Golden Empire Schools Financing Authority, et al.*, Case No. 12-cv-4558 (RJS), seeking to enjoin an arbitration brought by Golden Empire, a different ARS issuer.  Subsequently, Judge Sullivan issued an order preliminarily enjoining the Golden Empire arbitration, holding that Goldman Sachs was likely to successfully demonstrate that the merger clause and forum selection clause contained in the parties' broker-dealer agreements precluded arbitration, and required that Golden Empire bring its claims in this Court rather than FINRA.  Ex. 3, *Golden Empire*, 922 F. Supp. 2d at 443-45.  Golden Empire's appeal of Judge Sullivan's decision is pending.

20.     On February 27, 2013, Goldman, Sachs & Co. commenced a similar action in this Court, captioned *Goldman, Sachs & Co. v. North Carolina Municipal Power Agency Number One*, Case No. 13-cv-1319 (PAC), in order to enjoin an arbitration brought by NCMPA1, another ARS issuer.  Similar to Judge Sullivan, Judge Crotty issued an order preliminarily enjoining the NCMPA1 arbitration, relying on the *Golden Empire* decision.  Ex. 2, *NCMPA1*, 2013 WL 6409348 at *1.  NCMPA1's appeal of Judge Crotty's order is pending.

---

asserting violation of FINRA rules, breach of contract and negligence.

21.   On March 13, 2013, Citigroup Global Markets Inc. commenced another

similar action in this Court, captioned *Citigroup Global Markets Inc. v. North Carolina Eastern*

*Municipal Power Agency*, Case No. 13-cv-1703 (JMF), in order to enjoin an arbitration brought

by NCEMPA, another ARS issuer.  After receiving briefing regarding Citigroup's preliminary

injunction motion, Judge Furman heard oral argument on the motion on May 3, 2013 and ruled

from the bench that the arbitration be enjoined.  Ex. 4 (May 10, 2013 order memorializing the

May 3, 2013 ruling).  NCEMPA's appeal of Judge Furman's order is pending.

22.   As demonstrated below, the forum selection clauses at issue in *NCMPA1*,

*Golden Empire*, and *NCEMPA* are nearly identical to the forum selection clause of the Broker-

Dealer Agreement at issue in this case.  *See, e.g.,*

| *NCMPA1* Forum Selection Clause | Quinnipiac Broker-Dealer Agreement at 14 |
|---|---|
| The parties agree that all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York and that, in connection with any such action or proceeding, submit to the jurisdiction of, and venue in, such court. | The parties agree that all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in a New York State Court or United States District Court, in each case, in the County of New York and, in connection with any such actions or proceeding, submit to the jurisdiction of, and venue in, such County. |

## CAUSES OF ACTION

## COUNT I

(For a declaratory judgment)

23.   JPMS repeats and realleges paragraphs 1 through 22 as though fully set

forth herein.

24.   The parties executed a Broker-Dealer Agreement whereby they expressly

agreed to litigate claims related to and arising from the contract exclusively in a United States

District Court or New York State Court located in New York County. The agreement is valid

and binding and does not permit Quinnipiac to prosecute its claims before FINRA. Accordingly,

the dispute between JPMS and Quinnipiac is not arbitrable before FINRA.

25.     This Court, not FINRA, determines the arbitrability of Quinnipiac's

claims. Arbitration is a matter of contract. A FINRA arbitration panel has no authority to

determine whether JPMS and Quinnipiac have submitted to it under the terms of their contractual

agreements.

26.     Declaratory relief will resolve this controversy and limit the uncertainties.

27.     As alleged herein, a real, substantial, and immediate controversy is

presented regarding the rights, duties, and liabilities of the parties. JPMS, therefore, requests a

declaratory judgment form this Court pursuant to 28 U.S.C. §§ 2201, *et seq.* and Federal Rule of

Civil Procedure 57 that FINRA lacks jurisdiction over the FINRA Arbitration.

## COUNT II

(For an injunction prohibiting Quinnipiac from pursuing the FINRA Arbitration)

28.     JPMS repeats and realleges paragraphs 1 through 22 as though fully set

forth herein.

29.     Quinnipiac has asserted claims for money damages against JPMS in the

FINRA Arbitration and, on information and belief, unless enjoined, will continue to pursue such

claims to judgment.

30.     JPMS will suffer irreparable harm unless this Court grants the injunctive

relief it seeks because it will (i) be forced to arbitrate a dispute it has not agreed to arbitrate

before FINRA, (ii) be deprived of its right to expressly contract with Quinnipiac to exclusively

resolve disputes in particular fora; and (iii) be forced to expend substantial time and resources it can never recover arbitrating claims it never agreed to arbitrate before FINRA, or risk an adverse outcome in those proceedings.

31.   JPMS has no adequate remedy at law because any post-arbitration challenge by JPMS to an arbitrator's award would still require it to defend itself in an arbitration proceeding to which it did not consent.

32.   Quinnipiac will suffer no irreparable harm in the event an injunction issues.

33.   The balance of equities weighs heavily in favor of an injunction.

34.   The public interest would be served by enjoining Quinnipiac from pursuing its claims against JPMS in the FINRA Arbitration because the parties contractually and expressly agreed to resolve all disputes relating to the parties' Broker-Dealer Agreement in a federal or state court in New York County, and did not agree to arbitrate the dispute before FINRA.

### PRAYER FOR RELIEF

WHEREFORE, JPMS respectfully requests that this Court enter an order:

(1)   declaring that FINRA lacks jurisdiction over the FINRA Arbitration;

(2)   preliminarily and permanently enjoining Quinnipiac from pursuing its claims against JPMS in the FINRA Arbitration;

(3)   awarding JPMS its costs of suit; and

(4)   granting such other relief as may be just and proper.

Dated:  January 23, 2014
New York, New York

By: _____
SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood
425 Lexington Avenue
New York, NY  10017
Telephone: (212) 455-2000
Facsimile:  (212) 455-2502
email:     jyoungwood@stblaw.com

*Attorneys for Plaintiff J.P. Morgan Securities
LLC*

# EXHIBIT 1



Financial Industry Regulatory Authority



December 10, 2013

David W. Miller, CCO
J.P. Morgan Securities, LLC
575 Washington Blvd.
Floor 16
Jersey City, NJ 07310

Subject:    FINRA Dispute Resolution Arbitration Number 13-03552
            Quinnipiac University vs. J.P. Morgan Securities, LLC

Dear Mr. Miller:

FINRA sponsors a forum for securities dispute resolution. Our arbitration program administers claims involving customers of brokerage firms and disputes between brokerage firms and their employees. Arbitration is a method of having a dispute between two or more parties resolved by impartial persons. Any type of dispute, claim, or controversy arising out of business dealings with any FINRA firm or registered person can be resolved in arbitration.

You have been named as a party in this arbitration, which the claimant(s) filed on **December 3, 2013**. Enclosed is a copy of the Statement of Claim filed by the claimant(s). You are required by FINRA rules to arbitrate this dispute.

This office administers arbitration cases according to the FINRA Codes of Arbitration Procedure (Codes). The Codes are separated into three parts: the Customer Code, the Industry Code, and the Mediation Code. The most up-to-date version of the Codes can be accessed or downloaded from our Web site at www.finra.org. In addition, our Web site provides various resources for parties, including the *Party's Reference Guide* which includes important information about the arbitration process. In addition, there is a short video on FINRA's Web site showing what to expect during the FINRA arbitration process (go to www.finra.org, click on the link to *Arbitration and Mediation*, and then click *Resources for Parties*). If you do not have access to the Internet, you may call our office to request a copy of arbitration materials.

<u>**Filing a Statement of Answer**</u>

You are required, on or before **January 29, 2014**, to directly serve each party with a signed and dated submission agreement (form enclosed) and answer to the statement of claim specifying the relevant facts and available defenses to the statement of claim. At the same time that the answer to the statement of claim is served on the other parties, you must file with FINRA an original and three copies of the following: the submission agreement, the answer to the statement of claim, and any additional documents submitted with your answer. Please send these documents and all other subsequent correspondence to the attention of the undersigned. In your submission, you

Investor protection. Market integrity.          Dispute Resolution          One Liberty Plaza          t  212 858 4200
                                                Northeast Regional Office   165 Broadway              f  301 527 4873
                                                                            27th Floor                www.finra.org
                                                                            New York, NY
                                                                            10006-1404

should also establish proof of service on the other parties to this matter, which is a signed statement indicating the date, time, and manner of service

Rule 12308 of the *Customer Code* and Rule 13308 of the *Industry Code* provide that, if you do not answer within the time period specified above, the panel may, upon motion, bar you from presenting any defenses or facts at the hearing, unless the time to answer was extended in accordance with the Codes. In addition, if you answer a claim that alleges specific facts and contentions with a general denial, or fail to include defenses or relevant facts in your answer that were known to you at the time the answer was filed, the panel may bar you from presenting the omitted defenses or facts at the hearing.

With the claimant's written consent, you may obtain extensions of time to answer. In accordance with Rule 12207 of the *Customer Code* and Rule 13207 of the *Industry Code*, FINRA staff will not grant you an extension of time to answer, except upon a showing of good cause. If the claimant agrees to extend your time to file your answer, please notify FINRA in writing of the new deadline for filing your answer. You should also send a copy of that notice to the claimant and all other parties.

If you receive an amended statement of claim you should review Rule 12310 of the *Customer Code* or Rule 13310 of the *Industry Code* to determine your time to file a response to the amendment.

## CRD Reporting Obligations for Registered Representatives

Article V, Section 2(c) of the FINRA By-Laws provides that registered representatives must keep their CRD registration current. Therefore, you are advised to review the Form U4 to determine if disclosure of this matter is required. If so, your failure to update your registration application may result in the filing of a formal complaint based on any omission. Any questions regarding this disclosure requirement should be directed to the FINRA Member Services Phone Center at (301) 590-6500.

## Filing Other Claims

The answer to the statement of claim may include any counterclaims against the claimant, cross claims against other respondents, or third party claims, specifying all relevant facts and remedies requested, as well as any additional documents supporting such claim. When serving a third party claim, you must provide each new respondent with copies of all documents previously served by any party, or sent to the parties by FINRA. If the answer to the statement of claim contains any counterclaims, cross claims or third party claims, you must pay all required filing fees at the time of filing. Parties may pay filing fees for counterclaims, cross claims or third party claims by check or money order payable to "FINRA Dispute Resolution" and should mail payments to the FINRA Dispute Resolution Regional Office administering the case. Please write the name of the counterclaimant, cross claimant or third party claimant and case number on the check or money order.

## Hearing Location

For customer disputes, Rule 12213 of the *Customer Code* provides that FINRA will generally select the hearing location closest to the customer's residence at the time the dispute arose, unless the customer requests in his/her initial filing a hearing location in the customer's state of residence at the time the dispute arose.

For industry disputes, Rule 13213 of the *Industry Code* provides that FINRA will generally select the hearing location that is closest to the location where the associated person was employed at the time the dispute arose. In industry disputes involving FINRA firms only, unless the firms are located in the same city, FINRA will consider a number of factors when deciding the hearing location. These include the following:

- signed agreements to arbitrate;
- who initiated the transactions or business at issue; and
- location of essential witnesses and documents.

If all parties in any arbitration agree to a hearing location, FINRA ordinarily will select that hearing location.

FINRA has selected **Hartford, CT** as the hearing location for this case. FINRA will consider changing the hearing location upon motion of a party. After the panel is appointed, however, the panel will decide any motion relating to changing the hearing location.

## Number of Arbitrators

Rule 12401 of the *Customer Code* and Rule 13401 of the *Industry Code* provide that one arbitrator will decide this case if the amount of the claim is $100,000 or less, exclusive of interest and expenses, unless all parties agree in writing to three arbitrators. If this claim is more than $100,000 or for an unspecified or non-monetary amount, a panel of three arbitrators will be selected to decide the case, unless all parties agree in writing to the appointment of a single arbitrator to decide the case.

There are several benefits to the appointment of a single arbitrator, including: 1) reduced hearing session fees because hearings sessions with one arbitrator cost substantially less than hearing sessions with three arbitrators ($450 per hearing session versus $1,200 per hearing session in cases with over $500,000 in damages), 2) reduced fees for other events such as initial pre-hearing conferences, other pre-hearings, and postponements, 3) reduced case processing times because single arbitrators do not need to coordinate their calendars with co-panelists to schedule a hearing, 4) reduced party effort in the arbitrator selection process because parties will receive one list of 10 names from which to choose their arbitrator, rather than three lists of 10 names each (i.e., parties will only need to research the disclosures and histories of 10 proposed arbitrators instead of 30), 5) reduced costs for photocopying pleadings and exhibits (by two-thirds), and 6) less likelihood of last minute changes in hearing dates because of arbitrator scheduling issues.

## Representation of Parties

Rule 12208 of the *Customer Code* and Rule 13208 of the *Industry Code* provide that parties may represent themselves or may be represented by an attorney admitted to practice and in good standing in any jurisdiction. A party may be represented by a non-attorney, unless state law prohibits such representation, the person is currently suspended or barred from the securities industry in any capacity, or the person is currently suspended from the practice of law or disbarred.

## Discovery

Rule 12505 of the *Customer Code* and Rule 13505 of the *Industry Code* provide that parties must cooperate to the fullest extent practicable in the exchange of documents and information to expedite the arbitration. Parties in customer cases should carefully review the *FINRA Discovery Guide* and *Document Production Lists*, which can be downloaded from our Web site at www.finra.org. Upon request, FINRA will provide the parties with a copy of the *Discovery Guide* and *Document Production Lists*. Document Production Lists 1 and 2 describe the documents that are presumed to be discoverable in all arbitrations between a customer and a firm or registered person. Parties should not file with FINRA copies of correspondence relating to the exchange of documents and information, except as provided below.

## Motions

As explained in Rule 12503 of the *Customer Code* and Rule 13503 of the *Industry Code*, written motions are not required to be in any particular form. Motions may take the form of a letter, legal motion, or any other form that the panel decides is acceptable. Motions include all requests to the arbitrators or the Director of Arbitration, including challenges for cause and recusal requests. Any written request to the arbitrators or the Director of Arbitration will be treated as a motion even when it is not expressly labeled as a motion by a party. Written motions must be served directly on all other parties, at the same time and in the same manner. Written motions must also be filed with the FINRA staff member assigned to your case, with additional copies for each arbitrator, at the same time and in the same manner in which they are served on the parties. Responses to written motions must be served directly on each other party, at the same time and in the same manner. Responses to written motions must also be filed with the FINRA staff member assigned to your case, with an additional copy for the arbitrator, at the same time and in the same manner in which they are served on the parties.

## Motion Response Deadlines

**Generally**. Under Rule 12503 of the *Customer Code* and Rule 13503 of the *Industry Code*, parties have 10 days from the receipt of a written motion to respond to the motion, unless the moving party agrees to an extension of time, or the panel decides otherwise. Parties have 5 days from the receipt of a response to a motion to reply to the response unless the responding party agrees to an extension of time, or the Director or the panel decides otherwise.

**Subpoenas**. Under Rule 12512 of the *Customer Code* and Rule 13512 of the *Industry Code*, parties have 10 calendar days from the receipt of a motion requesting that an arbitrator issue a subpoena to file a response, and moving parties have 10 calendar days from receipt of the response to submit a reply.

**Motions to Dismiss**. Motions to dismiss have different response deadlines. Parties should review Rules 12206(b) and 12504 of the *Customer Code* and Rules 13206(b) and 13504 of the *Industry Code* for the applicable response deadlines.

## Motions to Dismiss

Rule 12504 of the *Customer Code* and Rule 13504 of the *Industry Code* limit significantly the filing of motions to dismiss in the arbitration forum and impose strict sanctions against parties who engage in abusive motion practices. These rules specify the following three limited

grounds on which a motion to dismiss may be granted before a claimant finishes presenting his/her case: 1) the non-moving party signed a settlement and release; 2) the moving party was not associated with the account, security, or conduct at issue; or 3) the claim does not meet the criteria of the eligibility rule (contained in *Customer Code* Rule 12206 and *Industry Code* Rule 13206).

### Fees

Any time a fee is assessed to you during the case, you will receive an invoice that reflects the fee assessed. At the conclusion of the case, you will receive a Statement of Account that reflects the fees assessed and any outstanding balance or refund due. Fees are due and payable to FINRA Dispute Resolution upon receipt of an invoice and should be sent to the address specified on the invoice. All questions regarding the assessment of fees should be directed to the regional office administering your case. All questions regarding the payment of fees and refunds should be directed to FINRA Finance at (240) 386-5910.

In the event multiple parties file a claim, and a single party pays the filing fees on behalf of the other filing parties, FINRA will credit the paying party the amount of the payment. In the event the parties' representative or non-party pays the filing fee on behalf of all the filing parties, FINRA will credit the first named party in the claim the amount of the payment.

At the conclusion of the case, FINRA will use the filing fee funds to pay fees owed by any of the parties that jointly filed the claim. FINRA will evenly distribute the funds to pay each party's fees. If any funds remain for any of the parties, FINRA will use those funds to pay the balance of fees owed by any other parties that filed the claim.

### Expungement Requests

FINRA rules provide for strict standards and procedures for expungement of customer dispute information from the CRD system. This rule protects the ability of investors to obtain accurate and meaningful data about firms and brokers by permitting expungement only under appropriate circumstances. Under Rule 2080, an arbitrator may grant expungement only when the claim, allegation, or information in the customer dispute is factually impossible or clearly erroneous; the broker was not involved in the alleged misconduct; or the claim, allegation, or information is false. In addition, Rule 12805 of the *Customer Code* and Rule 13805 of the *Industry Code* require arbitrators considering an expungement request to hold a recorded hearing session by telephone or in person, provide a brief written explanation of the reasons for ordering expungement, and, in cases involving settlement, review the settlement documents to examine the amount paid to any party and any other terms and conditions of the settlement.

### Explained Decisions

The arbitrators will provide an explained decision at the parties' joint request. An explained decision is a fact-based award stating the general reasons for the arbitrators' decision. FINRA rules require parties to submit any joint request for an explained decision at least 20 days before the first scheduled hearing date.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

Nicole C. Haynes
Case Assistant Manager
Phone:   212-858-4200
Fax:       301-527-4873
NEProcessingCenter@finra.org

NCH:nsc:LC39E
idr: 02/09/2012

Enclosures

CC:

Peter J. Mougey, Esq., Quinnipiac University
Levin, Papantonio, Thomas, Mitchell etal, 316 S. Baylen Street, Suite 600, Pensacola,
FL 32502

RECIPIENTS:

David W. Miller, CCO, J.P. Morgan Securities, LLC
J.P. Morgan Securities, LLC, 575 Washington Blvd., Floor 16, Jersey City, NJ 07310

**FINRA ARBITRATION Submission Agreement**

_____

In the Matter of the Arbitration Between

    Name(s) of Claimant(s)

Quinnipiac University

                                                              13-03552

    Name(s) of Respondent(s)

J.P. Morgan Securities, LLC

_____

1. The undersigned parties ("parties") hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related cross claims, counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the FINRA By-Laws, Rules, and Code of Arbitration Procedure.

2. The parties hereby state that they or their representative(s) have read the procedures and rules of FINRA relating to arbitration, and the parties agree to be bound by these procedures and rules.

3. The parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The parties further agree and understand that the arbitration will be conducted in accordance with the FINRA Code of Arbitration Procedure.

4. The parties agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement. The parties further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

_____
J.P. Morgan Securities, LLC                                      Date
State Capacity if other than individual (e.g., executor, trustee, corporate officer)


LC43A: SUBMISSION AGREEMENT
idr: 02/09/2009

RECIPIENTS:
     David W. Miller, CCO, J.P. Morgan Securities, LLC
     J.P. Morgan Securities, LLC, 575 Washington Blvd., Floor 16, Jersey City, NJ 07310

13-03552

## SECTION 8: SUBMISSION AGREEMENT AND ELECTRONIC SIGNATURE
### FINRA Arbitration Submission Agreement

In the Matter of the Arbitration Between

Name(s) of Claimant(s)

Quinnipiac University

and

Name(s) of Respondent(s)

J P. MORGAN SECURITIES LLC

The undersigned parties ("parties") understand that an electronic signature below means that the party certifies that the information entered on the form is true and accurate, and that the party agrees to the terms of the following Submission Agreement.

The parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related cross claims, counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the FINRA By-Laws Rules, and Code of Arbitration Procedure

The parties hereby state that they or their representative(s) have read the procedures and rules of FINRA relating to arbitration, and the parties agree to be bound by these procedures and rules The parties further agree and understand that the arbitration will be conducted in accordance with the FINRA Code of Arbitration Procedure

The parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s)

The parties agree to abide by and perform any award(s) rendered. The parties further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

### Electronic Signature

By entering your electronic signature below, you are one of the following: (1) the claimant; or (2) a person with legal authority to bind the claimant; or (3) a person with firsthand knowledge of the facts and actual or implied authority to act on behalf of the claimant, or 4) an attorney who has actual or implied written or verbal power of attorney from the claimant to sign on the claimant's behalf and thus, bind the claimant to the terms of the Submission Agreement as if the claimant signed the form personally

**Signatures**

| Claimant | Signature | Capacity | Date |
|---|---|---|---|
| Quinnipiac University | /Peter J. Mougey pjm/ | Attorney | 12/03/2013 |

I certify that the information entered on the form is true and accurate, and agree to the terms of the Submission Agreement, whether submitted manually or electronically. If I electronically signed the form, I certify that I entered my signature personally.

## FINANCIAL INDUSTRY REGULATORY AUTHORITY

QUINNIPIAC UNIVERSITY

    Claimant,

v.

                               FINRA Case Number:

JP MORGAN SECURITIES, LLC

    Respondent.

## STATEMENT OF CLAIM

Claimant, QUINNIPIAC UNIVERSITY,[1] ("QUINNIPIAC") respectfully submits this Statement of Claim against Respondent JP MORGAN SECURITIES ("JPM" or "Respondent").

### SUMMARY

1.    JPM recommended to Quinnipiac that it issue $116,350,000 of bonds as auction rate securities ("ARS") combined with derivatives in order to create a "synthetic fixed rate" despite its knowledge that the risks associated with this transaction had dramatically increased. The December 20, 2007 ARS Synthetic fixed rate issuance was one of the last of its kind in the history of the ARS market.  Pursuant to JPM's recommendation, the ARS issuance was coupled

---

[1] The Series K-1 Bonds and the Series K-2 Bonds (together, the "Series K Bonds") were issued as special obligations of the State of Connecticut Health and Educational Facilities Authority (the "Authority") and were secured under the provisions of the relevant Trust Indenture, dated December 1, 2007 by and between the Authority and the U.S. Bank National Association, as trustee (the "Trustee"), payable solely from the Revenues of the Authority paid to the Trustee for the account of the Authority by Quinnipiac University in accordance with the provisions of the Loan Agreement, dated as of December 1, 2007 (the "Loan Agreement"), by and between the Authority and Quinnipiac. The proceeds of the Series K Bonds were loaned by the Authority to Quinnipiac pursuant to the Loan Agreement, and the Series K Bonds were payable from Revenues derived by the Authority pursuant to the Loan Agreement.

with floating-to-fixed swaps in an attempt to create a synthetic fixed rate. JPM recommended this synthetic fixed structure in return for minimal savings over traditional fixed but failed to disclose serious and pervasive risks.

2.     Throughout the fall of 2007, the risks of issuing ARS had increased dramatically. JPM failed to disclose its knowledge of the increasing risks that its support bids were propping up the ARS market, and were necessary to achieve the represented interest payments and functionality of the synthetic fixed rate. Similarly, Respondent's artificial support bids materially impacted the correlation of the variable leg of the swap and the auction results. The correlation between these two integral pieces of the synthetic fixed rate was vital to the synthetic fixed rate structure recommended by Respondent. Respondent should have disclosed the correlation was artificially manipulated by the support bids and the risk of de-coupling of the variable rates was much higher than represented. Not only was this information not disclosed, but the support bids' impact on the auction results and the correlation to the swap was only known to the major broker-dealers who routinely participated in the auction process. There was virtually no transparency to the global auction process or the auction results. JPM, as a member of Quinnipiac's Finance Team who recommended ARS and the synthetic fixed rate structure with ARS, failed to disclose these material facts that would have enabled Quinnipiac to analyze the looming risks of issuing ARS.

3.     Of course, ARS coupled with a swap was more profitable to JPM than alternate solutions. Respondent was aware of the significant risks but failed to warn Quinnipiac prior to its issuance when JPM decided without warning to drastically reduce its artificial support of the ARS market. JPM's decision to withdraw its artificial support was less than eight weeks after JPM closed the ARS issuance it recommended. The rates on Quinnipiac's ARS skyrocketed in

2

excess of 10% when the LIBOR index, which was used as part of the swap and represented by JPM to be highly correlated with ARS, was hovering around 2%-3% and comparable fixed rates were between 4%-5%. In April of 2008, within months of the ARS issuance, Quinnipiac was forced to restructure the synthetic fixed rate structure into traditional fixed at significant expense. Because of the significant swap termination on the structure, Quinnipiac entered into another swap agreement with JPM at unfavorable terms to avoid paying millions in swap termination fees. Quinnipiac brings this arbitration against JPM to recover in excess of $20 million [2] it suffered in damages due to JPM's misrepresentations and omissions.

4. After the ARS rates skyrocketed and decoupled from the variable leg of the swap, Respondent continued to cover-up its long-standing knowledge of the latent risks, and blamed various other market factors for the ARS failure and the synthetic fixed rate structure. Quinnipiac continued to work with JPM, as a trusted advisor and part of the finance team, and entered into further swap transactions in an attempt to reduce the amount of swap termination fees. The initial December 19, 2007 ARS synthetic rate structure continued to cause damages through 2013. Respondent never disclosed to Quinnipiac that without its artificial bids the ARS markets would not function and the synthetic fixed-rate structure had a high probability of failure either before the ARS skyrocketed or at any time thereafter. In fact, only after reviewing several hundred thousand auction results and the Respondent's specific auctions, was the truth revealed.

## THE PARTIES

5. Quinnipiac University is a private, nonsectarian, coeducational university located in Hamden, Connecticut.

6. Respondent, JP MORGAN (CRD #79), is a registered brokerage firm with a principal place of business in New York, New York.

---

[2] Claimant reserves the right to revise this number based on documents produced during discovery.

## FINRA'S JURISDICTION

7.    JPM is a FINRA member. Quinnipiac is a customer of JPM, having procured and paid for JPM's services as underwriter and broker-dealer and this dispute arises from the business activities of JPM, including, but not limited to, underwriting and broker-dealer activities. Quinnipiac demands arbitration pursuant to FINRA Rule 12200.

## BACKGROUND

### A.    Auction Rate Securities

8.    ARS are long-term variable-rate instruments with interest rates that reset at frequent periodic auctions. In each auction, existing holders and prospective bidders state the interest rate they require to purchase or continue to hold the security in each auction. In a typical ARS auction, bid orders are accepted starting with the lowest interest rate bid until all securities available for sale are matched with purchase orders. The rate at which the final sell order is filled is known as the "clearing rate." The clearing rate applies to the entire issue of ARS, including all other buy orders, and to the securities of existing holders who chose to hold rather than sell their securities in the auction. This type of auction process is referred to as a "Dutch auction."

9.    ARS auctions are generally held every 7, 28, or 35 days. Orders to purchase or sell ARS at auctions can be placed only through designated broker-dealers that manage the auctions of the ARS. These broker-dealers (in this case, JPM ) collect "buy" and "sell" orders and then forward them to the designated auction agent that administers the Dutch auction.

10.    If the bids received by the auction agent are insufficient to purchase all the ARS offered for sale at a particular auction, the auction fails, and the issuer has to pay a pre-determined max penalty rate. As a result, until the next successful auction, the ARS holders are unable to sell the securities that they hold (unless they can do so in a secondary market) and the

4

interest rate on all ARS in the issuance jumps to a contractual "maximum" rate. The "maximum" rate could be capped at a formula, which is frequently based on a percentage of LIBOR or a fixed-rate maximum rate.    Quinnipiac's fixed maximum penalty rate of 12 was draconian. Importantly, JPM never advised Quinnipiac that it did not enjoy any additional clearing rate reduction or savings for agreeing to the high fixed maximum penalty rate. Both the formulaic maximum rates, which are commonly 150% of Libor, and the fixed maximum penalty rate, which was 12% for Quinnipiac, cleared for very similar rates but the fixed maximum penalty rates carried significantly more risk for the issuer without any additional commensurate return.

11.    JPM promoted the ARS structure to issuers like Quinnipiac as a means to borrow money long-term for capital projects at short-term interest rates. Respondent described the combination of ARS with a swap, like the 2007 issuance, as a way to save interest costs and lock in a fixed rate.    Similarly, JPM also promoted ARS to investors interested in short-term investments (for example, to manage cash balances) as a money-market substitute that generally offered a slightly higher interest rate than a money-market fund. Underwriters preferred ARS to other variable-rate instruments because ARS generated larger fees for broker-dealers (e.g., ARS remarketing fees were typically 25 basis points, compared to 7 basis points for variable-rate demand obligations ("VRDO")) and because ARS did not require a liquidity facility or letter of credit and therefore did not use up bank capital.

## B.    Unbeknownst to Most Market Participants, Broker-Dealers like JPM Propped-Up Auctions for ARS which Impacted Auction Results

12.    The ARS market had historically appeared to function as promoted because broker-dealers like JPM placed support bids in a significant majority, if not all, of the ARS auctions for which they were the lead underwriter. The support bids also materially impacted the ARS rate results which undermine the use of the correlation coefficient between the variable leg

5

of the swap and the ARS. This information was material when was making the decision to issue ARS and use a swap to create a synthetic fixed rate. At all times, JPM was aware the risks of the synthetic fixed rate structures were much higher than it relayed.

     13.     The broker-dealers' support bidding thereby created the artificial appearance of a highly liquid and efficient market with close correlations to the variable leg of the swap enabling JPM to market its ARS capital-raising structure to issuers like Quinnipiac and to market the securities themselves to institutional and retail investors as sound financial investments. For underwriters and broker-dealers, the apparent zero percent failure rate in ARS auctions was a critical means by which to create and foster trust in the ARS market. In truth, the probability of an ARS auction failing and the risk of the product not fulfilling the issuer's objectives was much higher than Respondent relayed. This risk was of critical importance because if ARS investors were aware that there was a chance that they would be unable to quickly liquidate their ARS positions and would be stuck holding long-term variable-rate bonds, these traditional ARS investors would quickly abandon the product.

     14.     JPM touted that ARS and the variable leg of the swap, which are designed to cancel each other out leaving the agreed upon fixed-rate as Quinnipiac's liability on the issuance, were historically highly correlated or mirrored each other. In reality, JPM was aware that the correlation was a fiction driven by its artificial support bids. In addition to failing to disclose the true nature of the auctions and its role in the auctions, JPM failed to disclose the material conflicts of interest it experienced in its dual role of underwriting the securities, selling them to customers, and buying for it own accounts."

     15.     JPM will point to boilerplate "disclosures" within the issuance documents claiming that Quinnipiac was informed about the risks. JPM, however, was aware of specific

6

risks associated with ARS that had dramatically increased throughout 2007 that it failed to relay to Quinnipiac. "[N]o protection" is afforded "to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." In re Worldcom, 294 F.Supp. 2d 392, at 427 (citing In re Prudential Sec. Inc. Ltd. Partnerships Litig., 930 F.Supp. 68, 72 (S.D.N.Y.1996)). Even specific risk disclosures are misleading if the risks are significantly greater or more certain than those portrayed in the prospectus. See In re Apple Computer Securities Litigation, 886 F.2d 1109, 1115 (9th Cir.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990) ("There is a difference between knowing that any product in development may run into a few snags and knowing that a particular product has already developed problems....")." In re Prudential Securities Inc. Ltd. Partnerships Litigation 930 F.Supp. 68, 72 -73 (S.D.N.Y.,1996). JPM was aware that the risks associated with ARS had risen dramatically through 2007, was discussing the risks internally, but failed to disclose these risks to Quinnipiac.

## C. ARS Issuers' Troubles Were Compounded by Derivatives like Interest-Rate Swaps

16. In a typical floating-to-fixed swap, an ARS issuer agrees to make fixed-rate payments to a counterparty (often an affiliate of the underwriter) in exchange for a floating-rate payment from the counterparty. The floating-rate payment is typically based on an index, such as BMA/SIFMA or a percentage of LIBOR, which would be expected to track ARS interest rates such that the floating-rate payment and the payment on the ARS would cancel each other out. When the ARS and the interest-rate swap are combined, the ARS issuers' ultimate interest rate-related obligations would be expected to be the fixed-rate payments on the swap and the administrative costs of the ARS. This structure is referred to as a "synthetic fixed-rate." The purported benefit of this synthetic fixed-rate structure is that it produces fixed-rate payment

7

obligations, allowing for easier budgeting and predictability of an issuer's future interest obligations at reduced rates.

17.     One significant feature of interest-rate swaps is that, upon early termination, one party to the swap will owe the other a termination payment. The termination payment obligation is generally fixed based upon the present value of the parties' expected future payments under the swap (along with some additional considerations outlined in the particular swap contract). For a floating-to-fixed swap, the present value of the expected future interest payments fluctuates constantly based upon interest rate projections.

18.     For the synthetic fixed rate product to perform as promised, the auctions and the floating leg of the swap had to be highly correlated or cancel each other out. The derivative structure initially appeared to function as Respondent represented. Respondent was aware however, that the "highly correlated" floating leg of the swap and the auction results were artificially manufactured to look and act alike. The correlation coefficient, a widely used calculation to gauge when specific indices or investments move up and/or down in tandem, was driven by the artificial support bids. Because Respondent stopped supporting the ARS market without warning, ARS no longer generated short-term interest rates that matched the variable payments made by swap counterparties. ARS issuers had to pay more to the bondholders than they received from the swap counterparty. The interest obligations of an ARS issuer with a synthetic fixed-rate issuance began to increase as well as fluctuate wildly.

## JPM PROVIDED ADVICE AND RECOMMENDATIONS
## TO QUINNIPIAC UNIVERSITY

19.     On December 20, 2007, Quinnipiac issued ARS to repay previous bonds. JPM had a longstanding relationship with Quinnipiac as part of the Financial Team and as lead

8

underwriter. JPM worked closely with Quinnipiac and the rest of the financial team to structure the 2007 bond issuance. JPM approached Quinnipiac about refunding prior issuances with ARS in order to reduce the costs.

20.     JPM through its representatives actively took a lead position in structuring and implementing Quinnipiac's 2007 financing.  JPM ultimately advised Quinnipiac on what they regarded as the appropriate capital-generation structure for Quinnipiac's' bonds; acted as Quinnipiac's agents in dealing with the rating agencies; assisted with ARS-related discussions with bond insurers on Quinnipiac's behalf; bought the instant ARS bonds from Quinnipiac and resold them; sold related interest rate swaps to Quinnipiac that supposedly supported the ARS structure; and performed various other tasks as Quinnipiac 's advisors, agents, and fiduciaries.

21.     In the course of structuring the bonds to refund, JPM's representatives had regular telephone conferences and in-person meetings with Quinnipiac's representatives. During this structuring period, JPM's representatives continually provided advise and made recommendations to Quinnipiac and its representatives regarding ARS the synthetic fixed rate structure on the 2007 issuance. Quinnipiac and other members of the Finance Team had questions about ARS, the risks, and the market conditions surrounding ARS in late 2007. JPM reassured other members of the Finance Team and Quinnipiac that the costs savings of ARS in late 2007 outweighed the risks.

22.     In structuring Quinnipiac's 2007 bonds, JPM recommended that Quinnipiac issue \$116,350,000 [3] as auction rate securities coupled with a synthetic fixed rate for a significant portion of the ARS.  JPM represented that ARS would generate considerable interest savings as compared to the existing structures. Although the cost savings rewards were highlighted, the specific risks known to JPM were not disclosed. Instead, JPM will rely on general boilerplate

---

[3] Quinnipiac issued additional bonds in December of 2007 that were not ARS.

risk disclosures when it was well aware of problems in the ARS markets at the time of this issuance.

23.   Relying on representations and recommendations by JPM's representatives about the benefits and cost savings of the synthetic fixed rate with ARS, Quinnipiac decided to issue $116,350,000 in the form of ARS.

## A. The Synthetic Fixed-Rate Structure Recommended by JPM

24.   Quinnipiac, at JPM's recommendation, used a floating-to-fixed rate swap, which attempted to create a "synthetic fixed-rate" structure for a significant portion of the 2007 ARS issuance. JPM represented that Quinnipiac could achieve a fixed debt obligation equal to the fixed rate on the swap plus the administrative costs of the bonds because the swap counterparties' floating rate payments and the bond payments would be expected to offset.

25.   The swaps' fixed leg was 3.3945% and 3.22%, which Quinnipiac was responsible for paying to the swap counterparty. The variable leg was 63.9% and 64.05% of 5 Year LIBOR ("LIBOR"), which is the amount Quinnipiac received from the swap counterparty. Of course, Quinnipiac was also responsible for paying the ARS bond holders the ARS clearing rate. In total, Quinnipiac was responsible for paying the ARS clearing rate to the bond holders and the fixed rate of the swap minus the LIBOR income it received from the counterparty.

26.   The ARS clearing rate, however, was supposed to almost exactly match the LIBOR income Quinnipiac received from the counterparty leaving it with the fixed payment obligation to the counterparty as its net obligation. If Quinnipiac terminated the swap early or was forced to restructure, it would owe the counterparty a fee based on prevailing interest rates or have to continue paying the terms of the swap.

27.     The Quinnipiac swap would only function as represented if JPM continued manipulating the ARS rates by placing support bids. The entire time JPM was providing advice on the structure it knew the correlation on the floating leg of the swap and the auction results was artificially created because of the material amount of support bids which impacted the rates of the auctions.  JPM knew and did not disclose that there were significant latent risks with this structure. For example, fluctuations in the mark to market value of the swap were likely to be high if the changes in swap rates were not highly correlated with long term municipal bond yields – which they were not. Instead of disclosing the complex risks of the synthetic fixed-rate structure, JPM highlighted the "cost saving rewards". When Quinnipiac finalized its bond issuance under the structure recommended by JPM it was locked into payments to the counterparty for many years.

## B.  JPM Omitted Material Information About Their Support Bidding Practices and the Impact of the Role of the Swap.

28.     JPM did not disclose it had a practice of placing bids to prevent failures in a material amount of auctions for which they were lead underwriters or that without these support bids auctions would fail, the ARS market would collapse, lower interest costs would surely not be realized, and the correlation of the swap was manipulated.  Respondent was well aware that there was not enough organic demand to support the auctions and that its support bids were a vital to a functioning market. Had Quinnipiac known that it would be wholly-dependent on JPM's continued support bidding practice for the ARS market to function and the swap to work as represented, Quinnipiac would never have taken the significant risk for less than 1% savings.  Instead, Quinnipiac would have issued its bonds in an alternate structure or left the structures as they were.   JPM's failure to inform Quinnipiac about the impact of its auction practices on the rates and the swap are a violation of JPM's obligations under federal and state securities laws, MSRB and FINRA rules, as well as its duties as Quinnipiac's underwriter and fiduciary under state and common law.

11

29.     By failing to disclose the risks of the synthetic fixed-rate ARS structure and by masking those risks through manipulative bidding practices, JPM violated its obligations under MSRB and FINRA rules. For example, MSRB rule G-17 requires the issuer be treated fairly "*in light of the relationship of reliance that exists between the issuer and the underwriter.*" (MSRB G-17 Interpretive Letter, December 1, 2007 Reminding Members of Their Obligations (emphasis added)). JPM knew that due to the lack of transparency in the ARS markets, Quinnipiac was particularly dependent on JPM to provide it accurate information about the state of the ARS market. JPM's bidding practices, and the impact of the synthetic fixed-rate structure. However, JPM never provided accurate information to Quinnipiac. Even Quinnipiac's Financial Advisor would not have been privy to the magnitude of support bidding that was required for the markets to function and the impact the support bids had on the ARS rates.

## C.     Interest Rates for ARS Spiked When JPM Ceased Entering Cover Bids

30.     On or about February 12, 2008, JPM decided to stop submitting support bids for almost all of its lead broker-dealer auctions in the municipal ARS market. Other broker-dealers also ceased support for the market. Quinnipiac's ARS began to clear over 10% when the SIFMA variable rate hovered around 2% and fixed rates were approximately 4%- 5%. The variable components of the synthetic fixed rate structure, ARS and LIBOR, were supposed to cancel each other out in the swap but the de-coupling of the two variable rates created significant liability for Quinnipiac. Quinnipiac was not aware that the historical correlation was created through manipulated auction resets.

31.     JPM never disclosed to Quinnipiac that the significant majority of the auctions required JPM's artificial support bids to cover for the lack of investor demand. Instead, while knowing full-well that the auctions would not survive without its artificial support bids and the

12

draconian impact withdrawal of auction support would have on issuers like Quinnipiac. JPM included in its boilerplate disclosures that it may bid on the auctions for its own accounts or to prevent an auction from failing. This "disclosure" in no way described the significant risk of the synthetic fixed structure from decoupling and causing millions in losses for Quinnipiac. Importantly, historical savings of ARS compared to VRDO or traditional fixed rates was approximately .20% - .70%, hardly enough to take the significant risks that JPM will argue were disclosed. FINRA, the MSRB and the SEC each require that their members such as JPM provide clients "balanced" advice that gives equal treatment to both rewards and risks. JPM failed to warn of the risks that Quinnipiac incurred to save less than 1% percent in the synthetic fixed-rate structure with ARS and continued to cover up its knowledge of the latent risks after the February 2008 auction failures.

32.     Quinnipiac through this arbitration seeks to recover the damages it has suffered as a result of JPM's serial breaches of its duties as Quinnipiac's advisors under MSRB and FINRA rules, as well as damages incurred as a result of JPM's omission of material information during the underwriting of Quinnipiac's bonds and its omissions and misrepresentations after Respondent ceased supporting the auctions. Quinnipiac seeks to recover, among other costs, its excess interest payments, refinancing costs, swap payments, unfavorable terms of swap restructures, and additional interest payments on the refinancing. In addition, Quinnipiac restructured the 2007 ARS into traditional fixed rates in April of 2008 causing additional damages.

## CAUSES OF ACTION

## COUNT ONE
### BREACH OF FIDUCIARY DUTY

Quinnipiac adopts and incorporates by reference each and every preceding paragraph as if fully set forth herein.

33. Quinnipiac trusted and relied upon Respondent to provide complete and accurate advice and recommendations. As part of the finance team, JPM owed Quinnipiac a fiduciary duty to exercise the utmost good faith and loyalty. *See Gochnauer v. A.G. Edwards & Sons, Inc.,* 810 F.2d 1042, 1049 (11th Cir. 1987); *Gouger v. Bear Stearns & Co., Inc.,* 823 F. Supp. 282, 286 (E.D.Pa.1993) *See also* RESTATEMENT (2d) of Agency § 425 (agents employed to make, manage, or advise on investments have fiduciary obligation); *Ward v. Atlantic Security,* 777 So.2d 1144 (Fla. 3d DCA 2001).

34. As a fiduciary, JPM owed Quinnipiac a duty to: (1) **provide full, candid, and truthful communication to [Quinnipiac] of all known facts; (2) refrain from making any misstatement, misrepresentation, or omission concerning any matter; (3) always place [Quinnipiac's] welfare and best interests above his own and refrain from self-dealing;** (4) transact business only after receiving approval from the customer; and, (5) recommend an investment only after studying it sufficiently. *Gochnauer,* 810 F.2d at 1049.

35. According to the SEC, securities brokers have a fiduciary obligation to their customers under both the common law rules of agency and the rules of the NASD (now FINRA) and NYSE. *See, In re E.F. Hutton & Co. Inc.,* Exchange Act Release No. 25,887 [1988-89 Transfer Binder] Fed. Sec. L.Rep. (CCH) ¶ 84,303 (July 6, 1988) ("The concept of just and equitable principles of trade embodies basic fiduciary responsibilities....").

36. At the most basic level, as stated by the United States Supreme Court, a securities

professional such as a financial advisor "owes a duty of honesty and fair dealing toward his clients." *Bateman Eichler Hill Richards, Inc. v. Berner*, 472 U.S. 299, 314 (1985). A fiduciary owes duties not only of utmost good faith and honesty but also that of competence.[4] The fiduciary duty of competence requires more than ordinary care – the financial advisor is judged against the standard of prudence and care expected of a financial professional. As stated in Professor Norman Poser's influential treatise *Broker-Dealer Law & Regulation*:

> Since the fiduciary duties of a [financial advisor] include the duty to use the skill and diligence necessary to protect his customer's interests, negligent conduct may be a breach of fiduciary duty. In this regard, it is normally not sufficient for a [financial advisor] to exercise ordinary care and judgment in discharging his duties, he must employ such care, skill, prudence, diligence and judgment as might reasonably be expected of persons skilled in his calling. If his customer's money is lost because the [financial advisor] undertakes his duties without possessing the requisite skills, or because of his negligence, the [financial advisor] is liable for the loss.

§ 16.03[A][1] (4th ed. 2007).

37.     Respondent breached its duties as a fiduciary when it failed to provide complete, candid, accurate, and objective advice. Respondent also failed to disclose significant conflicts of interest. These breaches were the direct and proximate result of Quinnipiac losses.

**WHEREFORE, PREMISES CONSIDERED**, Quinnipiac demands judgment against Respondent for compensatory damages in an amount exceeding $20,000,000 and punitive damages in the amount to be determined from the evidence accumulated during discovery, plus interest, costs, attorneys' fees and such other damages the Panel deems appropriate.

---

[4] *Davis v. Merrill Lynch*, 906 F.2d 1206, 1215 (8th Cir. 1990); *Johnson*, 217 S.W. 3d at 428-429. Both negligent conduct and intentional wrongs by a fiduciary give rise to liability. *Thropp v. Bache Halsey*, 650 F.2d 817, 820 (6th Cir. 1981); *Baker v. Wheat First Sec.*, 643 F. Supp. 1420, 1430-31 (D.W. Va. 1986).

## COUNT TWO
## VIOLATION OF FINRA RULES, BREACH OF CONTRACT AND NEGLIGENCE

Quinnipiac adopts and incorporates by reference each and every preceding paragraph as if fully set forth herein.

38.     At all times relevant to this case, Respondent was a member of FINRA and as such was required to abide by its rules including those required for the protection of customers such as Quinnipiac The rules of the self-regulatory organizations such as FINRA "set out general standards of industry conduct" and are evidence of the standard of care by which brokers must abide in dealing with their clients. *In re E.F. Hutton & Co. Inc., Exchange Act Release No. 25,887* [1988-89 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 84,303 (July 6, 1988). See also *Miley v. Oppenheimer & Co. Inc.,* 637 F. 2d 318, 333 (5th Cir. Unit A, 1981) (industry rules are "excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account"); *Lange v. Hentz & Co.,* 418 F. Supp. 1376, 1383-84 (N.D. Tex. 1976) (violations of industry rules and practices give rise to common law claim for negligence).

39.     Respondent, as a member of FINRA, is subject to the Conduct Rules of FINRA and MSRB. Accordingly, JPM was obligated to provide services to Quinnipiac in conformity with those rules. Respondent failed to abide by industry rules, including the following:

a.  MSRB Rule G-17
b.  FINRA Conduct Rule 2120 (prohibition of the use of any manipulative, deceptive or other fraudulent device or contrivance);
c.  FINRA Conduct Rule 2110 (members shall observe high standards of commercial honor and just and equitable principles of trade);
d.  FINRA Conduct Rule 2210 (written and oral sales materials for products must present a fair and balanced picture of both benefits and risks); and
e.  FINRA Conduct Rule 3010 (duty to supervise registered representatives and accounts).

40.     The conduct described herein constitutes a breach of FINRA rules, breach of contract, and negligence.

16

**WHEREFORE, PREMISES CONSIDERED**, Quinnipiac demands judgment against Respondent for compensatory damages in an amount exceeding $20,000,000 and punitive damages in the amount to be determined from the evidence accumulated during discovery, plus interest, costs, attorneys' fees and such other damages the panel deems appropriate.

## COUNT THREE
## NEGLIGENT SUPERVISION

Quinnipiac adopts and incorporates by reference each and every preceding paragraph as if fully set forth herein.

41.     Securities laws impose a duty upon Respondent to properly and reasonably supervise its employees who provided advice to Quinnipiac according to the general and statutory standard of care.

42.     Respondent by virtue of its superior knowledge, judgment, and skill in the financial markets owed Quinnipiac a duty to properly and reasonably supervise its employee advisors. Respondent failed in this regard.

43.     Quinnipiac suffered damages as a result of Respondent's failure to supervise its employees.

44.     Quinnipiac's damages were a direct and proximate result of the Respondent's negligent supervision.

**WHEREFORE, PREMISES CONSIDERED**, Quinnipiac demands judgment against Respondent for compensatory damages in an amount exceeding $20,000,000 and punitive damages in the amount to be determined from the evidence accumulated during discovery, plus interest, costs, attorneys' fees and such other damages the panel deems appropriate.

17

## COUNT FOUR
## FRAUD

Quinnipiac adopts and incorporates by reference each and every preceding paragraph as if fully set forth herein.

45.     Respondent intentionally and/or recklessly misrepresented material facts and/or omitted material facts to Quinnipiac that it had a duty to disclose.

46.     Quinnipiac relied on Respondent's misrepresentations and/or omissions when it made the decision to issue the ARS and the swap.

47.     As a result of Respondent's misrepresentations and/or omissions, Quinnipiac has suffered significant damages.

48.     The damages are a direct and proximate result of Respondent's misrepresentations and omissions.

**WHEREFORE, PREMISES CONSIDERED,** Quinnipiac demands judgment against Respondent for compensatory damages in an amount exceeding $20,000,000 and punitive damages in the amount to be determined from the evidence accumulated during discovery, plus interest, costs, attorneys' fees and such other damages the panel deems appropriate.

## COUNT FIVE
## NEGLIGENT MISREPRESENTATION

Quinnipiac adopts and incorporates by reference each and every preceding paragraph as if fully set forth herein.

49.     Respondent negligently misrepresented material facts and/or omitted material facts to Quinnipiac regarding risks of the ARS and the synthetic fixed structure. Quinnipiac relied to its detriment on Respondent's negligent misrepresentations and/or omissions. As a

18

result of Respondent's misrepresentations and/or omissions, Quinnipiac has suffered significant damages.

**WHEREFORE, PREMISES CONSIDERED,** Quinnipiac demands judgment against Respondent for compensatory damages in an amount exceeding $20,000,000 and punitive damages in the amount to be determined from the evidence accumulated during discovery, plus interest, costs, attorneys' fees and such other damages the panel deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Quinnipiac prays that this Statement of Claim be deemed good and sufficient, and that after due proceedings had, there be an award in its favor of:

a.  Actual damages in excess of $20,000,000;

b.  Compensatory damages;

c.  Punitive damages;

d.  Consequential damages;

e.  Restitution and disgorgement of all fees and costs associated with issuing the ARS, the swap, conducting the auctions, and any and all other associated fees and costs;

f.  The costs of prosecuting this action, together with interest, including pre- and post-judgment interest;

g.  Reasonable attorneys' fees in connection with the prosecution of this case; and

h.  All other appropriate legal or equitable relief deemed appropriate.

Date: December 3, 2013                    Respectfully submitted,


By: /s/ Peter J. Mougey
Peter J. Mougey, Esq.
Page Poerschke, Esq.
James Kauffman, Esq.
Laura Dunning, Esq.
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Telephone: (850) 435-7068
Facsimile: (850) 436-6068

Joseph C. Peiffer, Esq.
PEIFFER, ROSCA, ABDULLAH, & CARR, P.A.
201 St. Charles Ave., 46th Floor
New Orleans, LA 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250

Peter C. Schneider
SCHNEIDER, WALLACE, COTTRELL,
KONECKY, LLP
3700 Buffalo Speedway, Suite 1100
Houston, Texas 77098
Telephone: (713) 338-2560
Facsimile: (866) 505-8036

Alan Konigsberg
LEVY PHILLIPS & KONIGSBERG, LLC
800 Third Avenue, 11th Floor
New York, New York 10022
Telephone: (212) 605-6200

*Attorneys for Claimant*

# EXHIBIT 2

2013 WL 6409348
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

GOLDMAN, SACHS & CO., Plaintiff,

v.

NORTH CAROLINA MUNICIPAL POWER
AGENCY NUMBER ONE, Defendant.

No. 13 Civ. 1319(PAC). | Dec. 9, 2013.

**Opinion**

### OPINION AND ORDER

PAUL A. CROTTY, District Judge.

**\*1** This case involves a dispute over what forum is appropriate to resolve an underlying dispute concerning the issuance by Defendant North Carolina Municipal Power Agency Number One ("NCMPAI") of $149.7 million in auction rate securities ("ARS") in which Goldman, Sachs & Co. ("Goldman") acted as the underwriter and broker-dealer for the issuance. Goldman argues that this Court has exclusive jurisdiction under an applicable forum selection clause; NCMPAI argues that arbitration before the Financial Industry Regulatory Authority ("FINRA") is the appropriate forum to settle the parties' dispute. On December 12, 2012, NCMPAI initiated an arbitration in North Carolina against Goldman before FINRA to settle disputes arising from the issuance. On February 27, 2013, Goldman filed a complaint against NCMPAI in this Court seeking a declaration that the FINRA arbitration was an inappropriate forum for the dispute and an enjoinment of the arbitration. Before this Court is Goldman's motion for a preliminary injunction and NCMPAI's motion to dismiss the complaint or, alternatively, to transfer for improper venue.

Very similar issues, indeed identical issues, were recently litigated before U.S. District Judge Richard J. Sullivan (*Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.,* 922 F.Supp.2d 435, 440–41 (S.D.N.Y.2013)) and U.S. District Judge Jesse Furman (*Citigroup Global Mkts., Inc. v. N.C. E. Mun. Power Agency,* No. 13 CV 1703 (S.D.N.Y. May 3, 2013), Dkt. No. 30). Both judges enjoined the FINRA arbitrations and held that under the Forum Selection Clause in the broker-dealer agreements, this Court had exclusive

jurisdiction over any dispute. The Court agrees with their analysis and reasoning; and applies them here. Accordingly, the Court GRANTS Goldman's motion for a preliminary injunction; and DENIES NCMPAI's motion to dismiss the complaint or, alternatively, to transfer the case to the Eastern District of North Carolina.

### BACKGROUND

On April 11, 2003, NCMPAI issued $149.7 million in ARS in order to raise funds to refinance existing debt. ARS are "long-term bonds and stocks whose interest rates or dividend yields are periodically reset through auction." *Ashland Inc. v. Morgan Stanley & Co.,* 652 F.3d 333, 335 (2d Cir.2011). The concept is to finance long term debt at short term rates. At each periodic auction, ARS investors submit bids for the number of ARS they wish to purchase, hold, or sell at an auction and the lowest rate they will accept. *Id.* If the buy/hold orders meet or exceed sell orders, then the auction succeeds. *Id.* Alternatively, if the supply exceeds demand, the auction fails and "the issuer is forced to pay a higher rate of interest in order to penalize it and to increase investor demand.' " *Id.* The concept appeared to work well until the recession began in 2007–2008.

NCMPAI selected Goldman as the sole underwriter and broker-dealer for the ARS. Compl. ¶ 14. Goldman and NCMPAI signed an underwriter agreement (the "Underwriter Agreement") describing Goldman's duties to purchase NCMPAI's ARS and to distribute them to interested investors as bona fide securities. Compl. ¶ 14; *see id.,* Ex. 5. The Underwriter Agreement did not contain an arbitration clause and provided that North Carolina law govern its validity, interpretation, and performance. Comp. ¶ 17; *see id.,* Ex. 5, at 19. Contemporaneously, the parties also signed a broker-dealer agreement (the "Broker–Dealer Agreement") setting forth Goldman's duties regarding management of the auctions and oversight of the bidding process. Compl. ¶ 15; *see id.,* Ex. 3. The Broker–Dealer Agreement provided that New York law would govern, waived jury trial, and specified the following forum selection clause ("Forum Selection Clause"):

> **\*2** The parties agree that all actions and proceedings arising out of this Broker–Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States

District Court in the County of New York and that, in connection with any such action or proceeding, submit to the jurisdiction of, and venue in, such court.

Compl. ¶ 16; *id.,* Ex. 3, at 14. The Broker–Dealer Agreement also contained a merger clause (the "Merger Clause") providing as follows:

This Broker–Dealer Agreement, and the other agreements and instruments executed and delivered in connection with the issuance of the [ ]ARS, contain the entire agreement between the parties relating to the subject matter hereof, and there are no other representations, endorsements, promises, agreements or understandings ... between the parties relating to the subject matter hereof.

Compl. ¶ 19; *id.,* Ex. 3, at 13.

The market for ARS collapsed in the recession that started in 2007–2008. *See UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.,* 660 F.3d 643, 646 (2d Cir.2011). On December 21, 2012, NCMPAI instituted a FINRA arbitration in Raleigh, North Carolina against Goldman by filing a Statement of Claim ("SOC"), pursuant to FINRA Rule 12200. Compl. ¶ 20; *see id.,* Ex. 2. FINRA Rule 12200 requires that FINRA members arbitrate a dispute when a customer requests arbitration and the dispute arose in connection with the business activities of a FINRA member. In its SOC, NCMPAI alleged that Goldman created the artificial appearance of an efficient market for ARS by placing its own bids in every auction in which it was lead broker-dealer. Compl. ¶ 21–23; *see id.,* Ex. 2. Further, NCMAPI claims that Goldman did not disclose its full use of these bids, known as "cover bids," and therefore made material misrepresentations and/or omissions. Compl. ¶¶ 21–23; *see id.,* Ex. 2. On February 27, 2013, Goldman filed a complaint in this Court seeking declaratory relief and an injunction against the FINRA Arbitration.

On April 26, 2013, NCMPAI moved to dismiss Goldman's complaint or, alternatively, to transfer the case to the U.S. District Court for the Eastern District of North Carolina pursuant to *Federal Rule of Civil Procedure 12(b)(3).*[1] NCMPAI argues that this Court lacks the authority to enjoin an

arbitration pending in a different district. On the same day, Goldman moved for an order preliminarily enjoining NCMPAI from pursuing its claims against Goldman in the FINRA arbitration.[2] Goldman alleges that the parties agreed to bring all disputes relating to the ARS issuance to this Court pursuant to the Forum Selection Clause in the Broker–Dealer Agreement.

## *DISCUSSION*

### I. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must establish: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir.2010). The moving party carries the burden of persuasion to demonstrate "by a clear showing" that the necessary elements are satisfied. *See Sussman v. Crawford,* 488 F.3d 136, 139–40 (2d Cir.2007) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)) (emphasis omitted).

**\*3** Whether Goldman is likely to succeed on the merits depends, in part, on the outcome of NCMPAI's *Rule 12(b)(3)* motion. On a motion to dismiss for improper venue under *Rule 12(b)(3),* "the plaintiff bears the burden of establishing that venue is proper." *French Transit, Ltd. v. Modern Coupon Sys., Inc.,* 858 F.Supp. 22, 25 (S.D.N.Y.1994); *see also Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 355 (2d Cir.2005). "The court must take all allegations in the complaint as true, unless contradicted by the defendants' affidavits." *McKeown v. Port Authority of N.Y. and N.J.,* 162 F.Supp.2d 173, 183 (S.D.N.Y.2001).

### II. Analysis

#### A. Likelihood of Success on the Merit s

#### 1. This Court Has the Authority to Enjoin an Arbitration in Other District Courts

It is well established that a "federal court sitting as a court of equity having personal jurisdiction over a party has power to enjoin him from committing acts elsewhere." *NML Capital,*

*Ltd. v. Republic of Argentina,* 699 F.3d 246, 263 (2d Cir.2012) (internal quotations omitted); *see Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633, 647 (2d Cir.1956). Only "the clearest command from Congress" may strip a district court of this power. *Califano v. Yamasaki,* 442 U.S. 682, 705 (1979). NCMPAI claims that this Court lacks the authority to enjoin the FINRA Arbitration pursuant to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 *et seq. See* Def.'s Mot. to Dismiss at 7–13. The FAA, however, is silent on a court's authority to enjoin arbitrations.

Instead, NCMPAI asks this Court to convert the FAA's provision for a court's power to compel arbitration to a court's power to stay arbitration. Section 4 of the FAA provides that an aggrieved party "*may* petition any United States district court" with subject-matter jurisdiction over the action for an order compelling arbitration pursuant to the terms of an arbitration agreement. *See* 9 U.S.C. § 4 (emphasis added). The text continues and provides that the "hearing and proceedings, under such [arbitration] agreement, *shall* be within the district in which the petition for an order directing such arbitration is filed." *See id.* (emphasis added). Despite the conflicting language in the statute, NCMPAI urges that a district court may only compel arbitration within its own district under § 4. *See* Def.'s Mot. to Dismiss at 9–10. Since a motion to enjoin arbitration "is simply the inverse of the motion to compel under § 4 of the FAA," the argument runs, a court may only stay an arbitration occurring within its own district. *See id.* at 10–14. NCMPAI cites numerous cases, but none are binding on this Court. *Id.* Rather, this Court agrees with Judge Furman's rejection of this argument. *See* Transcript of Oral Argument at 56:24–59:14, *Citigroup Global Mkts., Inc.,* No. 13 CV 1703, Dkt. No. 30.

Section 4 of the FAA does not inhibit or prevent a district court from enjoining an arbitration pending in another district. Prior to the FAA's enactment, a civil suit could generally be brought only in the district in which the defendant resided. *See Cortez Byrcl Chips, Inc. v. Bill Harbert Const. Co.,* 529 U.S. 193, 199 (2000). The FAA's venue provisions were intended to have a "liberalizing effect" by both expanding the choice of venue; and providing for the enforcement of forum selection agreements. *Id.* at 199–200. Section 4 embodies both of these policies by providing permissive venue rules, 9 U.S.C. § 4 (stating that a party "may petition any United States district court"), restricted by the parties' contractual choice of forum, *id.* (requiring that the "hearing and proceedings, under [an arbitration] agreement, ... be within the district in which the petition for an order directing such arbitration is filed").

Read together, Section 4 provides that any district court with jurisdiction may compel arbitration, unless the parties have agreed otherwise. *See Maronian v. Am. Commc'ns Network, Inc.,* No. 07–CV–6314, 2008 WL 141753, at *4 (W.D.N.Y. Jan. 14, 2008). When a plaintiff seeks to enjoin arbitration, however, that party is contesting the very existence of an arbitration agreement, including any contractual choice of forum. Since Section 4's restrictions do not apply if the parties did not agree to arbitrate in a specific forum, a party seeking to enjoin arbitration is only subject to Section 4's permissive venue rules.

**\*4** NCMPAI argues that the venue standard for motions to compel arbitration must apply to motions to enjoin because "it is inconceivable that Congress intended the rule to differ depending upon which party to the arbitration agreement first invokes the assistance of a federal court." *See* Def.'s Mot. to Dismiss at 11–12 (internal quotations omitted). But the two motions are fundamentally different. Unlike a motion to compel, a motion to enjoin arbitration questions the very validity of an arbitration agreement and therefore implicates the central concern of arbitration-whether a party is being forced to arbitrate a dispute when that party has not consented to arbitration. *See In re Am. Express Fin. Advisors Secs. Litig.,* 672 F.3d 113 (2d Cir.2011) (("As is clear from the Supreme Court's and this Circuit's cases, arbitration under the FAA is a matter of consent, not coercion." (internal quotations omitted)); *see also Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83 (2002) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."). Here, NCMPAI claims that only the Eastern District of North Carolina can enjoin the FINRA Arbitration, Yet NCMPAI agreed to bring "all actions and proceedings arising out of [the] Broker–Dealer Agreement" in this Court. *See* Compl. ¶¶ 15–16. Goldman cannot be expected to bring its claims in a venue dictated by FINRA Rule 12200 when it asserts that this rule has no bearing on its claims.

NCMPAI cites to *In re American Express Financial Advisors Securities Litigation,* 672 F.3d 113 (2d Cir.2011), holding that district courts may enjoin an arbitration when a valid and binding agreement to arbitrate is absent. *Id.* at 141, NCMPAI claims that the court's use of the phrase "within its jurisdiction" prohibits a court from enjoining arbitrations outside of its own district. *See* Def.'s Mot. to Dismiss at 10 (quoting *In re Am. Express,* 672 F.3d at 141). Yet nothing in the decision limits a district court's authority. It is equally likely that the term "jurisdiction" related to personal

jurisdiction, which, if absent, prevents a court from enjoining a defendant's conduct in other districts. *See* Transcript of Oral Argument at 57:15–58:4, *Citigroup Global Mkts., Inc.,* No. 13 CV 1703, ECF No. 30; *cf. Califano,* 442 U.S. at 705 ("Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have [personal] jurisdiction."). Furthermore, the Second Circuit neither relied on § 4 directly nor suggested that it limits a court's ability to stay arbitration. Instead, the court merely confirmed that a court may stay arbitration without violating the FAA.

NCMPAI also claims that application of the same standard for motions to compel arbitration and to enjoin it is necessary to promote three policy goals. First, according to NCMPAI, restricting injunctions to the district in which the arbitration was brought would "eliminate the expense and delay of extended court proceedings" and "streamline judicial proceedings" prior to arbitration. *See* Def.'s Mot. to Dismiss at 8, 12. This saves no time, however, because, by NCMPAI's own admission, it is only implicated *after* a court has decided that arbitration is proper. Second, NCMPAI argues that its position would prevent forum shopping, the potential for which is "particularly acute where, as here, the substantive law of arbitrability differs in the two districts." *See* Def.'s Mot. to Dismiss at 12–14. But who is forum shopping? NCMPAI's sole purpose in moving for dismissal or transfer is to arbitrate and/or litigate in the presumptively more favorable forum of the Eastern District of North Carolina. In situations like the present case, venue is proper where the arbitration is held or where the parties specified in the forum selection clause. Although this may lead to minimal forum shopping, this policy goal alone does not compel a different result. Third, NCMPAI claims that allowing a district court to enjoin arbitrations outside its district would "encourage duplicative litigation" because a plaintiff could ignore an unfavorable ruling and then force the opposing party to move to compel in the district where arbitration would occur. *Id.* at 13–14. Yet where a party seeks to enjoin an ongoing arbitration, as here, this risk cannot materialize. As a result, NCMPAI's policy concerns must be rejected.

**\*5** Accordingly, this Court holds that FAA § 4 does not limit a district court's ability to enjoin an arbitration outside of its district. Without a "clear[ ] command from Congress" otherwise, *see Califano,* 442 U.S. at 705, this Court may enjoin the FINRA Arbitration, if Goldman establishes that the Forum Selection Clause waived NCMPAI's right to

arbitration and that the present dispute falls within the scope of that clause.

## 2. The Forum Selection Clause in the Broker–Dealer Agreement Superseded the Arbitration Agreement

This Court now considers whether NCMPAI and Goldman waived the right to arbitration under FINRA Rule 12200 by signing the Broker–Dealer Agreement. If an agreement neither "specifically precludes" nor provides "positive assurance" that a dispute is no longer subject to arbitration, then the agreement must be read as maintaining the right to arbitrate. *See Applied Energetics, Inc. v. NewOak Capital Mkts., LLC,* 645 F.3d 522, 525 (2d Cir.2011); *Bank Julius Baer & Co., Ltd. v. Waxfield Ltd.,* 424 F.3d 278, 284 (2d Cir.2005). For example, in *Bank Julius Baer,* the Second Circuit held that a broad agreement to arbitrate was not overridden by a later-executed, non-exclusive forum selection clause because the clause did not mention arbitration and could be read as waiving objection to "jurisdiction" in New York over ancillary proceedings. 424 F.3d at 282. Alternatively, in *Applied Energetics,* the Second Circuit held that the contracting parties specifically precluded arbitration by executing an agreement that "[a]ny dispute" between the parties "shall be adjudicated" in New York, even though the agreement did not explicitly mention arbitration. 645 F.3d at 525.

Here, the Broker–Dealer Agreement provides "positive assurance" that the parties intended to preclude arbitration. The Forum Selection Clause requires that "all actions and proceedings arising out of [the] Broker–Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York." The clause plainly references judicial action by specifying the "United States District Court." *See Applied Energetics, Inc.,* 645 F.3d at 525 (stating that the word "adjudicate" is a "clear and unmistakable reference to judicial action"). Its use of the mandatory language "all actions and proceedings" and "shall" preclude resolution of disputes anywhere other than within this district. *See id.* (holding that the use of "shall" demonstrated that the clause precluded arbitration); *see also Phillips v. Audio Active Ltd.,* 494 F.3d 378, 387–88 (2d Cir.2007) (holding that the forum selection clause was "mandatory" when it used the phrase "are to be brought"). Furthermore, the parties included a merger clause providing that "there are no other representations, endorsements, promises, agreements or understandings ... between the parties relating to the subject matter hereof." *See Applied Energetics,* 645 F.3d at 525–26 & n. 2 (holding

that an identical merger clause displaced a prior arbitration agreement). Read together, the Forum Selection Clause and the Merger Clause demonstrate that the parties intended the Broker–Dealer Agreement to prevail over FINRA Rule 12200.

**\*6** Two of NCMPAI's arguments fail from the start, based on contrary Second Circuit holdings. NCMPAI claims that FINRA Rule 12200 must be construed liberally to effectuate the purposes of the FAA. *See* Def.'s Opp'n to Mot. for Prelim. Inj. at 9. But the presumption in favor of arbitration applies only when there are "doubts concerning the scope of an arbitration clause," not when, as here, there are "disputes concerning whether an agreement to arbitrate has been made." *See Applied Energetics,* 645 F.3d at 526. Next, NCMPAI argues that "the waiver of arbitration must be explicit for this later agreement to revoke an earlier agreement." Def.'s Opp'n to Mot. for Prelim. Inj. at 17–20. Again, NCMPAI misconstrues *Applied Energetics.* There, the court explained that a forum selection clause need not mention arbitration to revoke an earlier arbitration agreement. 645 F.3d at 525. Instead, the clause may simply substantively exclude it. *Golden Empire Schs. Fin. Auth.,* 922 F.Supp.2d at 440–41; *see Applied Energetics,* 645 F.3d at 525.

NCMPAI marshals two arguments in support of its position that arbitration is neither an "action" nor a "proceeding" under the Forum Selection Clause. *See* Def.'s Opp'n to Mot. for Prelim. Inj. at 10–13. NCMPAI first relies on New York State statutes that use the words "actions" and "proceedings" to discuss judicial proceedings. *See* N.Y. C.P.L.R. § 103 (defining civil judicial disputes as "actions" or "proceedings"), N.Y. C.P.L.R. § 304 ("An action is commenced by filing a summons and complaint or summons with notice.... A special proceeding is commenced by filing a petition...."). Yet neither statute limits the terms to judicial actions and the Forum Selection Clause suggests no such limitation. Furthermore, courts commonly refer to arbitrations as "actions" or "proceedings." *See, e.g., Citigroup Global Mkts., Inc.,* 598 F.3d at 32 ("[Defendant] began arbitration proceedings against [plaintiff] before the FINRA pursuant to FINRA Rule 12200."); *Wachovia, N.A. v. VCG Special Opportunities Master Fund, Ltd.,* 888 F.Supp.2d 380, 382 (S.D.N.Y.2012) ("Plaintiffs ... commenced this action against defendant ... to enjoin an arbitration proceeding...."). In fact, NCMPAI's own pleading in the FINRA Arbitration uses these terms, *see, e.g.,* Compl., Ex. 2, at 37 ("NCMPAI prays that ... after due proceedings had, there be an award in its favor ...."), and FINRA rules

do too, *see, e.g.,* FINRA Rule § 12208 ("At any stage of an arbitration proceeding...."). To limit "actions" and "proceedings" to judicial actions would run contrary to the plain and commonly accepted meaning of these terms.

NCMPAI also claims that the Broker–Dealer Agreement's waiver of a trial by jury in any "action or proceeding" provides further support. *See* Def.'s Opp'n to Prelim. Inj. at 10. The Forum Selection Clause states that each party "IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIMS ARISING OUT OF THIS BROKER–DEALER AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY." Compl., Ex. 3, at 14. But this provision immediately follows the statement that "all actions and proceedings ... [must be brought in] the United States District Court in the County of New York." *Id.* Because the term "proceeding" is already limited to proceedings before this Court, there is no inherent tension between the two sentences, as NCMPAI claims. The first sentence simply requires that all actions or proceedings be brought in the Southern District of New York and the second states that no jury trial is available for those proceedings. As a result,

**\*7** NCMPAI's interpretation of the terms "actions" and "proceedings" must be rejected. Nor does this Court's holding create an "unnecessary conflict," as NCMPAI asserts. *See* Def.'s Opp'n to Prelim. Inj. at 20–21. The Forum Selection Clause and FINRA Rule 12200 cannot be read as complementary. Instead, "this case falls within the alternative scenario ..., where contracting parties are free to revoke an earlier agreement to arbitrate by executing a subsequent agreement the terms of which plainly preclude arbitration." *See Applied Energetics, Inc.,* 645 F.3d at 524–25. As a result, this Court holds that the Broker–Dealer Agreement precludes arbitration under FINRA Rule 12200.

### 3. The Present Dispute Falls Within the Scope of the Forum Selection Clause

The Forum Selection Clause in the Broker–Dealer Agreement governs the parties' entire contractual relationship relating to the ARS transaction. Despite NCMPAI's arguments to the contrary, *see* Def .'s Opp'n to Prelim. Inj. at 14, the clause's language supports its application to the present dispute. The Forum Selection Clause controls "all actions and proceedings arising out of [the] Broker–Dealer Agreement or any of the transactions contemplated hereby." Compl., Ex. 3, at 14. NCMPAI asserts that the ARS issuance arose out of the Underwriter Agreement, but that is not so. The Broker–Dealer

Agreement was clearly predicated on the ARS issuance occurring. In fact, the first paragraph of the Agreement's preamble explicitly references the transaction. *See* Compl., Ex. 3 at 1 ("WHEREAS, the Issuer is issuing $149,700,000 in aggregate principal amount of its Catawba Electric Revenue Bonds, Refunding Series 2003C ....") The ARS issuance therefore constitutes a "transaction contemplated" by the Broker–Dealer Agreement and, as such, falls within the scope of the Forum Selection Clause.

NCMPAI's FINRA claims are also tied to the Broker–Dealer Agreement. The claims focus on whether Goldman failed to disclose its use of "cover bids" to support the ARS auctions in its role as broker-dealer. In particular, Goldman purportedly failed to disclose that it "always placed a bid in every auction in which it was lead broker-dealer to prevent auction failure, and that Goldman was aware at all times that if it failed to place a bid for its own account in the auctions it managed, a large number ... of the actions would fail and the market for ARS would collapse." Compl., Ex. 2,149; *see* Def.'s Opp'n to Mot. for Prelim. Inj. at 4. NCMPAI brought its action to recover damages it sustained due to these claimed misrepresentations and omissions, which were made "during the structuring process and during the 5 years that Goldman ... served as [a] broker-dealer[ ] for NCMPAI's bonds." Compl., Ex. 2, ¶ 4. In fact, throughout the SOC, NCMPAI references Goldman's role as a "broker-dealer" and describes Goldman's failure to fulfill its responsibilities as such. *See, e.g.,* SOC ¶ 2 ("For the next five years, Goldman served as broker-dealer for NCMPAI's ARS, earning hundreds of thousands of dollars in periodic broker-dealer fees while continuing to fail to disclose [the use of cover bids.]"). NCMPAI cannot wish away the terms of the Broker–Dealer Agreement when its claims are based on Goldman's actions as a broker-dealer.

**\*8** Any conflict between the governing law provisions in the Broker–Dealer Agreement and the Bond Contract of Purchase is not dispositive on whether the Forum Selection Clause applies to the overall ARS issuance. New York law governs the Broker–Dealer Agreement, *see* Compl., Ex. 3, at 14, while North Carolina law governs the Bond Contract of Purchase, *see* Compl., Ex. 5, at 19. But different governing law can control different pieces of a transaction without creating any conflict. Furthermore, even if the clauses are "irreconcilable," *see* Def.'s Opp'n to Prelim. Inj. at 14–15, a conflict between governing law provisions does not overcome a non-conflicting forum selection clause that, by its terms, encompasses the present dispute.

Accordingly, Goldman has established that the Forum Selection Clause applies to the present dispute. This Court therefore holds that Goldman is likely to succeed on the merits of its action for declaratory and permanent injunctive relief.

**B. Irreparable Harm**

Goldman will suffer irreparable harm absent a preliminary injunction in this case. "As a matter of law, there is irreparable harm when a party is 'compelled to arbitrate ... without having agreed to arbitration' because that party is 'forced to expend time and resources arbitrating an issue that is not arbitrable.' " *NASDAQ OMX Group, Inc. v. UBS Secs. LLC,* No. 13 Civ. 2244, 2013 WL 3942948, at \*12 (S.D.N.Y. June 18, 2013) (quoting *UBS Sec. LLC v. Voegeli,* 684 F.Supp.2d 351, 354 (S.D.N.Y.2010)). NCMPAI does not dispute that Goldman will suffer irreparable harm, *see* Def's Opp'n to Prelim. Inj. at 21–22, and this Court holds that this requirement is satisfied.

**C. Balance of the Equities**

Goldman has also established that the balance of the equities decidedly tips in its favor. "The balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Golden Empire Schs. Financing Auth.,* 922 F.Supp.2d at 444 (quoting *Tradescape.com v. Shivaram,* 77 F.Supp.2d 408, 411 (S.D.N.Y.1999)) (internal quotations omitted). Here, Goldman would be "forced to expend time and resources arbitrating an issue that is not arbitrable." *Merrill Lynch Inv. Managers v. Optibase, Ltd.,* 337 F.3d 125, 129 (2d Cir.2003). On the other hand, NCMPAI argues that a preliminary injunction would frustrate its right to a speedy arbitration of its claims. *See* Def.'s Opp'n to Prelim. Inj. at 21–22. But NCMPAI's argument is based entirely on *UBS v. W. Va. Univ. Hosps., Inc.,* 760 F.Supp.2d 373 (S.D.N.Y.2011), *aff'd in part, vacated in part on other grounds,* 660 F.3d 643 (2d Cir.2011), where the court held that plaintiffs failed to establish a likelihood of success on the merits. *Id.* at 379. Any potential hardship on NCMPAPs right to arbitration is minimal because Goldman will likely demonstrate that NCMPAI is not entitled to arbitration. Furthermore, NCMPAPs four-year delay in bringing its claims suggests that the alleged need for a speedy arbitration process is hollow. *See Goldman Empire,* 922 F.Supp.2d at 444. As a result, the balance of the equities decidedly tips in Goldman's favor.

**D. The Public Interest**

**\*9** NCMPAI argues that an injunction would not be in the public interest because there is a federal policy favoring arbitration. *See* Def.'s Opp'n to Prelim. Inj. at 22. But this presumption only applies when the parties have agreed to arbitration, *see Applied Energetics,* 645 F.3d at 526, and here they did not. Instead, an injunction would favor the public interest because it would enforce the terms of a valid and enforceable contract between the parties.

Goldman has established that it is entitled to a preliminary injunction, *see Winter,* 555 U.S. at 20, and this Court accordingly GRANTS the motion. Since Goldman established a likelihood of success on the merits, NCMPAI's motion to dismiss or, alternatively, to transfer for improper venue is DENIED.

SO ORDERED.

## *CONCLUSION*

Footnotes

1    NCMPAI's Memorandum in Support of Its Motion to Dismiss or, Alternatively, to Transfer for Improper Venue will be referred to as "Def.'s Mot. to Dismiss." Goldman's Memorandum of Law in Opposition to Defendant's Motion to Dismiss or, Alternatively, to Transfer for Improper Venue will be referred to as "Pl.'s Opp'n to Mot. to Dismiss." NCMPAI's Reply Memorandum in Support of Its Motion to Dismiss or, Alternatively, to Transfer for Improper Venue will be referred to as "Def.'s Reply Mot. to Dismiss,"

2    Goldman's Memorandum of Law in Support of Its Motion for a Preliminary Injunction will be referred to as "Pl.'s Mot. for Prelim. Inj." NCMPAI's Memorandum in Opposition to Goldman's Motion for Preliminary Injunction will be referred to as "Def.'s Opp'n to Prelim. Inj." Goldman's Reply Memorandum of Law in Further Support of Its Motion for a Preliminary Injunction will be referred to as "Pl.'s Reply Mot. for Prelim. Inj."

**End of Document**                                  © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 3

Goldman, Sachs & Co. v. Golden Empire Schools..., 922 F.Supp.2d 435...

Case 1:14-cv-00429-RAE   Document 2   Filed 01/23/14   Page 50 of 95

295 Ed. Law Rep. 57

922 F.Supp.2d 435
United States District Court,
S.D. New York.

GOLDMAN, SACHS & CO., Plaintiff,

v.

GOLDEN EMPIRE SCHOOLS
FINANCING AUTHORITY and Kern
High School District, Defendants.

No. 12 Civ. 4558(RJS).   |   Feb. 8, 2013.

**Synopsis**
**Background:** Underwriter which had also served as broker for deal involving sale of auction rate securities (ARS) on behalf of a public financing authority issuer filed suit against issuer seeking declaration that it was not subject to arbitrate dispute involving the ARS. Plaintiff moved for preliminary injunction.

**Holdings:** The District Court, Richard J. Sullivan, J., held that:

[1] forum selection clause in broker-dealer agreement supplanted arbitration provision in earlier-executed underwriter agreement, but

[2] even if arbitration provision had not been overridden, broker-dealer agreement covered resolution of the disputes; and

[3] preliminary injunction enjoining arbitration would issue.

Motion granted.

West Headnotes (11)

**[1]** **Injunction**
   👉 Extraordinary or unusual nature of remedy
A preliminary injunction is an extraordinary remedy.

1 Cases that cite this headnote

**[2]** **Injunction**
   👉 Grounds in general;  multiple factors
Plaintiff seeking a preliminary injunction must establish: (1) irreparable harm and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and (3) a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

**[3]** **Injunction**
   👉 Presumptions and burden of proof
**Injunction**
   👉 Clear showing or proof
Party seeking preliminary injunction carries burden of persuasion to demonstrate by a clear showing that the necessary elements are satisfied.

**[4]** **Alternative Dispute Resolution**
   👉 Contractual or consensual basis
An agreement to arbitrate is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. 9 U.S.C.A. § 1.

**[5]** **Federal Courts**
   👉 Arbitration
Whether an agreement to arbitrate exists is a question of state contract law.

**[6]** **Contracts**
   👉 Application to Contracts in General
**Contracts**
   👉 Language of Instrument
Under New York law, a written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms.

**[7]** **Alternative Dispute Resolution**

Goldman, Sachs & Co. v. Golden Empire Schools..., 922 F.Supp.2d 435...

Case 1:14-cv-00429-RAE   Document 2   Filed 01/23/14   Page 51 of 95

295 Ed. Law Rep. 57

🔑 Modification or termination

In determining whether an agreement to arbitrate has been supplanted by a later accord, court looks to whether the subsequent agreement specifically precludes or provides positive assurance that a dispute is no longer subject to arbitration.

2 Cases that cite this headnote

**[8]      Alternative Dispute Resolution**
      🔑 Place of arbitration

Under New York law, a forum selection clause need not explicitly contradict an arbitration agreement to trump it; instead, it may simply substantively exclude it.

2 Cases that cite this headnote

**[9]      Alternative Dispute Resolution**
      🔑 Agreements to arbitrate

Under New York law, forum selection clause in broker-dealer agreement which had been executed after underwriter agreement, between the same parties, and which contained both a merger clause and the provision that "all actions and proceedings shall be brought in the United States District Court in the County of New York," served to override reference in underwriter agreement requiring arbitration of disputes under Financial Industry Regulatory Authority (FINRA), since the terms "actions and proceedings" in broker-dealer agreement which applied to resolution of disputes were broad enough to encompass arbitration as well as judicial disputes.

2 Cases that cite this headnote

**[10]      Alternative Dispute Resolution**
      🔑 Agreements to arbitrate

Under New York law, even though broker-dealer agreement and underwriting agreement had been executed nearly simultaneously between the same two parties, and although both agreements involved the public offering of auction rate securities (ARS), the broker-dealer agreement, which provided for litigation of disputes, rather than the underwriting agreement, which

contained provision for arbitration, governed bond issuer's claims for breach of fiduciary duty, fraud, and negligent misrepresentation claims; the claims arose from the extent to which broker's cover bid practice created and manipulated the market for ARS generally, by disguising the lack of natural demand for ARS, and issuer's claim that had it known that ARS market was wholly dependent on broker's support bids it would have sought an alternative vehicle for its debt.

**[11]      Alternative Dispute Resolution**
      🔑 Performance, breach, enforcement, and contest of agreement

Preliminary injunction would issue enjoining arbitration of dispute between broker and issuer of auction rate securities (ARS) where broker was likely to succeed on merits of claim that provision in the parties' broker-dealer agreement requiring disputes to be brought in district court overrode earlier arbitration provision in the underwriting agreement, and equities tipped in broker's favor, in that issuer had waited four years from its alleged injury to bring claim, arbitration had already been stayed for nearly a year's time, and public interest favored enforcement of contracts as written.

**Attorneys and Law Firms**

**\*436**  Andrew Hunter Reynard, David Harold Braff, and Matthew Alexander Schwartz, **\*437** Esqs., of Sullivan & Cromwell, LLP, New York, NY, for Plaintiff.

James L. Kauffman and Peter J. Mougey, Esqs., Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A, Pensacola, FL; James Richard Swanson, Jason W. Burge, and Joseph C Peiffer, Esqs., Fishman Haygood Phelps Walmsley Willis & Swanson, LLP, New Orleans, LA; Kevin Joseph Madonna, Esq., Kennedy & Madonna, LLP, Hurley, NY, for Defendants.

**Opinion**

**MEMORANDUM AND ORDER**

RICHARD J. SULLIVAN, District Judge:

From 2004 to 2007, Defendants Golden Empire Schools Financing Authority and Kern High School District (collectively, "Golden Empire") issued approximately $125 million of complex securities to fund projects, employing Plaintiff Goldman, Sachs & Co. ("Goldman") as the sole underwriter and broker. In 2012, Golden Empire initiated an arbitration before the Financial Industry Regulatory Authority ("FINRA") to settle disputes arising from that relationship. Before the Court is Goldman's motion to preliminarily enjoin that arbitration. For the reasons that follow, the Court grants Goldman's motion.

## I. BACKGROUND [1]

In July 2004, Golden Empire, a public financing authority in Bakersfield, California, elected to issue approximately $95 million of bonds to refinance prior debt and to acquire and build new educational facilities. (Compl. ¶ 13; Defs.' Opp'n 2.) In time, Golden Empire approached Goldman about underwriting the debt, whereupon Goldman advised Golden Empire on the desirability of issuing the debt in the form of auction rate securities ("ARS"), which offered long-term liquidity at lower, short-term interest rates that would be reset at public auctions. (Compl. ¶ 13; Defs.' Opp'n 2–4.) Specifically:

> ARS are long-term bonds and stocks whose interest rates or dividend yields are periodically reset through auction. At each auction, holders and buyers of the securities specify the minimum interest rate at which they want to hold or buy. If buy/hold orders meet or exceed sell orders, the auction succeeds. If supply exceeds demand, however, the auction fails and the issuer is forced to pay a higher rate of interest in order to penalize it and to increase investor demand.

*Ashland Inc. v. Morgan Stanley & Co.,* 652 F.3d 333, 335 (2d Cir.2011).

Ultimately, Golden Empire retained Goldman as the sole underwriter and broker-dealer for the issue. As such, two contracts governed the relationship between the parties:

an underwriter agreement setting forth Goldman's duty to purchase and offer the bonds (the "2004 Underwriter Agreement"), and a separate but contemporaneously executed broker-dealer agreement that outlined Goldman's obligations in the management of the auction and bids (the "2004 Broker–Dealer Agreement"). (Compl. ¶¶ 13–14.)

With respect to the resolution of disputes arising between the parties, the 2004 Underwriter Agreement is silent, stating only that the agreement is subject to "the laws of the State [of California]." (*Id.* Ex. 5 ¶ 15.) However, the 2004 Broker–Dealer Agreement contains a forum selection **\*438** clause (the "Forum Selection Clause" or "Clause") providing that:

> The parties agree that all actions and proceedings arising out of this Broker–Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York and that, in connection with any such action or proceeding, submit to the jurisdiction of, and venue in, such court.

(*Id.* ¶¶ 15–16; *see id.* Ex. 2 ¶ 5.9.) The 2004 Broker–Dealer Agreement also contains a merger clause providing that:

> This Broker–Dealer Agreement, and the other agreements and instruments executed and delivered in connection with the issuance of the [ ]ARS, contain the entire agreement between the parties relating to the subject matter hereof, and there are no other representations, endorsements, promises, agreements or understandings ... between the parties relating to the subject matter hereof.

(*Id.* ¶ 18; *see id.* Ex. 2 ¶ 5.4.) The parties entered into identical contracts in 2006 and 2007 (collectively, the "Underwriter Agreements" and "Broker–Dealer Agreements"), when Golden Empire issued ARS in the amounts of $20 million and $10 million, respectively, using Goldman as the sole underwriter and broker-dealer. (*Id.* ¶¶ 19–30.)

In 2008, the ARS market collapsed. *See UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.,* 660 F.3d 643, 646 (2d Cir.2011).

Goldman, Sachs & Co. v. Golden Empire Schools..., 922 F.Supp.2d 435...

295 Ed. Law Rep. 57

As a result, Golden Empire's ARS auctions failed, triggering higher interest rates on the debt and, eventually, requiring Golden Empire to refinance. (Defs.' Opp'n 6.) On February 11, 2012, Golden Empire filed a Statement of Claim against Goldman before FINRA, pursuant to FINRA Rule § 12200, which states that FINRA members and their customers "must arbitrate a dispute ... [i]f arbitration ... is ... [r]equested by the customer; [t]he dispute is between a customer and a [FINRA] member ...; and [t]he dispute arises in connection with the business activities of the member...." (Compl. ¶ 31; Decl. of James R. Swanson, dated Sept. 5, 2012, Ex. A.) In its Statement of Claim, Golden Empire argued, *inter alia,* that Goldman fraudulently induced it to issue ARS by failing to disclose both Goldman's higher fees on ARS as well as its practice of placing "cover bids" at ARS auctions. (Compl. Ex. 1, ¶¶ 1–2.) That is, when serving as a broker-dealer, Goldman often placed support bids to "prop up" ARS auctions to prevent their failure. (*Id.*) Allegedly, once Goldman ended this practice in 2008, auctions failed and the market collapsed, precipitating Golden Empire's losses. (*Id.* Ex. 1, ¶ 4.) Had Golden Empire been aware of this scheme, it claims, it would have chosen another vehicle for its debt. (*Id.* Ex. 1, ¶ 28.)

On June 11, 2012, Goldman brought suit in this Court pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, seeking declaratory relief and preliminary and permanent injunctions against the arbitration under the Forum Selection Clauses in the parties' Broker–Dealer Agreements. (*Id.* ¶¶ 36–46.) Goldman filed the instant motion for a preliminary injunction on August 8, 2012. (Doc. No. 26.) Golden Empire filed its opposition brief on September 5, 2012 (Doc. No. 29), and Goldman replied on September 25, 2012 (Doc. No. 32). Defendants submitted supplemental authority on December 3, 2012, and Plaintiff replied on December 5, 2012. (Doc. Nos.35, 37.) The Court heard oral argument on January 11, 2013. On January 15, 2013, Plaintiff wrote the Court to clarify a point made at oral argument. (Doc. No. 37.) Defendants responded that same day. (Doc. No. 37.) Finally, Plaintiff submitted additional supplemental authority **\*439** on January 23, 2013, and Defendants responded the next day. (Doc. Nos. 36, 37.)

## II. LEGAL STANDARD

[1]  [2]  [3]  A preliminary injunction is an "extraordinary remedy." *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). In the Second Circuit, a plaintiff seeking a preliminary injunction must establish:

"(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir.2010). The party seeking the injunction carries the burden of persuasion to demonstrate "by a clear showing" that the necessary elements are satisfied. *See Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).

## III. DISCUSSION

The parties do not dispute that Goldman will suffer irreparable harm if it is improperly forced to arbitrate. (*See* Defs.' Opp'n 8); *see also Merrill Lynch Inv. Managers v. Optibase, Ltd.,* 337 F.3d 125, 129 (2d Cir.2003) (holding that irreparable harm occurs where a movant is "forced to expend time and resources arbitrating an issue that is not arbitrable"). Rather, Golden Empire contests the likelihood of Goldman's success on the merits and the balance of the hardships. The Court addresses each argument in turn.

### A. Likelihood of Success on the Merits

[4]  [5]  [6]  The Federal Arbitration Act evinces a strong federal policy favoring arbitration. *See* 9 U.S.C. § 1 *et seq.; Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). However, it is undisputed that an agreement to arbitrate "is a matter of contract[,] and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *see also Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC,* 450 F.3d 100, 104 (2d Cir.2006). Whether an agreement to arbitrate exists is a question of state contract law. *Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co., Ltd.,* 189 F.3d 289, 295 (2d Cir.1999). In New York, "a written agreement that is complete, clear[,] and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002).

Thus, if the plain meaning of the Forum Selection Clause in the Broker–Dealer Agreements is to limit disputes to the Southern District of New York—thereby overriding the

Goldman, Sachs & Co. v. Golden Empire Schools..., 922 F.Supp.2d 435...

295 Ed. Law Rep. 57

Case 1:14-cv-00429-BAF   Document 2   Filed 01/23/14   Page 54 of 95

arbitration agreement in FINRA Rule § 12200—Goldman likely will prevail. Golden Empire argues against this result for three reasons. First, Golden Empire claims that, under Second Circuit precedent, the parties' Forum Selection Clause is insufficiently explicit to override the prior arbitration agreement in FINRA Rule § 12200 and should therefore be read to preserve the agreement. (Defs.' Opp'n 8–9.) Second, Golden Empire contends that the phrase "action or proceeding" in the Clause does not encompass arbitration and instead applies only to judicial proceedings. (*Id.* 10–13.) Finally, Golden Empire asserts that, even if the Clause bars arbitration of disputes arising out of the Broker–Dealer Agreements, it does not bar arbitration of claims grounded in the Underwriter Agreements because the two contracts are **\*440** distinct. (*See* Defs.' Opp'n 21.) The Court concludes that each of these arguments fails for the reasons set forth below.

## 1. Specificity and Meaning of the Forum Selection Clause

[7]    In determining whether an agreement to arbitrate has been supplanted by a later accord, courts in the Second Circuit look to whether the subsequent agreement "specifically preclude[s]" or provides "positive assurance" that a dispute is no longer subject to arbitration. *Applied Energetics, Inc. v. NewOak Capital Markets, LLC,* 645 F.3d 522, 525 (2d Cir.2011); *Bank Julius Baer & Co., Ltd. v. Waxfield Ltd.,* 424 F.3d 278, 284 (2d Cir.2005). Two Second Circuit decisions are instructive. In *Bank Julius,* the court considered whether a broad agreement to arbitrate "any dispute" was overridden by a later-executed forum selection clause that waived objections to jurisdiction in New York, but did not mention arbitration. 424 F.3d at 282. Citing the forum selection clause's failure to mention arbitration, the court held that it could not "say that the ... [c]lause, which does not even mention arbitration, either 'specifically precludes' arbitration or contains a 'positive assurance' that this dispute is not governed by the [a]rbitration [a]greement." *Id.* at 284. Instead, citing the presumption in favor of arbitration, the court directed that the agreements be read to complement each other, with the former requiring arbitration and the latter permitting enforcement of arbitral awards in New York courts. *Id.*

In *Applied Energetics,* the Second Circuit considered an expansive agreement to arbitrate "any dispute." 645 F.3d at 523. However, in contrast to *Bank Julius,* the subsequent

agreement broadly provided that "[a]ny dispute arising out of this [a]greement shall be adjudicated in the Supreme Court, New York County or in the federal district court for the Southern District of New York." *Id.* Rejecting the district court's reliance on *Bank Julius* to harmonize the agreements, the Second Circuit ruled that the parties had "revoke [d the] earlier agreement to arbitrate by executing a subsequent agreement the terms of which plainly preclude arbitration." *Id.* at 525. Pointing to the breadth of the subsequent agreement ("[a]ny dispute"), its mandatory nature ("shall"), and its reference to judicial action ("adjudicate"), the Second Circuit held that the parties' later agreement "specifically preclude[d]" arbitration, despite its failure to explicitly use the term. *Id.* at 526; *see also Biremis, Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* No. 11 Civ. 4934(LDW), 2012 WL 760564, at *5 (E.D.N.Y. Mar. 8, 2012) (finding that agreement granting "exclusive jurisdiction" to federal and state courts for "all disputes" waived earlier agreement to arbitrate before FINRA). The court additionally rejected the district court's reliance on the presumption in favor of arbitration to settle the claim, instructing that the presumption applies only when the *scope* of an agreement to arbitrate is in question, not the *existence* of the agreement itself. *Applied Energetics,* 645 F.3d at 526; *accord Biremis,* 2012 WL 760564, at *5.

[8]    Golden Empire cites *Bank Julius* for the propositions that the Forum Selection Clause at issue is insufficiently "explicit" to supplant the FINRA arbitration agreement, and that, regardless, the presumption in favor of arbitration requires that the Clause and FINRA arbitration agreement be read to complement each other. (Defs.' Opp'n 17, 19–20.) However, *Applied Energetics* bars both of these arguments. First, as the Second Circuit made clear in *Applied Energetics,* a forum selection clause need not explicitly contradict an arbitration agreement to trump it; **\*441** instead, it may simply substantively exclude it. 645 F.3d at 525; *Spanski Enters., Inc. v. Telewizja Polska, S.A.,* No. 07 Civ. 930(GEL), 2007 WL 1187870, at *5 (S.D.N.Y. Apr. 23, 2007) ("[A]lthough the [f]orum [s]election [c]lause does not explicitly use the word 'arbitration,' it need not, as its plain and unambiguous terms nevertheless 'specifically preclude[ ]' the disputed arbitration."). Further, relying on the presumption in favor of arbitration to force a complementary reading that conflicts with the plain meaning of a forum selection clause directly contradicts *Applied Energetics. See Applied Energetics,* 645 F.3d at 526 ("[W]hile doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration,

Goldman, Sachs & Co. v. Golden Empire Schools..., 922 F.Supp.2d 435...

295 Ed. Law Rep. 57

the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made.").

To bolster its arguments, Golden Empire looks beyond Second Circuit precedent to two district court cases and a Fourth Circuit opinion that addressed clauses identical to the Clause at issue but permitted arbitration to proceed. The first district court case, *Goldman, Sachs & Co. v. City of Reno,* denied an injunction on the cursory analysis that an identical clause "d[id] not touch upon arbitration or arbitrability directly" and therefore controlled only the forum of a court action. No. 12 Civ. 327(RCJ), 2012 WL 5944966, at *4 (D.Nev. Nov. 26, 2012). The second, *UBS Fin. Services Inc. v. Carilion Clinic,* denied a motion to enjoin arbitration on the grounds that the clause was "susceptible to an interpretation favoring arbitration" and that, without an explicit waiver, the presumption in favor of arbitration required a complementary reading. 880 F.Supp.2d 724, 732 (E.D.Va.2012). In affirming *Carilion Clinic,* the Fourth Circuit held that "it would never cross a reader's mind that the clause provides that the right to FINRA arbitration was being superseded or waived. No word even suggesting supersedence, waiver, or preclusion exists in the sentence." *UBS Fin. Services, Inc. v. Carilion Clinic,* 706 F.3d 319, 330 (4th Cir.2013). However, as discussed, the Second Circuit has rejected the need for explicit waiver contemplated by each of these rulings. *Applied Energetics,* 645 F.3d at 525–26. Thus, unless the plain meanings of FINRA Rule § 12200 and Forum Selection Clause can be harmonized, the latter must trump the former. The Court concludes that they cannot.

 **[9]**   The Forum Selection Clause provides that "*all actions and proceedings ... shall be brought in the United States District Court in the County of New York.*" Golden Empire struggles to argue that "all actions and proceedings" should be read to refer only to *judicial* proceedings while permitting arbitration to proceed before FINRA. (See Defs.' Opp'n 19–20.) To support its cause, Golden Empire marshals a variety of arguments for the proposition that "all actions and proceedings" cannot be read to encompass arbitration. As discussed below, the Court finds each to be patently unavailing and inconsistent with Second Circuit precedent.

### a. New York Civil Practice Law and Rules and the Federal Rules of Civil Procedure

Golden Empire cites the language of the federal and state civil rules as evidence that "actions" and "proceedings" may refer only to judicial disputes. *See* N.Y. C.P.L.R. § 103 (defining civil judicial disputes as "actions" or "special proceedings");

N.Y. C.P.L.R. § 304 ("An action is commenced by filing a summons and complaint or summons with notice.... A special proceeding is commenced by filing a petition...."); Fed.R.Civ.P. 1 ("These rules govern the procedure in all civil actions **\*442** and proceedings in the United States district courts...."). Because these civil rules do not explicitly include arbitration in the discussion of judicial disputes, Golden Empire argues, the Clause cannot be read to include arbitration.

However, that argument strains reason. As an initial matter, Federal Rule of Civil Procedure 1 presupposes the application of the Rules to actions and proceedings in federal courts. It plainly does not claim to limit other types of actions or proceedings. Similarly, while N.Y. C.P.L.R. sections 103 and 304 likewise contemplate "actions" or "proceedings" in the civil judicial context, the Forum Selection Clause negotiated between Golden Empire and Goldman makes no mention of the C.P.L.R. and suggests no such limitation. Indeed, it is instructive, but hardly surprising, that the United States Supreme Court, Second Circuit, and New York State courts routinely refer to arbitrations as "actions" or "proceedings." *See, e.g., 14 Penn Plaza LLC v. Pyett,* 556 U.S. 247, 269, 129 S.Ct. 1456, 173 L.Ed.2d 398 (2009) (discussing an "arbitral body conducting a *proceeding* " (emphasis added)); *Citigroup Global Mkts., Inc.,* 598 F.3d at 32 ("VCG began arbitration *proceedings* against CGMI before the FINRA pursuant to FINRA Rule [§ ] 12200." (emphasis added)); *City of New York v. Uniformed Fire Officers Ass'n, Local 854,* 263 A.D.2d 3, 699 N.Y.S.2d 355, 357 (App.Div.1999) ("Normally, a party to a valid arbitration agreement is required to submit to arbitration and to defer any challenge to the *proceeding* until an award is rendered ...." (emphasis added)). Moreover, Golden Empire itself referred to its FINRA arbitration as an "action" and "proceeding" in its Statement of Claim (*see* Compl. Ex. 120–21 (requesting that after "due *proceedings* " Golden Empire be awarded the "costs of prosecuting this action" (emphasis added))), and the FINRA rules also refer to arbitrations as proceedings (*see* FINRA Rule § 12208 ("At any stage of an arbitration *proceeding* held in a United States hearing location, all parties shall have the right to be represented by an attorney." (emphasis added))). Considered in context, Golden Empire's arguments amount to little more than a linguistic trick and are thus easily dismissed.

### b. Waiver of the Right to a Jury and Substitution of "Arbitration" in the Forum Selection Clause

Goldman, Sachs & Co. v. Golden Empire Schools..., 922 F.Supp.2d 435...

Case 1:14-cv-00429-RAE   Document 2   Filed 01/23/14   Page 56 of 95

295 Ed. Law Rep. 57

For the first time at oral argument, Golden Empire argued that the Clause's waiver of the right to a jury trial, as well as the illogical result of substituting "arbitration" for "actions and proceedings" in the Clause cut in favor of limiting the Clause's application to judicial disputes. Both arguments may be dispatched with ease. [2] As to the first of these arguments, the Clause merely states the obvious, that certain "actions and proceedings" would allow for jury trials, and then clarifies that the jury right is forfeited in those instances. (*See* Tr. 17:20–25.) For the second argument, an analogous substitution of "actions in the Supreme Court of New York" would be equally illogical since actions in Supreme Court cannot be brought in the Southern District. Nevertheless, it can hardly be argued that such a dispute would fall outside the heading of "actions and proceedings." (*See* Tr. 19:6–9.) Thus, **\*443** Golden Empire's arguments are once again unavailing.

### c. Scope of the Forum Selection Clauses in *Applied Energetics* and *Biremis*

Finally, Golden Empire argues that the Clause at issue is narrower than those covering "any dispute" in *Applied Energetics* and *Biremis.* Thus, Golden Empire asserts that the Clause should be read to cover only judicial disputes—that is, suits to compel arbitration, those to enforce arbitral awards, and suits brought by Goldman—as FINRA Rule § 12200 permits only customers and not members to demand arbitration. (Tr. 22:11–15.) However, this argument is unpersuasive. Simply put, the fact that the language at issue in *Applied Energetics* and *Biremis*—"any dispute"—indisputably encompasses arbitration does not mean that the language utilized here—"actions and proceedings"—cannot. Instead, this Court will follow the lead of the Supreme Court, the Second Circuit, New York State courts, Golden Empire itself, and the FINRA Rules to conclude that the phrase "actions and proceedings," by its plain terms, encompasses arbitration, and that any effort to limit the Clause to judicial disputes must strain to avoid that meaning.

* * *

Accordingly, as in *Applied Energetics,* the breadth of the Forum Selection Clause ("all actions and proceedings"), its mandatory nature ("shall"), and its plain reference to judicial action ("the United States District Court in the County of New York"), must be given full effect. Because the Clause and FINRA arbitration agreement are therefore "all-inclusive, ... mandatory, and neither admits the possibility of the other,"

*Applied Energetics,* 645 F.3d at 525, the Court concludes that the latter Broker–Dealer Agreements trump FINRA Rule § 12200, and that the parties' disputes must be heard in the first instance by a court in this district.

### 2. Application of the Forum Selection Clause to the Instant Dispute

[10] Golden Empire finally claims that, even if the Forum Selection Clause requires that disputes arising out of the Broker–Dealer Agreements must be heard by the Southern District, those arising out of the Underwriter Agreements may proceed before FINRA. (Defs.' Opp'n 13–17.) This argument fails on two independent grounds. First, the Broker–Dealer Agreements contain broad merger clauses referencing "the other agreements and instruments executed and delivered in connection with the issuance of the [ ]ARS" and stating that the Broker–Dealer Agreements "contain the entire agreement between the parties relating to the subject matter hereof, and there are no other representations, endorsements, promises, agreements[,] or understandings ... between the parties relating to the subject matter hereof." (Compl. ¶ 18); *see Applied Energetics,* 645 F.3d at 525–26 & n. 2 (finding that an identical merger clause displaced the arbitration clause in a prior agreement).

Second, Golden Empire's claims are inextricably linked to the Broker–Dealer Agreements and cannot escape application of the Forum Selection Clause. Though Golden Empire argues that its breach of fiduciary duty, fraud, and negligent misrepresentation claims arise solely out of the Underwriter Agreements (Defs.' Opp'n 21–22), even a cursory review of the Statement of Claim reveals that assertion to be false. Golden Empire's FINRA action hinges on Goldman's placement of "cover bids" to support ARS auctions in its role as broker–dealer. Specifically, Golden Empire recites in its Statement of Claim that its action for breach of fiduciary duty arises, in part, from "the extent to which **\*444** [Goldman's] cover bid practice created and manipulated the market for ARS generally," "disguis[ing] the lack of natural demand for ARS." (Compl. Ex. 1 at 16). Similarly, the fraud claim states that had Golden Empire "known that the ARS market was wholly dependent on Goldman's support bids and that if broker-dealers like Goldman ceased its [*sic* ] support bidding policy the market would collapse," Golden Empire would have sought an alternative vehicle for its debt. (*Id.* Ex. 1 at 17.) Finally, Golden Empire's negligent misrepresentation claim declares that Goldman had a duty to disclose "the extent of

its involvement in propping up the ARS market." (*Id.* Ex. 1 at 18.) Thus, the Court concludes that the entirety of Golden Empire's dispute with Goldman arises from the Broker–Dealer Agreements and is subject to the Forum Selection Clauses limiting jurisdiction to the Southern District.

* * *

As Goldman has demonstrated the applicability of the Forum Selection Clauses to the instant dispute, the Court determines that Goldman is likely to succeed on the merits of its action for declaratory and permanent injunctive relief.

### B. The Balance of Hardships and the Public Interest

 **[11]**  "[T]he balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Tradescape.com v. Shivaram,* 77 F.Supp.2d 408, 411 (S.D.N.Y.1999). Devoting precious little space to its argument, Golden Empire asserts that it would suffer greater harm because an injunction would deprive it of a "speedy and inexpensive" resolution of its claims. (Defs.' Opp'n 24.) The Court disagrees. First, Golden Empire waited four years from its alleged injury—stemming from the 2008 ARS market collapse—to bring its claim, undercutting any argument for haste. Second, the arbitration has been stayed since its initiation in February 2012. An injunction will simply maintain the status quo and permit the parties to pursue discovery and/or dispositive motions. Third, because Golden Empire and Goldman contracted to settle their disputes in the Southern District, denying an injunction would grant Golden Empire a windfall in the form of its preferred forum while forcing Goldman to "expend time and resources arbitrating an issue that is not arbitrable." *See Merrill Lynch Inv. Managers,* 337 F.3d at 129. Accordingly, the Court finds that the equities tip decidedly in favor of Goldman.

Golden Empire argues against this conclusion by citing the federal policy favoring arbitration, claiming that a

preliminary injunction would not be in the public interest. (Defs.' Opp'n 25.) However, as discussed above, that policy applies only where parties have contracted to arbitrate—and they have not done so here. Instead, the Court concludes that it is in the public's interest to enforce the parties' contract as executed—with an agreement to bring disputes in the Southern District. Thus, the Court finds that granting a preliminary injunction is in the public interest.

* * *

Accordingly, because Goldman has demonstrated that it "is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest," *Winter,* 555 U.S. at 20, 129 S.Ct. 365, the Court grants Goldman's motion for a preliminary injunction.

### IV. Conclusion

For the reasons stated above, the Court finds that Goldman has demonstrated by a **\*445** "clear showing" that it has satisfied the elements under the Second Circuit's test for a preliminary injunction. Accordingly, Plaintiffs' motion is GRANTED.

IT IS HEREBY ORDERED that, no later than February 28, 2013, the parties shall submit a joint letter outlining the next contemplated steps in this case, as well as a joint proposed case management plan and scheduling order. A template can be found at http://nysd.uscourts.gov/cases/show.php?db=judge—info& id=347.

SO ORDERED

**Parallel Citations**

295 Ed. Law Rep. 57

---

Footnotes

1    The facts are taken from the Complaint ("Compl."). In ruling on the instant motion, the Court has also considered Plaintiff's memorandum of law ("Pl.'s Mem."); Defendants' opposition brief ("Defs.' Opp'n"); Plaintiff's reply brief ("Pl.'s Reply"); and the declarations and exhibits attached thereto.

2    Golden Empire argues that the substitution would render the sentence illogical because arbitrations do not occur in court. For example, "[t]he parties agree that all [*arbitrations* ] arising out of this Broker–Dealer Agreement or any of the transactions contemplated hereby

Goldman, Sachs & Co. v. Golden Empire Schools..., 922 F.Supp.2d 435...

Case 1:14-cv-00429-RAE    Document 2    Filed 01/23/14    Page 58 of 95

295 Ed. Law Rep. 57

shall be brought in the United States District Court in the County of New York and that, in connection with any such [*arbitration*], submit to the jurisdiction of, and venue in, such court."

---

**End of Document**                                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT 4

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                │
│ DATE FILED: 5/10/2013                │
└─────────────────────────────────────┘
```

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CITIGROUP GLOBAL MARKETS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 CV 1703 (JMF) (DCF) |
| | ) | |
| NORTH CAROLINA EASTERN | ) | |
| MUNICIPAL POWER AGENCY, | ) | |
| | ) | |
| Defendant. | | |

### [~~PROPOSED~~] JUDGMENT AND ORDER FOR A PERMANENT INJUNCTION

WHEREAS on December 21, 2012, defendant North Carolina Eastern Municipal Power Agency (the "Power Agency") initiated an arbitration against plaintiff Citigroup Global Markets Inc. ("Citigroup") before the Financial Industry Regulatory Authority captioned *North Carolina Eastern Municipal Power Agency* v. *Citigroup Global Markets Inc.*, FINRA No. 13-00004 (the "FINRA Arbitration") asserting its claims (the "Claims") as set forth in the Power Agency's FINRA Statement of Claim;

WHEREAS on March 13, 2013, Citigroup filed the instant action against the Power Agency and, at the same time, moved to preliminarily enjoin the Power Agency from pursuing the FINRA Arbitration;

WHEREAS neither party requested an evidentiary hearing in connection with Citigroup's motion, and, in response to the Court's inquiry, expressly declined such a hearing;

WHEREAS on May 3, 2013, the Court heard oral argument in connection with Citigroup's motion;

WHEREAS, with the consent of the parties, the Court advanced trial and converted Citigroup's motion for a preliminary injunction into a request for a permanent injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure;

WHEREAS on May 3, 2013 the Court granted a permanent injunction, setting forth its reasoning orally, in a ruling from the bench on May 3;

WHEREAS the parties have consented to the entry of final judgment in this case based upon the record and proceedings thus far; and

WHEREAS, in addition to the conclusions of fact and law made by the Court in its ruling from the bench on May 3, the Court finds that Citigroup will suffer irreparable harm if the FINRA Arbitration is not permanently enjoined;

IT IS HEREBY ORDERED, ADJUDGED, and DECREED, as follows:

1. Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Power Agency is permanently enjoined from pursuing the Claims against Citigroup in the pending FINRA Arbitration or in any other arbitration.

2. This permanent injunction shall become effective immediately and without further order of the Court.

3. The Clerk is directed to close this case.

Dated: New York, New York
        May 10, 2013

_____
Jesse M. Furman
United States District Judge

# EXHIBIT 7

BROKER-DEALER AGREEMENT

Dated as of December 1, 2007

among

WILMINGTON TRUST COMPANY,
as Auction Agent

and

J.P. MORGAN SECURITIES INC.,
as Broker-Dealer

and

QUINNIPIAC UNIVERSITY

relating to

$116,350,000

STATE OF CONNECTICUIT HEALTH AND EDUCATIONAL FACILITIES AUTHORITY
REVENUE BONDS

QUINNIPIAC UNIVERSITY ISSUE

SERIES K

# TABLE OF CONTENTS

                                                                              **Page**

SECTION 1.  DEFINITIONS AND RULES OF CONSTRUCTION ......................................... 1

1.1    Terms Defined by Reference to the Auction Procedures......................................... 1
1.2    Additional Terms Defined Herein ........................................................................ 1
1.3    Rules of Construction .......................................................................................... 2

SECTION 2.  THE AUCTION............................................................................................ 2

2.1    Incorporation by Reference of Auction Procedures............................................... 2
2.2    Preparation for Each Auction................................................................................ 3
2.3    Securities Depository Participant Numbers and Reconciliations .......................... 3
2.4    Transfers ............................................................................................................. 4
2.5    Compensation ..................................................................................................... 5
2.6    Settlement ........................................................................................................... 6

SECTION 3.  THE AUCTION AGENT ............................................................................. 6

3.1    Duties and Responsibilities of the Auction Agent ................................................ 6
3.2    Rights of the Auction Agent ................................................................................ 7
3.3    Auction Agent's Disclaimer ................................................................................ 8

SECTION 4.  FURNISHING OF INFORMATION AND OFFERING MATERIALS;
            INDEMNIFICATION........................................................................................ 9

4.1    Furnishing of Information..................................................................................... 9
4.2    Supplements and Amendments to Official Statement ........................................... 9
4.3    Additional Information ........................................................................................ 10
4.4    Indemnification and Contribution......................................................................... 10

SECTION 5.  MISCELLANEOUS .................................................................................... 11

5.1    Termination......................................................................................................... 11
5.2    Participant .......................................................................................................... 12
5.3    Communications .................................................................................................. 12
5.4    Recording of Conversations................................................................................. 13
5.5    Entire Agreement ................................................................................................ 13
5.6    Benefits; Successors and Assigns ........................................................................ 13
5.7    Amendment; Waiver............................................................................................ 13
5.8    Severability ........................................................................................................ 14
5.9    Execution in Counterparts.................................................................................... 14
5.10   Governing Law; Jurisdiction; Waiver of Trial by Jury......................................... 14
5.11   No Implied Duties............................................................................................... 15

EXHIBIT A — Auction Procedures

BROKER-DEALER AGREEMENT

THIS BROKER-DEALER AGREEMENT, dated as of December 1, 2007, is among (i) WILMINGTON TRUST COMPANY (the "Auction Agent"), a Delaware banking corporation, not in its individual capacity but solely as agent of U.S. BANK NATIONAL ASSOCIATION (the "Trustee"), pursuant to authority granted to the Auction Agent in the Auction Agreement, dated as of December 1, 2007 (the "Auction Agreement"), between the Trustee and the Auction Agent and acknowledged by the Corporation, as hereinafter defined; (ii) J.P. MORGAN SECURITIES INC. ("BD"); and (iii) QUINNIPIAC UNIVERSITY, a Connecticut nonprofit corporation (the "Corporation").

WITNESSETH

WHEREAS, the State of Connecticut Health and Education Facilities Authority (the "Issuer") is issuing $116,350,000 in aggregate principal amount of its State of Connecticut Health and Educational Facilities Authority Revenue Bonds, Quinnipiac University Issue, Series K-1 (Tax Exempt) and K-2 (Taxable) (together, the "Bonds") pursuant to the Trust Indenture relating to the Bonds, dated as of December 1, 2007 (the "Indenture") and loaning the proceeds thereof to the Corporation; and

WHEREAS, the  interest rate on the Bonds will initially be set in accordance with the Auction Procedures; and

WHEREAS, Wilmington Trust Company has been appointed as Auction Agent for purposes of the Auction Agreement, and pursuant to the Auction Agreement, the Corporation has requested and directed the Auction Agent to execute and deliver this Broker-Dealer Agreement; and

WHEREAS, the Auction Procedures require the participation of one or more Broker-Dealers;

NOW, THEREFORE, the Auction Agent, as agent for the Trustee, BD and the Corporation agree as follows:

SECTION 1.   DEFINITIONS AND RULES OF CONSTRUCTION

1.1     *Terms Defined by Reference to the Auction Procedures*. Capitalized terms used herein shall have the respective meanings specified in the Auction Procedures.

1.2     *Additional Terms Defined Herein.* As used herein, the following terms shall have the following meanings, unless the context otherwise requires:

(a)     "Auction Procedures" shall mean the procedures for conducting Auctions for the Bonds during an ARS Rate Period as set forth in Exhibit A hereto.

(b)     "Authorized Officers" shall mean each Vice President, Assistant Vice President and authorized representative of the Auction Agent assigned to its Corporate Capital Markets Division and every other officer or employee of the Auction Agent designated

as an "Authorized Officer" for purposes hereof in a written communication from the Auction Agent signed by an Authorized Officer and delivered to the Trustee.

(c)     "BD Officer" shall mean each officer or employee of BD designated as a "BD Officer" for purposes of this Broker-Dealer Agreement in a communication to the Auction Agent.

(d)     "Broker-Dealer Agreement" shall mean this Broker-Dealer Agreement, including Exhibit A hereto, and any substantially similar agreement between the Auction Agent and a Broker-Dealer.

(e)     "Broker-Dealer Fee" shall mean the fee due to the BD, as set forth in Section 2.5(b) hereof.

(f)     "Broker-Dealer Fee Rate" shall have the meaning set forth in Section 2.5(a) hereof.

(g)     "Order Form" shall mean the form by which Orders are to be submitted by any Broker-Dealer on any Auction Date which shall be in a form acceptable to the Auction Agent and may be by Electronic Means or in writing.

1.3     *Rules of Construction.* Unless the context or use indicates another or different meaning or intent, the following rules shall apply to the construction of this Broker-Dealer Agreement:

(a)     Words importing the singular number shall include the plural number and vice versa.

(b)     The captions and headings herein are solely for convenience of reference and shall neither constitute a part of this Broker-Dealer Agreement nor affect its meaning, construction or effect.

(c)     The words "hereof," "herein," "hereto," and other words of similar import refer to this Broker-Dealer Agreement as a whole and not to any particular section or subsection.

(d)     All references herein to a particular time of day shall be to New York City time.

(e)     Each reference to the purchase, sale or holding of "Bonds" shall refer to beneficial ownership interests in Bonds unless the context clearly requires otherwise.

(f)     Any reference herein to Bonds shall be deemed to be a reference to each Series of Bonds.  References herein to an Auction and the Auction Procedures shall apply separately to each Series of Bonds.

SECTION 2.   THE AUCTION

### 2.1   *Incorporation by Reference of Auction Procedures.*

(a)       The parties to this Broker-Dealer Agreement agree to comply with the Auction Procedures. No amendment to the Auction Procedures shall be effective without the consent of the parties hereto. In addition if this Broker-Dealer Agreement takes effect as a result of an ARS Conversion Date, BD agrees to set the Initial Period Rate as provided in Schedule I of the Auction Procedures and give notice thereof as provided in such Schedule I. In the event there are multiple Broker-Dealers for the Bonds, the Corporation shall designate which Broker-Dealer shall determine the Initial Period Rate.

(b)       BD agrees to act as, and assumes the obligations of, and limitations and restrictions placed upon, a Broker-Dealer under this Broker-Dealer Agreement. BD understands that other Persons meeting the requirements specified in the definition of "Broker-Dealer" contained in the Auction Procedures may execute Broker-Dealer Agreements and participate as Broker-Dealers in Auctions.

(c)       BD and other Broker-Dealers may participate in Auctions for their own accounts. The Corporation may, however, by notice to BD and all other Broker-Dealers, prohibit all of the Broker-Dealers from submitting Bids in Auctions for their own accounts, provided that Broker-Dealers may continue to submit Hold Orders and Sell Orders. Notwithstanding the foregoing, if BD is an affiliate of the Corporation it may not submit Bids to purchase Bonds in Auctions for its own account, but may submit Hold Orders and Sell Orders in Auctions with respect to Bonds otherwise acquired for its own account. The Auction Agent shall be under no duty or liability with respect to monitoring compliance with this Section 2.1(c).

### 2.2   *Preparation for Each Auction.*

(a)       Not later than 3:00 P.M. on the Business Day preceding each Auction Date, the Auction Agent shall notify BD of any change in the aggregate principal amount of the Bonds, as of the opening of business on such day by delivering a notice to BD by Electronic Means or other communication acceptable to the parties.

(b)       In the event the Auction Date for any Auction shall be changed pursuant to Section 2.09(c) of the Auction Procedures after the Auction Agent has given notice of such Auction Date pursuant to Section 2.06 of the Auction Procedures, the Auction Agent, by such means as the Auction Agent deems practicable, shall promptly give notice of such change to BD. Thereafter, BD shall use its best efforts to promptly notify its customers who are Existing Owners and Potential Owners of which it is aware of such change in the Auction Date.

### 2.3   *Securities Depository Participant Numbers and Reconciliations.*

The Auction Agent may, but shall have no duty to, request, from time to time, BD to provide it with a list of the number of Units and affiliated Securities Depository participant numbers for customers BD believes are Existing Owners. BD shall comply with any such request, and the Auction Agent shall keep confidential any such information, including information received as to the identity of Bidders in any Auction, and shall not disclose any such

information so provided to any person other than the Trustee, the Corporation, the Issuer and their respective agents, provided that the Auction Agent reserves the right, and is authorized, to disclose any such information if required to do so by rule or regulation, or as confidential information to its internal and external accountants, auditors and counsel, its regulators and examiners, and any other person if the Auction Agent has been advised by its counsel that it may be unlawful to fail to disclose or the Auction Agent may be liable for a failure to effect such disclosure, or if it is ordered to do so pursuant to a subpoena, civil investigative demand or similar demand by a court of competent jurisdiction or regulatory, judicial, quasi judicial agency or authority having the authority to mandate such disclosures; provided, further, however, that the Auction Agent may refrain from making requested disclosures if in its sole discretion it receives satisfactory indemnity therefor for any actual or potential loss, claim, damage, liability or expense.

If any of the Corporation, the BD or the Trustee requests that the Auction Agent reconcile the number of Units for which a Broker-Dealer is listed as the Broker-Dealer in the Existing Owner Registry maintained by the Auction Agent pursuant to Section 2.2(a) of the Auction Agreement with the records of the Broker-Dealers, the Auction Agent may, but shall not be required to, perform such reconciliation with the consent of the Corporation. Any such reconciliation shall be based upon information provided by the Broker-Dealers and/or the Securities Depository. If the Auction Agent requires information from the Securities Depository in order to perform such reconciliation, the Corporation or the Trustee shall request such information from the Securities Depository or authorize the Auction Agent to request and obtain such information from the Securities Depository. The fees for services rendered and expenses (including any charges of the Securities Depository) incurred by the Auction Agent in performing any such reconciliation shall be paid by the Corporation. If as a result of any such reconciliation a discrepancy is discovered between the records of the Broker-Dealers and the Existing Owner Registry maintained by the Auction Agent pursuant to Section 2.2(a) of the Auction Agreement, such Existing Owner Registry shall be adjusted to conform to the records of the Broker-Dealers. If as a result of such reconciliation it is discovered that there are Units for which no Broker-Dealer has made known to the Auction Agent a Securities Depository participant account, such Units will be reflected in the Existing Owner Registry maintained by the Auction Agent pursuant to Section 2.2.(a) of the Auction Agreement as belonging to the lead underwriter/Broker-Dealer. The result of any reconciliation shall be final and binding upon the Corporation, the Broker-Dealers, the Trustee and the Auction Agent, absent manifest error; and, in no event, shall the Auction Agent incur any liability for any determination or adjustment made in connection with any reconciliation hereunder.

2.4    *Transfers.*

BD shall deliver to the Auction Agent a notice, in a form reasonably acceptable to the Auction Agent, of transfers of Bonds made through BD by an Existing Owner to another Person other than pursuant to an Auction. The Auction Agent is not required to accept any notice delivered pursuant to the terms of the foregoing sentence with respect to an Auction unless it is received by the Auction Agent by 11:00 a.m. on the applicable Auction Date.

Notwithstanding the provisions of Section 2.6(a) hereof, any delivery or non-delivery of Bonds which represents any departure from the results of an Auction, as determined

by the Auction Agent, shall be of no effect unless and until the Auction Agent shall have been notified of such delivery or non-delivery in accordance with the terms of this Section 2.4.

            2.5    *Compensation*

            (a)    The initial Broker-Dealer Fee Rate shall equal 0.25 of 1% per annum. The Broker-Dealer Fee for the Bonds shall be paid by the Auction Agent solely from moneys received from the Corporation or the Trustee pursuant to this Section 2.5 or Section 3.5 of the Auction Agreement and represents compensation for the services of the BD in facilitating Auctions for the benefit of the beneficial owners of the Bonds. The Broker-Dealer Fee rate may be adjusted from time to time with the approval of the Corporation upon a written request of the Broker-Dealers delivered to the Corporation.

            (b)    While the Bonds are in an Auction Period other than a daily Auction Period on each Interest Payment Date following each Auction Date, each Broker-Dealer shall be entitled to receive an amount equal to the product of (x) the Broker-Dealer Fee Rate multiplied by (y)(A) if an Auction was held on such Auction Date, the sum of the aggregate principal amount of Bonds that were (1) the subject of a valid Hold Order of an Existing Owner submitted by such Broker-Dealer, (2) the subject of a Submitted Bid of an Existing Owner submitted by such Broker-Dealer and continued to be held by such Existing Owner as a result of such Auction, (3) the subject of a Submitted Bid of a Potential Owner submitted by such Broker-Dealer and were purchased by such Potential Owner as a result of such Auction and (4) deemed to be the subject of a Hold Order by an Existing Owner that were acquired by such Existing Owner from such Broker-Dealer or (B) if an Auction was not held on such Auction Date, the aggregate principal amount of Outstanding Bonds that were acquired by an Existing Owner through such Broker-Dealer, multiplied by (z) a fraction, the numerator of which is (i) if the Auction Period is 180 days or less, the actual number of days in the Auction Period next succeeding such Auction Date or (ii) if the Auction Period is more than 180 days, the number of days in the Auction Period next succeeding such Auction Date calculated on the basis of twelve 30 day months in a year, and in either case the denominator of which is 360.

            If the Bonds are in a daily Auction Period each Broker-Dealer shall be entitled to receive on each Interest Payment Date an amount equal to the sum calculated for each Auction Period in the preceding month of the product of (x) the Broker-Dealer Fee Rate multiplied by (y) the aggregate principal amount of Bonds for each Auction Period that were (1) the subject of a valid Hold Order submitted by such Broker-Dealer, (2) the subject of a Submitted Bid of an Existing Owner submitted by such Broker-Dealer and continued to be held by such Existing Owner as a result of such Auction, (3) the subject of a Submitted Bid of a Potential Owner submitted by such Broker-Dealer and were purchased by such Potential Owner as a result of such Auction, (4) deemed to be the subject of a Hold Order by an Existing Owner that were acquired by such Existing Owner from such Broker-Dealer and (5) if an Auction was not held for any Auction Period, the aggregate principal amount of Outstanding Bonds that were acquired by an Existing Owner through such Broker-Dealer, multiplied by (z) a fraction, the numerator of which is the number of days in the Auction Period and denominator of which is 360.

The Broker-Dealer Fee (the "Broker-Dealer Fee") shall be calculated as set forth in this Section 2.5 by the Auction Agent, which shall be conclusive absent manifest error. Such amounts shall be communicated by the Auction Agent to the Corporation and the Trustee by 4:00 P.M., New York City time, on the Business Day immediately preceding each Interest Payment Date. On or before 10:00 A.M. on each Interest Payment Date, the Corporation shall pay to the Trustee the Broker-Dealer Fee. By noon on each Interest Payment Date, the Trustee shall deliver to the Auction Agent the amount constituting the Broker-Dealer Fee, by wire transfer of immediately available funds to such account as the Auction Agent may designate. The amount constituting the Broker-Dealer Fee shall be held by the Auction Agent on behalf of the Broker-Dealer and, immediately upon receipt of such fee, the Auction Agent shall deliver such fee to the Broker-Dealer pursuant to the written instructions of the Broker-Dealer. If any Existing Owner who acquired Bonds through a Broker-Dealer transfers any such Bonds to another Person other than through an Auction, the Broker-Dealer for the Bonds so transferred shall continue to be the Broker-Dealer with respect to such Bonds, provided, however, that if the transfer was effected by, or if the transferee is, another Person who has met the requirements specified in the definition of "Broker-Dealer" and executed a Broker-Dealer Agreement, such Person shall be the Broker-Dealer for such Bonds.

2.6     *Settlement.*

(a)     If any Existing Owner on whose behalf BD has submitted a Bid or Sell Order that was accepted in whole or in part fails to instruct its Participant to deliver the Bonds subject to such Bid or Sell Order against payment therefor, BD shall instruct such Participant to deliver such Bonds against payment therefor and BD may deliver to the Potential Owner on whose behalf BD submitted a Bid that was accepted in whole or in part a principal amount of the Bonds that is less than the principal amount of the Bonds specified in such Bid to be purchased by such Potential Owner.

(b)     The Auction Agent, the Trustee, the Corporation and the Issuer shall have no responsibility or liability with respect to the failure of an Existing Owner, a Potential Owner or its respective Participant to deliver Bonds or to pay for Bonds sold or purchased pursuant to the Auction Procedures or otherwise.

(c)     The Auction Agent shall have no duty or liability with respect to enforcement of this Section 2.6.

SECTION 3.   THE AUCTION AGENT

3.1     *Duties and Responsibilities of the Auction Agent.*

(a)     The Auction Agent is acting solely as non-fiduciary agent for the Trustee and owes no duties, fiduciary or otherwise, to any other Person by reason of this Broker-Dealer Agreement except as expressly set forth herein or in the Auction Agreement, and no implied duties, fiduciary or otherwise, shall be read into this Broker-Dealer Agreement against the Auction Agent.

(b)     The Auction Agent undertakes to perform such duties and only such duties as are specifically set forth in the Broker-Dealer Agreement or expressly

incorporated herein by reference pursuant to Section 2.1(a) hereof and no implied covenants or obligations shall be read into this Broker-Dealer Agreement against the Auction Agent.

(c)     In the absence of willful misconduct or gross negligence on its part, as determined by a court of competent jurisdiction, the Auction Agent, whether acting directly or through agents or attorneys as provided in Section 3.2(d) hereof, shall not be liable for any action taken, suffered, or omitted or for any error of judgment made by it in the performance of its duties hereunder. The Auction Agent shall not be liable for any error of judgment made in good faith unless the Auction Agent shall have been grossly negligent in ascertaining (or failing to ascertain) the pertinent facts necessary to make such judgment, as determined by a court of competent jurisdiction.

(d)     The Auction Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Broker-Dealer Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including without limitation: acts of God; earthquakes; fires; floods; wars; civil or military disturbances; sabotage; acts of terrorism; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; or acts of civil or military authority or governmental actions; it being understood that the Auction Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

(e)     The Auction Agent shall not be (i) required to and does not make any representations nor have any responsibilities as to the validity, accuracy, value or genuineness of any signatures or endorsements, except with respect to itself, on any document delivered pursuant to or as contemplated by this Broker-Dealer Agreement; (ii) obligated to take any legal action hereunder that might, in its judgment, involve any expense or liability, unless it has been furnished with indemnity satisfactory to the Auction Agent; or (iii) responsible for or liable in any respect on account of the identity, authority or rights of any Person executing or delivering or purporting to execute or deliver any document under this Broker-Dealer Agreement or the Auction Agreement except with respect to its own individuals executing or delivering this Broker-Dealer Agreement or the Auction Agreement.

(f)     Anything in this Broker-Dealer Agreement to the contrary notwithstanding, in no event shall the Auction Agent be liable for special, indirect, punitive or consequential damage (or loss) of any kind whatsoever (including but not limited to lost profits), even if the Auction Agent has been advised of the likelihood of such damage (or loss) regardless of the form of action.

3.2     *Rights of the Auction Agent.*

(a)     The Auction Agent may conclusively rely on and shall be fully protected in acting or refraining from acting upon any communication authorized hereby and upon any written instruction, notice, request, direction, consent, report, certificate, security certificate or other instrument, paper, document or communication reasonably believed by it to be genuine. The Auction Agent shall not be liable for acting, or refraining from action, upon any communication made by telephone, Electronic Means or other means acceptable to the parties

and authorized hereby which the Auction Agent believes (or has no reason not to believe) to have been given by the Trustee, a Broker-Dealer, the Corporation, the Issuer or the Securities Depository. The Auction Agent may record telephone communications with the Trustee, the Issuer, the Corporation or BD.

(b)     The Auction Agent may consult with counsel of its choice, and the advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)     The Auction Agent shall not be required to advance, expend or risk its own funds or otherwise incur or become exposed to financial liability in the performance of its duties hereunder.

(d)     The Auction Agent may perform its duties and exercise its rights hereunder either directly or by or through agents or attorneys and shall not be responsible for any misconduct or negligence on the part of, or for the supervision of, any agent or attorney appointed by it with due care hereunder.

(e)     The Auction Agent shall have no obligation to monitor, or liability in respect of, the registration or exemption therefrom of the Bonds (or any beneficial ownership interest therein) under any federal or state securities laws or in respect of any transfer of the Bonds (or any beneficial ownership interest therein) pursuant to the terms of this Broker-Dealer Agreement, the Auction Agreement, the Indenture, any other document contemplated by any thereof, or otherwise, including, but not limited to, compliance with any such laws in regards to any such registration, exemption or transfer.

(f)     (i) Any corporation or other entity into which the Auction Agent may be merged or converted or with which it may be consolidated, (ii) any corporation or other entity resulting from any merger, conversion or consolidation to which the Auction Agent may be a party or (iii) any corporation or other entity succeeding to all or substantially all of the auction agent business of the Auction Agent shall be the successor of the Auction Agent hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto, except where any instrument of transfer or assignment is required by law to effect such succession, anything hereunder to the contrary notwithstanding.

3.3     *Auction Agent's Disclaimer.*

The Auction Agent makes no representations as to, and shall have no liability with respect to, the correctness of the recitals in, or the validity with respect to parties other than the Auction Agent, the accuracy or adequacy of this Broker-Dealer Agreement, the Auction Agreement, the Indenture, the Bonds or the Official Statement, as hereinafter defined, or any other offering material used in connection with the offer and sale of the Bonds or any other agreement or instrument executed in connection with the transactions contemplated herein or in any thereof.

SECTION 4.  FURNISHING OF INFORMATION AND OFFERING MATERIALS; INDEMNIFICATION.

4.1    *Furnishing of Information.*

The Corporation agrees to furnish, or cause to be furnished, BD with as many copies as BD may reasonably request, of the official statement relating to the Bonds (the "Official Statement") as the same may be supplemented or amended from time to time, and such other information with respect to the Corporation and its properties, the Indenture and the Bonds as BD shall reasonably request from time to time.

4.2    *Supplements and Amendments to Official Statement.*

If at any time during the term of this Broker-Dealer Agreement any event or condition known to the Corporation relating to or affecting the Corporation or its properties, the Bonds, the Indenture or the documents or transactions contemplated thereby, shall occur which, in the reasonable judgment of the Corporation or the Broker-Dealer, might affect the accuracy, correctness or completeness of any statement of a material fact contained in the Official Statement, as it shall have been supplemented or amended from time to time pursuant to this Section or included in any report or notice filed by the Corporation (each, a "Disclosure Statement") pursuant to the undertaking entered into by the Corporation pursuant to the requirements of Rule 15c2-12 of the Securities and Exchange Commission (the "Continuing Disclosure Undertaking") which in the reasonable judgment of the Corporation or BD might result in the Official Statement, as so supplemented or amended, containing any untrue, incorrect or misleading statement of material fact or omitting to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading, then:

(a)    the Corporation (as to events or conditions relating to itself and otherwise of which it becomes aware) shall promptly notify BD of the circumstances and details of such event;

(b)    if, in the opinion of BD, such event or condition requires the preparation and publication of an amendment or supplement to the Official Statement, the Corporation at its expense shall promptly prepare or cause to be prepared an appropriate amendment or supplement thereto, in a form and manner approved by BD, so that the statements in the Official Statement, as so amended or supplemented, will not contain any untrue, incorrect or misleading statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading; and

(c)    the Corporation shall take all necessary action to approve such supplement or amendment.

### 4.3   *Additional Information*

Without limiting the foregoing, the Corporation shall notify BD of:

(a)     proposed adverse determination letter from the Internal Revenue Service with respect to the federal income tax treatment of the Bonds, of which the Corporation shall have knowledge;

(b)     any replacement of the Trustee under the Indenture;

(c)     Any Event of Default under the Indenture provided such Event of Default relates to the Corporation, or any other default which, with notice or lapse of time or both, would constitute such an Event of Default;

(d)     the publication of notice of redemption or purchase of the Bonds, together with a copy of such notice (which notice shall be provided to BD no later than the date of publication of such notice); and

(e)     the occurrence of any of the following events with respect to the Bonds; (i) principal and interest payment delinquencies; (ii) non payment related defaults; (iii) unscheduled draws on debt service reserves; (iv) unscheduled draws on credit enhancements; (v) substitution of credit provider or liquidity provider, or their failure to perform; (vi) adverse tax opinions or events affecting the tax exempt status of the Bonds (initially as to Series K-1 only); (vii) modifications to rights of  security holders; (viii) bond calls; (ix) defeasance; (x) release, substitution, or sale of property securing repayment of the securities; (xi) rating changes (including any announcement that any of the Bonds, Corporation or the Bond Insurer has been put on credit watch); and (xii) failure of the Corporation to  provide "annual financial information" in accordance with Rule 15c2-12(b)(5)(i)(D) under the Securities Exchange Act as required in its Continuing Disclosure Undertaking.

### 4.4   *Indemnification and Contribution.*

(a)     To the extent, if any, that a court of competent jurisdiction would enforce such agreement as not contrary to law or public policy, the Corporation agrees to indemnify and hold harmless BD and each person, if any, who controls (as such term is defined in Section 15 of the Securities Act of 1933, as amended (the "1933 Act")) BD against any and all losses, claims, damages, expenses, and liabilities whatsoever arising out of any violation of this Broker-Dealer Agreement by the Corporation, including any untrue statement or alleged untrue statement in the Official Statement and the Disclosure Statement of a material fact or any omission or alleged omission of any material fact necessary to make the statements therein, at the time and in light of the circumstances under which they were made, not misleading, including, without limiting the generality of the foregoing, the aggregate amount paid in settlement of any litigation commenced or threatened or of any claim whatsoever based upon any such untrue statement or omission or alleged untrue statement or omission, including without limitation the reasonable costs and expenses (including fees and expenses of counsel) of investigating, preparing for or defending itself, if such settlement is effected with the written consent of the Corporation.  In each case the indemnification for any such settlement or expense shall be made

promptly by the Corporation as the costs of such settlement or expenses are incurred by BD. In case any claim should be made or action brought against any of BD or any controlling person (as aforesaid) based upon a violation of this Broker-Dealer Agreement by the Corporation, in respect of which indemnity may be sought against the Corporation, BD or such controlling person shall, as a condition to its right to indemnification hereunder, promptly notify the Corporation in writing setting forth the particulars of such claim or action and the Corporation shall assume the defense thereof, including the retaining of counsel and the payment of all expenses. BD or any such controlling person shall have the right to retain separate counsel in any such action and to participate in the defense thereof, but the fees and expenses of such counsel shall be at BD's expense or the expense of such controlling person unless the retaining of such counsel has been specifically authorized in writing by the Corporation or counsel retained by the Corporation has advised BD that the representation of the two parties would constitute a conflict.

(b)     If for any reason indemnification is unavailable to BD or insufficient to hold BD harmless in connection with this Broker-Dealer Agreement, then the Corporation shall contribute to the amount paid or payable by BD as a result of any loss, claim, damage or liability or action in respect thereof (including such legal or other expenses) in such proportion as is appropriate to reflect the relative benefits received by the Corporation on the one hand and BD on the other hand from the sale of the Bonds (as described in the next sentence) or, if such allocation is not permitted by applicable law, in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Corporation on the one hand and BD on the other as well as any other relevant equitable considerations. For this purpose the relative benefits received by Corporation on the one hand and BD on the other shall be deemed to be in the same proportion as the principal amount of the Bonds sold bears to one year's compensation, at the rate applicable at the time of such loss, claim, damage or liability or action, received by BD pursuant to Section 2.5 above. The Corporation agrees with BD that it would not be just and equitable if contribution pursuant to this provision were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to above. The reimbursement, indemnity and contribution obligations of the Corporation under this subsection shall be in addition to any liability which the Corporation may otherwise have, shall extend upon the same terms and conditions to the officers, members, partners, employees an controlling persons (if any) of BD and shall be binding upon and inure to the benefit of any successors and assigns of the Corporation and BD.

SECTION 5.  MISCELLANEOUS

5.1     *Termination.* BD may resign at any time, upon five Business Days' notice to the Auction Agent; provided, however, that BD may suspend its duties hereunder immediately if it determines, in its reasonable judgment, that for any reason, including, without limitation, (a) a pending or proposed change in applicable tax laws, (b) a material adverse change in the financial condition of the Corporation, (c) hostilities involving the United States, (d) a down-rating of the Bonds, or (e) an imposition of material restrictions on the Bonds or similar obligations, it is not advisable to attempt to Auction the Bonds. The Auction Agent upon the written direction of the Corporation, with the consent of the Issuer, which shall not be unreasonably withheld or delayed, may terminate this Broker-Dealer Agreement at any time on five Business Days' notice to the other parties hereto; and provided that this Broker-Dealer

Agreement shall terminate upon the resignation or removal of the BD pursuant to this Section 5.1 or termination of the Auction Agreement.

       5.2    *Participant*. BD is and for the term of this Broker-Dealer Agreement shall remain a member of, a participant in, or an affiliate of such a member or participant in Securities Depository; and will give the Auction Agent, each other Broker-Dealer, the Corporation and the Trustee two Business Days' notice if it ceases to be so or if it changes its participation or affiliation to a different Securities Depository.

       5.3    *Communications*. Except for communications authorized to be made by Electronic Means or other communication acceptable to the parties pursuant to this Broker-Dealer Agreement or the Auction Procedures all notices, requests and other communications to any party hereunder shall be in writing (which may be by facsimile) and shall be given to such party, addressed to it, at its address or facsimile number address set forth below and, where appropriate, reference the particular Auction to which such notice relates:

| | |
|---|---|
| If to BD addressed: | J.P. Morgan Securities Inc. |
| | 270 Park Avenue, 6th Floor |
| | New York, New York 10017 |
| | Attention:  Municipal Short-Term Desk |
| | Telephone Number:  (212) 834-7175 |
| | Facsimile: (212) 834-6743 |
| | |
| If to the Auction Agent addressed: | Wilmington Trust Company |
| | 1100 North Market Street |
| | Wilmington, DE  19890 |
| | Attention:  Michael H. Wass/Corporate Trust Administration |
| | Telephone Number:  (302) 636-6398 |
| | Facsimile:  (302) 636-4145 |
| | Email:  auctionteam@wilmingtontrust.com |
| | |
| If to the Corporation addressed: | Quinnipiac University |
| | 275 Mount Carmel Avenue |
| | Hamden, CT 06518 |
| | Attention: Senior Vice President for Finance and Administration |
| | Telecopier:  (203) 582-8936 |
| | Telephone:  (203) 582-8643 |

or such other address, telephone, facsimile number or e-mail address as such party may hereafter specify for such purpose by notice to the other party.   Each such notice, request or communication shall be effective when delivered at the address specified herein. Communications shall be given on behalf of BD by a BD Officer and on behalf of the Auction Agent by an Authorized Officer.

5.4     *Recording of Conversations.* BD may record telephone communications with the Issuer, the Corporation, the Trustee, or the Auction Agent, or all of them.

5.5     *Entire Agreement.* This Broker-Dealer Agreement, and the other agreements and instruments executed and delivered in connection with the issuance of the Bonds, contain the entire agreement between the parties relating to the subject matter hereof, and there are no other representations, endorsements, promises, agreements or understandings, oral, written or inferred, between the parties relating to the subject matter hereof.

5.6     *Benefits; Successors and Assigns.* This Broker-Dealer Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the respective successors and assigns of BD, the Auction Agent and the Corporation. Except as provided in Section 3.2(f) hereof, this Broker-Dealer Agreement may not be assigned by any party hereto absent the prior written consent of the other parties; provided, however, that: (a) the Broker-Dealer Agreement may be assigned by the Auction Agent to a successor Auction Agent selected by the Corporation without the consent of BD and BD may assign its rights and obligations hereunder to an affiliate of BD or to an entity succeeding to the business of BD. Nothing in this Broker-Dealer Agreement, express or implied, shall give to any person, other than the Auction Agent and BD and their respective successors and assigns, any benefit of any legal or equitable right, remedy or claim under this Broker-Dealer Agreement, other than the rights expressly granted to the Issuer herein.

5.7     *Amendment; Waiver.*

(a)     This Broker-Dealer Agreement shall not be deemed or construed to be modified, amended, rescinded, canceled or waived, in whole or in part, except by a written instrument signed by a duly authorized representative of the parties hereto.

(b)     Failure of any party to this Broker-Dealer Agreement to exercise any right or remedy hereunder in the event of a breach of this Broker-Dealer Agreement by any other party shall not constitute a waiver of any such right or remedy with respect to any subsequent breach.

(c)     Notwithstanding anything herein to the contrary, the Auction Agent may, but shall have no obligation to execute any amendment or waiver which affects its rights, powers, immunities or indemnities hereunder.

5.8     *Severability.* If any clause, provision or section of this Broker-Dealer Agreement shall be ruled invalid or unenforceable by any court of competent jurisdiction, the invalidity or unenforceability of such clause, provision or section shall not affect any of the remaining clauses, provisions or sections hereof.

5.9     *Execution in Counterparts.* This Broker-Dealer Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

5.10    *Governing Law; Jurisdiction; Waiver of Trial by Jury.*

(a)    This Broker-Dealer Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in said State, without giving effect to principles of choice of law or conflicts of law thereof.

(b)    The parties agree that all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in a New York State Court or United States District Court, in each case, in the County of New York and, in connection with any such action or proceeding, submit to the jurisdiction of, and venue in, such County.

(c)    Each party to this Broker-Dealer Agreement hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Broker-Dealer Agreement in any court referred to in Section 5.10(b) hereof. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Broker-Dealer Agreement irrevocably consents to service of process in the manner provided for notices in Section 5.3 hereof. Nothing in this Broker-Dealer Agreement will affect the right of any party to this Broker-Dealer Agreement to serve process in any other manner permitted by law.

(e)    EACH PARTY TO THIS BROKER-DEALER AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THE INDENTURE, THIS BROKER-DEALER AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE). EACH PARTY HERETO ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS BROKER-DEALER AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH.

5.11    *No Implied Duties.*

Nothing contained in this Broker-Dealer Agreement, the Auction Procedures or the Auction Agreement shall be deemed to imply any duties, covenants or obligations on the part of the Corporation not otherwise expressly set forth herein or therein.

IN WITNESS WHEREOF, the parties hereto have caused this Broker-Dealer Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date first above written.

WILMINGTON TRUST COMPANY,
  as Auction Agent

By: _Michael H. Van_____
   Authorized Signatory


J.P. MORGAN SECURITIES INC.,
  as Broker-Dealer

By: _Scott W_____
   Authorized Signatory


QUINNIPIAC UNIVERSITY

By: _____
   Authorized Signatory

EXHIBIT A — Auction Procedures

# EXHIBIT 6

**STATE OF CONNECTICUT HEALTH AND EDUCATIONAL FACILITIES AUTHORITY**

**REVENUE BONDS, QUINNIPIAC UNIVERSITY ISSUE**

$64,650,000                                                                                    $51,700,000
Series K-1                                                                                       Series K-2
(Tax Exempt)                                                                                    (Taxable)

---

**PURCHASE CONTRACT**

---

State of Connecticut Health and Educational Facilities Authority
Columbus Boulevard, 7th Floor
Hartford, Connecticut 06106-1978
Members of the Board of Directors:

        J.P. Morgan Securities Inc., as senior manager (the "Underwriter") offers to enter into the following agreement with the State of Connecticut Health and Educational Facilities Authority (the "Authority"), which, upon the acceptance of this offer by the Authority, will be binding upon the Authority and upon the Underwriter. This offer is made subject to the acceptance by the Authority of this Purchase Contract on or before 5:00 P.M., Hartford time, on the date set forth in item 1 of Schedule A-1 for the Series K-1 Bonds and Schedule A-2 for the Series K-2 Bonds attached hereto (the "Date Hereof").

        1.        Upon the terms and conditions and upon the basis of the representations, warranties and covenants set forth herein, the Underwriter hereby agrees to purchase from the Authority, and the Authority hereby agrees to sell to the Underwriter, all (but not less than all) of the State of Connecticut Health and Educational Facilities Authority Revenue Bonds, Quinnipiac University Issue, consisting of $64,650,000 Series K-1 Tax-Exempt (the "Series K-1 Bonds") and $51,700,000 Series K-2 Taxable (the "Series K-2 Bonds" and, collectively with the Series K-1 Bonds, the "Bonds"). The aggregate principal amount of the Bonds, the date of the Bonds, the date and years of the maturities of the Bonds, the principal amount of the Bonds due on each maturity, the sinking fund installments and years thereof, the interest rates per annum for the Bonds (or the variable rate formula therefor) and the public offering prices of each maturity of the Bonds are set forth in item 2 of Schedule A-1 for the Series K-1 Bonds and Schedule A-2 for the Series K-2 Bonds as attached hereto. The Bonds shall be subject to redemption as set forth in the Official Statement dated December 13, 2007 (the "Official Statement") and shall in all other respects be the same Bonds described in the Official Statement. The purchase price for the Bonds shall be as set forth in item 3 of Schedule A-1 for the Series K-1 Bonds and Schedule A-2 for the Series K-2 Bonds as attached hereto.

        The Bonds will be secured by a municipal bond insurance policy (the "Bond Insurance Policy") to be issued by MBIA Insurance Corporation (the "Bond Insurer").

        The Underwriter represents and warrants that it has been duly authorized to execute this Purchase Contract.

        2.        On the Date Hereof, the Authority shall deliver to the Underwriter copies of the forms of: (i) the Loan Agreement, to be dated as of December 1, 2007 (the "Loan Agreement"), intended to be executed by the Authority and Quinnipiac University (the "Institution"); (ii) the Trust Indenture, to be dated as of December 1, 2007 (the "Trust Indenture"), intended to be executed by the Authority and U.S. Bank National Association, as bond trustee (the "Bond Trustee") relating to the issuance of the Bonds; (iii) the Mortgage Note, to be dated as of December 1, 2007, from the Institution to the Authority (the "Note"); (iv) the Open-End Mortgage (Security

Agreement and Financing Statement), to be dated December 1, 2007, from the Institution to the Authority (the "Mortgage"); (v) the Assignment of Mortgage and Note, to be dated as of December 1, 2007 (the "Assignment"), by the Authority to the Bond Trustee; (vi) the Tax Regulatory Agreement for the Series K-1 Bonds, to be dated the date of the Closing (the "Tax Regulatory Agreement"), by and among the Authority, the Institution and the Bond Trustee; (vii) the Continuing Disclosure Agreement, to be dated as of December 1, 2007 (the "Continuing Disclosure Agreement"), intended to be executed by the Institution and the Bond Trustee;(viii) the Remarketing Agreement to be dated as of December 1, 2007 (the "Remarketing Agreement") by and between the Institution and J.P. Morgan Securities Inc., as initial remarketing agent; (ix) the Refunding Escrow Deposit Agreement, to be dated as of December 1, 2007 (the "Escrow Agreement"), between the Authority and U.S. Bank National Association, as Escrow Agent; (x) the Auction Agreement, dated as of December 1, 2007 (the "Auction Agreement"), between the Wilmington Trust Company (the "Auction Agent") and the Bond Trustee; and (xi) the Broker-Dealer Agreement, dated as of December 1, 2007 (the "Broker-Dealer Agreement"), among the Institution, the Auction Agent and J.P. Morgan Securities Inc. (the "Broker-Dealer"). Also on the Date Hereof, the Underwriter shall have received: (i) an executed Letter of Representation and Indemnification from the Institution, addressed to the Authority and the Underwriter, dated as of the Date Hereof (the "Letter of Representation"); (ii) the Hazardous Substance Certificate and Indemnification Agreement, to be dated as of December 1, 2007 (the "Hazardous Substance Agreement"), intended to be executed by the Institution for the benefit of the Authority and the Bond Trustee; and (iii) a letter of McGladrey & Pullen, auditors for the Institution, dated on or before the Date Hereof, addressed to the Underwriter and the Authority, agreeing to the inclusion of the audited financial statements of the Institution as Appendix B to the Official Statement.

The Authority hereby acknowledges that the Official Statement dated December 13, 2007 was deemed final as of its date for purposes of Rule 15c2-12 ("Rule 15c2-12") promulgated under the Securities Exchange Act of 1934, as amended, except for the information provided by or relating to the Institution, the Bond Insurer, and The Depository Trust Company ("DTC"). We have also received, on or prior to such date, certifications from the Institution that, with respect to portions of the Official Statement relating to it, the Official Statement is deemed final for such purposes as of the date thereof.

3.      The Underwriter agrees to make a bona fide public offering of all of the Bonds at a price not in excess of the initial public offering price, which shall be as set forth in item 2 of Schedule A-1 for the Series K-1 Bonds and Schedule A-2 for the Series K-2 Bonds as attached hereto. The Authority authorizes the Loan Agreement, the Trust Indenture, the Hazardous Substance Agreement, the Letter of Representation, the Continuing Disclosure Agreement, the Escrow Agreement, the Note, the Assignment, the Mortgage, the Auction Agreement, the Broker-Dealer Agreement, the Bond Insurance Policy and the Official Statement to be used in connection with the public offering and sale of the Bonds. The Authority consents to the use by the Underwriter, prior to the Date Hereof, of the Official Statement in connection with the public offering of the Bonds.

No later than seven (7) business days after the acceptance hereof by the Authority, the Authority shall deliver to the Underwriter copies of the final printed form of the Official Statement of the Authority relating to the Bonds in such quantities as the Underwriter may reasonably request in order to comply with the rules of the Municipal Securities Rulemaking Board and Rule 15c2-12(b)(4) under the Securities Exchange Act of 1934.

The Underwriter agrees that it shall deliver an Official Statement to all nationally recognized municipal securities information repositories (approved by the Securities and Exchange Commission as eligible for compliance under Rule 15c2-12(b)(4) of the Securities Exchange Act of 1934) and to the Municipal Securities Rulemaking Board on or prior to the date of the Closing. Unless the Authority is otherwise notified in writing by the Underwriter, the Underwriter represents and warrants that the "end of the underwriting period" for purposes of Rule 15c2-12(b)(4) shall be the date of the Closing. The Authority agrees that if, through the 25th day after the date of the Closing, there shall occur an event that might cause the Official Statement to contain any untrue statement of a material fact or to omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, to notify the Underwriter, and, if in the opinion of the Underwriter such event requires the preparation and publication of a supplement or amendment to the Official Statement, at its expense (solely from funds derived from the Institution) to supplement or amend the Official Statement in a form and manner approved by the Underwriter and furnish to the Underwriter a reasonable number of copies of such supplement or amendment. Following the 25th day after the end of the underwriting period, the final

Official Statement may be amended or supplemented only to the extent as may be approved by the Underwriter and the Authority, which approval shall be in writing and shall not be unreasonably withheld by either party.

4.      In the event that the Underwriter fails (other than for a reason permitted hereunder) to accept and pay for the Bonds at the Closing as herein provided, the Underwriter shall pay to the Authority an amount equal to the amount set forth in item 4 of <u>Schedule A-1</u> for the Series K-1 Bonds and <u>Schedule A-2</u> for the Series K-2 Bonds as attached hereto as and for full liquidated damages for such failure and for any defaults hereunder on the part of the Underwriter and such amount shall constitute a full release and discharge of all claims and damages for such failure and for any and all such defaults, and the Authority shall have no further action for damages, specific performance or any other legal or equitable relief against the Underwriter.

5.      The Authority represents and warrants to the Underwriter (and it shall be a condition of the obligation of the Underwriter to purchase and accept delivery of the Bonds at the Closing, that the Authority shall so represent and warrant) that:

(a)      The Authority has complied and will comply at the Closing in all material respects in connection with the issuance of the Bonds with the State of Connecticut Health and Educational Facilities Authority Act, being Chapter 187 of the General Statutes of Connecticut Sections 10a-176 to 10a-198, inclusive, as amended (the "Act"), and that the Authority has full legal right, power and authority to make loans to "participating health care institutions", "participating institutions for higher education" and "participating qualified nonprofit organizations" as defined in the Act, and is empowered to issue revenue bonds for such purpose, to enter into this Purchase Contract, the Tax Regulatory Agreement, the Loan Agreement, the Escrow Agreement, the Assignment, the Mortgage and the Trust Indenture, to issue, sell and deliver the Bonds to the Underwriter as provided herein and to carry out and consummate all other transactions contemplated by each of the aforesaid documents; and

(b)      With respect to information therein under the heading "The Authority" (excluding the biographies of the members of the Authority and financing and statistical data contained therein), insofar as such information summarizes or describes the Authority, the Official Statement was as of its date and will be as of the date of the Closing, true, correct and complete in all material respects and did not, does not and will not omit any material statement which should be included therein for the purpose for which the Official Statement is to be used, or which is necessary to make the statements as to such matters contained therein not misleading in any material respect.

6.      The Authority, at the expense of the Underwriter, will furnish such information, execute such instruments and take such action in cooperation with the Underwriter as the Underwriter may reasonably request to qualify the Bonds for offer and sale under the Blue Sky or other securities laws and regulations of such states and other jurisdictions of the United States as the Underwriter may designate; provided, however, that the Authority will not be required to qualify as a foreign corporation or to file any general or special consents to service of process under the laws of any state.

7.      The Bonds will be initially registered in book-entry only form through the facilities of DTC. The Underwriter requests that the Bonds be registered in the name of "Cede & Co.", as the nominee of DTC, and that there be one (1) typewritten Bond for [each maturity of] the Bonds. The Authority agrees that it will to the extent practicable deliver to DTC in escrow the Bonds for inspection one business day prior to the Closing as hereinafter defined.

8.      On the date of the Closing as set forth in item 5 of <u>Schedule A-1</u> and <u>Schedule A-2</u> attached hereto or on such other date as shall have been mutually agreed upon, the Authority will release the Bonds from escrow to DTC on behalf of the Underwriter in fully registered definitive form, duly executed and authenticated, together with the other documents hereinafter mentioned, and the Underwriter, will accept such delivery and pay the purchase price of the Bonds as set forth in item 3 of <u>Schedule A-1</u> for the Series K-1 Bonds and <u>Schedule A-2</u> for the Series K-2 Bonds as attached hereto in such amount of Federal Funds, not exceeding the amount set forth in item 6 of <u>Schedule A-1</u> for the Series K-1 Bonds and <u>Schedule A-2</u> for the Series K-2 Bonds as attached hereto, as shall be communicated by the Authority to the Underwriter not later than 72 hours prior to the Closing, and the balance by certified or bank cashier's check or checks payable in New York Clearing House funds

to the order of "State of Connecticut Health and Educational Facilities Authority". This payment and delivery is herein called the "Closing".

        9.    The Underwriter's obligations hereunder to purchase and pay for the Bonds shall be subject to the performance by the Authority of the obligations of the Authority to be performed hereunder at or prior to the Closing and the accuracy in all material respects of your representations and warranties contained herein and shall also be subject to the following:

        (a)    That at the time of the Closing, the Loan Agreement, the Escrow Agreement, the Note, the Assignment, the Mortgage, the Trust Indenture, the Tax Regulatory Agreement, the Hazardous Substance Agreement, the Letter of Representation, the Auction Agreement, the Broker-Dealer Agreement and this Purchase Contract shall be in full force and effect, and shall not have been amended, modified, or supplemented except as may have been agreed to by the Underwriter; the Bond Insurance Policy shall be in full force and effect and delivered to the Trustee; and there shall have been taken in connection with the issuance of the Bonds such actions as, in the opinion of Pullman & Comley, LLC, Bond Counsel, shall be necessary and appropriate in connection with the transactions contemplated hereby; and

        (b)    That at or prior to the Closing the Underwriter shall receive the following documents:

        (i)    A copy of the Official Statement, executed on behalf of the Authority by an Authorized Officer, including Appendix A thereto which shall be executed on behalf of the Institution by its authorized officer;

        (ii)    The approving opinion of Pullman & Comley, LLC, Bond Counsel, dated the date of the Closing, in substantially the form attached as Appendix H to the Official Statement;

        (iii)    A certificate, dated the date of the Closing, of an Authorized Officer of the Authority, to the effect that: (1) the representations and warranties of the Authority herein are true and correct in all material respects as of the date of the Closing; (2) no litigation is pending or, to the best of such officer's knowledge, threatened against the Authority (either in state or federal courts) to restrain or enjoin the issuance, execution or delivery of the Bonds or in any manner questioning the proceedings or authority for the issuance thereof or affecting directly or indirectly the validity of the Bonds or of any provisions made or authorized for their payment, including the Trust Indenture or the Loan Agreement or the Mortgage, or contesting the existence of the Authority or the title of any of its members or officers to their respective offices or the collection of Revenues pledged under the Trust Indenture (but in lieu of such certificate the Underwriter may accept an opinion of Bond Counsel, in form and substance acceptable to the Underwriter, that in their opinion the issues raised in any such pending or threatened litigation are without substance or that the contentions of any plaintiffs therein are without merit); and (3) to the best of such officer's knowledge, no event affecting the Authority has occurred since the date of the Official Statement which should be disclosed in the Official Statement for the purpose for which it is to be used or which is necessary to disclose therein in order to make the statements and information therein concerning the Authority not misleading in any material respect;

        (iv)    The supplemental opinion, dated the date of Closing, of Pullman & Comley, LLC, Bond Counsel, addressed to the Authority, the Bond Insurer, and the Underwriter, to the general effect that: (1) the sections of the Official Statement entitled, "The Authority" (excluding the biographies of the members of the Authority and financial and statistical data included therein), "The Series K-1 Bonds" and "The Series K-2 Bonds" (excluding the section entitled "Book-Entry-Only System"), "Security and Sources of Payment for the Bonds, "Tax Matters", "Legality of the Bonds for Investment and Deposit", "Negotiable Instruments", "State Not Liable on the Bonds", and "Covenant by the State" and Appendices C, D and E are correct in all material respects, and no facts have come to their attention which would lead them to believe that such sections of the Official Statement, as of its date and as of the date of the Closing, contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements in such sections, in light of the circumstances under which they were made, not misleading (no

opinion need be expressed with respect to any other portions of the Official Statement, Appendices A, B, F, H or J or information with respect to DTC or any other securities depository or any information with respect to the Bond Insurer or the Bond Insurance Policy, or any other financial or statistical data contained in the Official Statement); (2) the Auction Procedures set forth in Appendix J to the Official Statement conform in all material respects to the Auction Procedures set forth in Exhibit A to the Trust Indenture; and (3) the Bonds and the Note are exempt from the registration requirements of the Securities Act of 1933, as amended, and the Trust Indenture is exempt from qualification as an indenture under the Trust Indenture Act of 1939, as amended;

(v)     The opinion, dated the date of Closing, of Squire, Sanders & Dempsey L.L.P., counsel to the Underwriter, addressed to the Underwriter (with a reliance letter addressed to the Authority), to the effect that: (1) no facts have come to their attention which would lead them to believe that the Official Statement (except for the sections entitled "Book-Entry-Only System", "The Authority", and "Tax Matters" and any information with respect to the Bond Insurer or the Bond Insurance Policy, and Appendices B, C, D, E, F, G, H and J thereto, and the financial and statistical information contained in the Official Statement, as to which no opinion is expressed), as of its date and as of the date of Closing, contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; (2) no registration with the Securities and Exchange Commission under the Securities Act of 1933, as amended, need be made in connection with the offer and sale of the Bonds by the Underwriter; and (3) the Trust Indenture is not required to be qualified as an indenture under the Trust Indenture Act of 1939, as amended; and (4) the Continuing Disclosure Agreement complies as to form with the requirements of Rule 15c2-12;

(vi)     The opinion, dated the date of Closing, of Shipman & Goodwin LLP, special counsel to the Authority, addressed to the Authority, the Trustee, the Bond Insurer and the Underwriter, to the general effect that: (1) the Authority is duly organized and exists as a body politic and corporate of the State of Connecticut, constituting a public instrumentality organized and existing under and by virtue of the laws of the State of Connecticut with the powers and authority set forth in the Act; (2) each of the Trust Indenture, the Loan Agreement, the Assignment, the Escrow Agreement, this Purchase Contract, the Tax Regulatory Agreement, and the Bonds has been duly authorized, executed and delivered by the Authority and each constitutes a legal, valid and binding obligation of the Authority, enforceable against the Authority in accordance with its terms; (3) the Authority's execution and delivery of, and compliance with, the terms and conditions of the Trust Indenture, the Loan Agreement, the Mortgage, the Assignment, the Escrow Agreement, this Purchase Contract, the Tax Regulatory Agreement and the Bonds will not violate or conflict with any provision of the Constitution of the State of Connecticut or any applicable statute (including the Act), or, to the best of such counsel's knowledge, any rule, order, regulation, judgment or decree of any court, agency or other governmental or administrative board or body to which the Authority is subject, or conflict with or constitute a breach of or a default under the Authority's By-Laws, or, to the best of such counsel's knowledge, any indenture, mortgage, deed of trust, agreement or other instrument to which the Authority is a party or by which it or its properties are bound; and (4) no additional or further approval, consent or authorization of any governmental or public agency or authority not already obtained is required by the Authority in connection with the issuance or delivery of the Bonds to the Underwriter or entering into and performing its obligations under the Bonds, the Trust Indenture, the Loan Agreement, the Mortgage, the Assignment, the Escrow Agreement, the Tax Regulatory Agreement, or this Purchase Contract;

(vii)     The opinion dated the date of Closing, of Wiggin & Dana LLP, counsel to the Institution, addressed to the Authority, the Trustee, the Bond Insurer, and the Underwriter and upon which Bond Counsel and counsel to the Underwriter may rely, to the effect that: (1) the Institution has been duly organized and is validly existing as a non-stock corporation incorporated under the laws of the State of Connecticut; (2) the Institution has full corporate power and authority to finance the Project with the loan from the Authority of the proceeds of the Bonds, to

adopt resolutions approving the form of or ratifying, as the case may be, the Loan Agreement, the Note, the Mortgage, the Letter of Representation, the Tax Regulatory Agreement, the Broker-Dealer Agreement, the Hazardous Substance Agreement, the Continuing Disclosure Agreement, and the other documents to which the Institution is a party required in connection with the issuance of the Bonds and the security therefor (collectively, the "Institution Documents") and to execute and deliver the Institution Documents; (3) nothing has come to their attention which would lead them to believe that (i) the portions of the Official Statement describing the Institution, the Project, the real property of the Institution, the personal property of the Institution, the Institution Documents, or the application of the proceeds of the Bonds; or (ii) Appendix A to the Official Statement (other than any financial statements or any other financial or statistical data included therein as to which no opinion need be expressed), as of the date of the Official Statement and as of the date of the Closing, contain an untrue statement of a material fact, or omit to state a material fact, necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; (4) the Institution has taken all requisite corporate proceedings to authorize the execution and delivery by the Institution of the Institution Documents and has validly authorized one or more of its officers to take any further action which is necessary or appropriate to carry out the transaction contemplated by the Institution Documents and the Official Statement; (5) the Institution Documents have been duly authorized, executed and delivered by the Institution, and constitute valid and binding agreements of the Institution enforceable in accordance with their terms; (6) to the best of their knowledge, after due inquiry and investigation, there is no action, suit, proceeding or investigation at law or in equity before or by any court, public board or body, pending or threatened against or affecting the Institution: (i) seeking to restrain or enjoin the issuance or delivery of the Bonds or the Note, (ii) in any way contesting or affecting any authority for the issuance of the Bonds or the validity of the Bonds, the Trust Indenture, the Institution Documents or this Purchase Contract, (iii) in any way contesting the corporate existence or powers of the Institution, or (iv) wherein an unfavorable decision, ruling or finding would adversely affect or could reasonably be expected to have a material adverse effect upon the transactions contemplated by the Official Statement, the Trust Indenture, the Institution Documents, this Purchase Contract, or the validity or enforceability of the Institution Documents, or the ability of the Institution to perform its obligations thereunder, as applicable to the extent the Institution is a party thereto; (7) to the best of their knowledge, the execution and delivery of the Institution Documents, and compliance with the provisions thereof, under the circumstances contemplated thereby, do not conflict with or violate any provision of any charter, by-laws, or any other organizational documents of the Institution or conflict with or constitute on the part of the Institution a breach of or default under any other agreement or instrument to which the Institution is a party or by which the Institution is bound, or any existing law (except federal or state securities laws, as to which no opinion is expressed), regulation, court order or consent decree to which the Project, the Institution or any of its revenues, properties, assets or operations is subject; (8) the Institution is an organization described in Section 501(c)(3) of the Code and is not a "private foundation" as described in Section 509(a) of the Code, and, assuming the proceeds of the Bonds are used as described in the Loan Agreement and the Tax Regulatory Agreement, the proceeds of the Bonds will be used in furtherance of the "exempt purposes" of the Institution; (9) all licenses, consents, approvals or authorizations of any federal, state or local governmental authority required on the part of the Institution to be obtained in connection with the execution and delivery of the Institution Documents, and the performance by the Institution of its obligations thereunder, and the Institution's consummation of the transactions contemplated thereby and by the Official Statement, which can be obtained as of the Closing, have been duly obtained, and the Institution has complied with all applicable provisions of law requiring any designation, declaration, filing, registration or qualification with any governmental authority in connection therewith; (10) the filing of a financing statement on Form UCC-1 with the Secretary of State of Connecticut describing the Gross Receipts will, when filed, be sufficient to perfect the security interest created by the Loan Agreement and the Mortgage in all right, title and interest of the Institution in those items and types of property included in the Gross Receipts in which a security interest may be perfected by the filing of a financing statement under the Connecticut Uniform Commercial Code (the "UCC"), subject to the qualification that the security interest in certain items and types of property included in the Gross Receipts (including, without limitation, cash and

6

certain securities) may not be perfected by the filing of a financing statement under the UCC, and there were on record in such office no filings with respect to the Gross Receipts prior to such financing statement (except with regard to Parity Debt); (11) the Note is not required to be registered pursuant to the Securities Act of 1933, as amended; (12) the Project is not located in an area designated by the Department of Housing and Urban Development as having a special flood hazard; (13) the filing of a financing statement on Form UCC-1 with the Secretary of State of Connecticut describing the Mortgaged Premises will, when filed, be sufficient to perfect the security interest created by the Mortgage in all right, title and interest of the Institution in those items and types of property included in the Mortgaged Premises in which a security interest may be perfected by the filing of a financing statement under the UCC, subject to the qualification that the security interest in certain items and types of property included in the Mortgaged Premises may not be perfected by the filing of a financing statement under the UCC, and there were on record in such office no filings with respect to the Mortgaged Premises prior to such financing statement; (14) based solely upon the title insurance policy for the Mortgaged Premises (the "Title Policy"), the Institution has good and marketable title to the Mortgaged Premises, subject only to recorded Permitted Encumbrances (as defined in the Loan Agreement); and (16) no bankruptcy proceedings are pending against the Institution nor are any proceedings for the liquidation or dissolution of the Institution pending. Such opinion shall also state that (a) the opinion is rendered with the intention that it benefits the Authority, the Underwriter, the Trustee, the Bond Insurer, the Authority's Bond Counsel, Pullman & Comley, LLC, the Authority's special counsel, Shipman & Goodwin LLP and the Underwriter's counsel, Squire, Sanders & Dempsey L.L.P. (the "Benefited Parties"); (b) the opinion is requested directly by the Benefited Parties; and (c) such counsel acknowledges that the Benefited Parties are relying on such opinion. Such opinion may state that the enforcement of remedies under the Institution Documents is subject to bankruptcy, insolvency, reorganization, moratorium, and other laws affecting creditors' rights generally, constitutional limitations on creditors' recourse to security in the absence of notice and a hearing, and statutes and case law requiring that creditors' rights be exercised in good faith and in commercially reasonable fashion, general principles of equity, including the availability of remedies of specific performance or injunctive relief being subject to the discretion of the court, and otherwise as acceptable to the Authority and the Underwriter;

        (viii)    A certificate of the Institution signed by a duly authorized officer, dated the date of Closing, to the effect that: (1) the representations of the Institution contained in the Letter of Representation are still true and correct; (2) since the date of the Official Statement, no material adverse change has occurred in the financial position or results of operations of the Institution other than as set forth in or contemplated by the Official Statement; (3) the Institution has not, since the date of the Official Statement, incurred any material liabilities other than in the ordinary course of business or as set forth in or contemplated by the Official Statement; (4) as of the date of the Closing, the Official Statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided no representation is made by the Institution as to information contained therein or omitted therefrom that relates solely to the Authority, DTC, the Bond Insurer or the Underwriter; (5) no litigation (including any action, suit, proceeding or investigation at law or in equity before or by any court, public board or body) is pending or, to his or her knowledge, threatened against or affecting the Institution (i) seeking to restrain or enjoin the issuance or delivery of the Bonds or the Note, (ii) in any way contesting or affecting any authority for the issuance of the Bonds or the validity of the Bonds, the Trust Indenture, the Institution Documents, the Escrow Agreement, or this Purchase Contract, (iii) in any way contesting the corporate existence or powers of the Institution, (iv) which might reasonably result in a material liability on the part of the Institution or might materially and adversely affect the operation, condition or feasibility of the Project or the financial condition or results of operations of the Institution, or (v) wherein an unfavorable decision, ruling or finding would adversely affect the transactions contemplated by the Bonds, the Trust Indenture, the Institution Documents, the Escrow Agreement, the Official Statement, or this Purchase Contract or the validity or enforceability of the Bonds, the Trust Indenture, the Institution Documents, the Escrow Agreement, or this Purchase Contract, or the ability of the Institution to perform its

obligations thereunder; (6) the execution and delivery by the Institution of, and its performance of its obligations under or contemplated by, and its compliance with the terms and conditions of, the Bonds, the Trust Indenture, the Escrow Agreement, the Institution Documents, and the consummation of the transactions to which the Institution is or is to be a party as contemplated by such documents and the Official Statement (a) do not and will not violate or conflict with any provision of any statute, or any rule, order, regulation, judgment or decree of any court, agency or other governmental or administrative board or body to which the Institution is subject, or conflict with or constitute a breach of or a default under any provision of the Institution's Certificate of Incorporation or By-Laws, or any indenture, mortgage, deed of trust, agreement or other instrument to which the Institution is a party or by which it or its properties are bound; and (b) will not result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the Institution's revenues, properties or assets; (7) the Institution is not in any material respect in breach or violation of or default under any applicable law, regulation, judgment, order, injunction, decree or ruling by or to which the Institution or any of its revenues, properties, assets or operations is subject or any agreement or other instrument by or to which the Institution is a party or by which the Institution or any of its revenues, properties, assets or operations is bound or subject, and no event has occurred and is continuing that with the passage of time or the giving of notice, or both, would constitute such a breach, violation or default under any such instrument; (8) all licenses, consents, approvals or authorizations of any federal, state or local governmental authority required on the part of the Institution to be obtained in connection with the execution and delivery by the Institution of the Institution Documents, and the performance by the Institution of its obligations thereunder and the Institution's consummation of the transactions contemplated thereby and by the Official Statement, which can be obtained by the Closing, have been duly obtained and the Institution has complied with all applicable provisions of law requiring any designation, declaration, filing, registration or qualification with any governmental authority in connection therewith; (9) to the best of such officer's knowledge, no bankruptcy proceedings are pending or contemplated by or against the Institution nor are any proceedings for the liquidation or dissolution of the Institution pending or contemplated; and (10) to the best of such officer's knowledge, after due inquiry, no event affecting the Institution has occurred since the date of the final Official Statement (including all appendices thereto) which should be disclosed therein in order to make the statements and information therein not misleading in any material respect;

(ix)  A certificate or certificates of the Institution, reasonably satisfactory to the Authority and the Underwriter and dated the date of the Closing, to the effect that the Institution's insurance coverages then in effect comply with the requirements set forth in the Loan Agreement, with copies of all insurance policies and confirmation of payment of all premiums;

(x)  The opinion, dated the date of Closing, of counsel to the Bond Trustee, addressed to the Authority, the Bond Insurer and the Underwriter in form and substance satisfactory to the Authority and the Underwriter;

(xi)  The Institution Documents, the Assignment, and the Trust Indenture;

(xii)  A certificate of the Governor of the State of Connecticut, evidencing the Governor's approval of the issuance of the Bonds for purposes of Section 147(f) of the Code;

(xiii)  A transcript of the proceedings, in the usual form, relating to the authorization and issuance of the Bonds;

(xiv)  Evidence that Moody's Investors Service, Inc. and Standard & Poor's Ratings Service have assigned long-term ratings of "Aaa" and "AAA", respectively, to the Bonds and that such ratings are in full force and effect and have not been withdrawn, suspended or reduced;

(xv)  Title Insurance Policy with respect to the Mortgaged Premises;

8

(xvi)   Survey of the Mortgaged Premises certified to the Authority;

(xvii)   A copy of the Bond Insurance Policy issued by the Bond Insurer and certificates of the Bond Insurer and opinions of counsel to the Bond Insurer in form and substance satisfactory to the Authority, Bond Counsel, the Underwriter and counsel to the Underwriter;

(xviii)   A letter of McGladrey & Pullen, auditors to the Institution, dated the date of the Closing, addressed to the Authority and the Underwriter as to the financial information set forth in Appendix A and B to the Official Statement, as of a date not more than five (5) business days prior to the Closing in form and substance satisfactory to the Authority and the Underwriter;

(xix)   A copy of the Escrow Agreement relating to the refunding and defeasance of the Authority's Revenue Bonds, Quinnipiac College Issue, Series E, dated December 1, 1998, the Authority's Revenue Bonds, Quinnipiac University Issue, Series F, dated October 31, 2001 and the Authority's Variable Rate Demand Revenue Bonds, Quinnipiac University Issue, Series G, dated November 18, 2003 (the "Prior Bonds"), together with a defeasance certificate of the trustee for the Prior Bonds, a Verification Report of the Arbitrage Group, Inc. issued with respect to the defeasance of the Prior Bonds, and the defeasance opinion of Bond Counsel relating to the Prior Bonds;

(xx)   A copy of the Remarketing Agreement;

(xxi)   Written confirmation from the Bond Insurer that it shall not require the funding of a Debt Service Reserve Fund in connection with the issuance of its Bond Insurance Policy;

(xxii)   A copy of the Intercreditor Agreement; and

(xxiii)   Such additional legal opinions, certificates and other evidence as the Underwriter, special counsel to the Authority, the Authority's general counsel, Bond Counsel or Counsel to the Underwriter may deem necessary or advisable to evidence the truth and accuracy as of the date of the Closing of (A) the representations and warranties of the Authority contained herein, of the Institution contained in the Letter of Representation, and (B) the information contained in the Official Statement, or to evidence the due performance and satisfaction by the Authority and the Institution of all agreements to be performed and all conditions to be satisfied by the Authority or the Institution as the case may be, in connection with the issuance of the Bonds.

10.   The Underwriter may terminate this Purchase Contract by notifying in writing the Authority and the Institution if at any time subsequent to the Date Hereof and at or prior to the Closing: (a) legislation shall be enacted by the State of Connecticut or the United States or introduced in or favorably reported to either the United States House of Representatives or the United States Senate or a decision by a court of the United States or the United States Tax Court shall be rendered, or a ruling or regulation (final, temporary or proposed) shall be made by or on behalf of the Treasury Department of the United States or the Internal Revenue Service, or a release or official statement shall be issued by the President, the Treasury Department or the Internal Revenue Service of the United States, which makes the revenues or other income of the general character expected to be derived by the Authority, or the interest received on "qualified 501(c)(3) bonds" (as defined in the Code) not excludable from gross income for purposes of Federal or Connecticut income taxation or which would have the effect of changing directly or indirectly the Federal or Connecticut income tax consequences of interest on qualified 501(c)(3) bonds in the hands of the owners thereof, which in the reasonable opinion of the Underwriter materially affects the market price of the Bonds adversely; (b) (i) the United States shall have become engaged in hostilities which have resulted in a declaration of war or a national emergency or (ii) in the reasonable opinion of the Underwriter there shall have occurred a national emergency or any other outbreak of hostilities, local, national or international, or an escalation thereof, the effect of which on the financial markets of the United States being such as would affect materially and adversely the ability of the Underwriter to market the Bonds; (c) there shall have occurred a general suspension of trading on the New York Stock Exchange or a general banking moratorium shall have been declared by the United States or by authorities in the State of New York or the State of Connecticut; or

9

(d) an event shall occur which makes untrue or incorrect in any material respect, as of the time of such event, any statement or information contained in the Official Statement or which is not reflected in the Official Statement but should be reflected therein in order to make the statements and information contained therein not misleading in any material respect, and the Authority or the Institution refuses to permit the Official Statement to be supplemented to correct, or supply, such statement or information, or the effect of the Official Statement as so corrected or supplemented is, in the reasonable judgment of the Underwriter, to materially adversely affect the market for the Bonds.

If the obligations of the Underwriter to purchase and accept delivery of the Bonds shall be terminated for any reason permitted by this Purchase Contract, neither the Underwriter nor the Authority shall be under further obligation hereunder; except that the obligation of the Authority for the payment of expenses, as provided in Section 12 hereof, shall continue in full force and effect.

11.    (a)    CGS Section 4a-60.  In accordance with Connecticut General Statutes Section 4a-60(a)(1), as amended by Connecticut Public Act 07-142, and to the extent required by Connecticut law, the Underwriter agrees and warrants as follows: (1) in the performance of this Purchase Contract, it will not discriminate or permit discrimination against any person or group of persons on the grounds of race, color, religious creed, age, marital or civil union status, national origin, ancestry, sex, mental retardation or physical disability, including, but not limited to, blindness, unless it is shown by the Underwriter that such disability prevents performance of the work involved, in any manner prohibited by the laws of the United States or of the State of Connecticut and further to take affirmative action to insure that applicants with job-related qualifications are employed and that employees are treated when employed without regard to their race, color, religious creed, age, marital or civil union status, national origin, ancestry, sex, mental retardation, or physical disability, including, but not limited to, blindness, unless it is shown by the Underwriter that such disability prevents performance of the work involved; (2) in all solicitations or advertisements for employees placed by or on behalf of thee Underwriter, to state that it is an "affirmative action-equal opportunity employer" in accordance with regulations adopted by the Commission on Human Rights and Opportunities (the "CHRO"); (3) to provide each labor union or representative of workers with which the Underwriter has a collective bargaining agreement or other contract or understanding and each vendor with which the Underwriter has a contract or understanding, a notice to be provided by the CHRO advising the labor union or workers' representative of the Underwriter's commitments under Connecticut General Statutes Section 4a-60, and to post copies of the notice in conspicuous places available to employees and applicants for employment; (4) to comply with each provision of Connecticut General Statutes Sections 4a-60, 46a-68e and 46a-68f and with each regulation or relevant order issued by the CHRO pursuant to Connecticut General Statutes Sections 46a-56, 46a-68e and 46a-68f; (5) to provide the CHRO with such information requested by the CHRO, and permit access to pertinent books, records and accounts, concerning the employment practices and procedures of the Underwriter as relate to the provisions of Connecticut General Statutes Sections 4a-60a and 46a-56.

(b)    CGS Section 4a-60a.  In accordance with Connecticut General Statutes Section 4a-60a(a)(1), as amended by Connecticut Public Act 07-142, and to the extent required by Connecticut law, the Underwriter agrees and warrants as follows: (1) that in the performance of this Purchase Contract, the Underwriter will not discriminate or permit discrimination against any person or group of persons on the grounds of sexual orientation, in any manner prohibited by the laws of the United States or of the State of Connecticut, and that employees are treated when employed without regard to their sexual orientation; (2) to provide each labor union or representative of workers with which the Underwriter has a collective bargaining agreement or other contract or understanding and each vendor with which the Underwriter has a contract or understanding, a notice to be provided by the CHRO advising the labor union or workers' representative of the Underwriter's commitments under Connecticut General Statutes Section 4a-60a, and to post copies of the notice in conspicuous places available to employees and applicants for employment; (3) to comply with each provision of Connecticut General Statutes Section 4a-60a and with each regulation or relevant order issued by the CHRO pursuant to Connecticut General Statutes Section 46a-56; (4) to provide the CHRO with such information requested by the CHRO, and permit access to pertinent books, records and accounts, concerning the employment practices and procedures of the Underwriter which relate to the provisions of Connecticut General

Statutes Sections 4a-60a and 46a-56; and (5) to include provisions (1) through (4) this section in every subcontract or purchase order entered into by the Underwriter in order to fulfill any obligation of this Purchase Contract, and such provisions shall be binding on a subcontractor, vendor or manufacturer unless exempted by regulations or orders of the CHRO and take such action with respect to any such subcontract or purchase order as the CHRO may direct as a means of enforcing such provisions in accordance with Connecticut General Statutes Section 4a-60a.

           12.    The Authority shall pay any expenses incident to the performance of the obligations of the Authority hereunder including but not limited to: (a) the cost of the preparation and printing (for distribution on or prior to the Date Hereof) of the Institution Documents, the Trust Indenture, the Escrow Agreement, the Official Statement, the Verification Report with respect to the Prior Bonds and this Purchase Contract; (b) the fees and disbursements of Bond Counsel including the cost of the preparation and printing of the definitive Bonds; (c) the fees of any other attorneys, experts or consultants retained by the Authority; and (d) the fees and disbursements of counsel to the Underwriter.

           The Underwriter shall pay: (a) the cost of the preparation and printing of the Blue Sky Survey; (b) all advertising expenses in connection with the public offering of the Bonds; and (c) all other expenses incurred by the Underwriter in connection with its public offering and distribution of the Bonds, including the fees and disbursements of all experts and consultants retained by it.

           13.    Any notice or other communication to be given to the Authority under this Purchase Contract may be given by mailing or delivering the same in writing to the Executive Director of the Authority at the address of the Authority set forth above, and any notice or other communication to be given to the Underwriter under this Purchase Contract may be given by mailing or delivering the same in writing to J.P. Morgan Securities Inc., 270 Park Avenue, New York, New York, Attention: Diana Hoadley, Managing Director.

           14.    This Purchase Contract is made solely for the benefit of the Authority, the Institution and the Underwriter (including the successors or assigns of the Underwriter and no other person shall acquire or have any right hereunder or by virtue hereof. All representations, warranties and agreements of the Authority in this Purchase Contract shall remain operative and in full force and effect, regardless of any investigation made by or on behalf of the Underwriter and delivery of and payment for the Bonds hereunder.

           15.    This Purchase Contract shall be governed by and construed in accordance with the laws of the State of Connecticut without giving effect to the principles of conflicts of laws thereof.

           16.    This Purchase Contract may be executed in any number of counterparts, each of which when so executed and delivered shall constitute for all purposes an original, and such counterparts together shall constitute but one and the same Purchase Contract.

*[Signature page follows]*

       17.    Upon the execution of the acceptance hereof by a duly authorized officer of the Authority and delivery of same to the Underwriter prior to 5:00 p.m. Hartford time, on the Date Hereof, this Purchase Contract shall become effective, valid, binding and enforceable.

Very truly yours,

**J.P. MORGAN SECURITIES INC.**

By: _____

    Name:   Scott Wentnick
    Title:   Vice President

Accepted on the Date Hereof

**STATE OF CONNECTICUT HEALTH
AND EDUCATIONAL FACILITIES
AUTHORITY**

By: _____
    Name:   Richard D. Gray
    Title:   Executive Director

13

**STATE OF CONNECTICUT HEALTH AND EDUCATIONAL FACILITIES AUTHORITY
REVENUE BONDS, QUINNIPIAC UNIVERSITY ISSUE
SERIES K-1 (TAX-EXEMPT)**

Item
Number

1.    Date of this Purchase Contract — December 19, 2007.

2.    (a)    Aggregate principal amount of the Series K-1 Bonds — $64,650,000.

     (b)    Date of the Series K-1 Bonds — December 20, 2007.

     (c)    Date of maturity — July 1, 2031.

     (d)    Initial Interest Rate and Public Offering Price:

| Initial Interest Rate | Public Offering Price |
|---|---|
| Auction | 100% |

     (e)    The Series K-1 Bonds are subject to redemption prior to maturity as provided in the Indenture.

3.    Purchase Price of the Series K-1 Bonds — $64,382,563.21 (representing $64,650,000 principal amount of the Series K-1 Bonds, less underwriter's discount of $267,436.79).

4.    Amount to be paid as liquidated damages, if any, 1% of par.

5.    Date of the Closing — December 20, 2007.

6.    Amount of Purchase Price to be paid in Federal Funds — 100%.

**STATE OF CONNECTICUT HEALTH AND EDUCATIONAL FACILITIES AUTHORITY
REVENUE BONDS, QUINNIPIAC UNIVERSITY ISSUE
SERIES K-2 (TAXABLE)**

Item
Number

1.    Date of this Purchase Contract — December 19, 2007.

2.    (a)    Aggregate principal amount of the Series K-2 Bonds — $51,700,000.

      (b)    Date of the Series K-2 Bonds — December 20, 2007.

      (c)    Date of maturity — July 1, 2028.

      (d)    Initial Interest Rate and Public Offering Price:

|  | Initial Interest Rate | Public Offering Price |
|---|---|---|
|  | Auction | 100% |

      (e)    The Series K-2 Bonds are subject to redemption prior to maturity as provided in the Indenture.

3.    Purchase Price of the Series K-2 Bonds — $51,486,133.31 (representing $51,700,000 principal amount of the Series K-2 Bonds, less underwriter's discount of $213,866.69).

4.    Amount to be paid as liquidated damages, if any, 1% of par.

5.    Date of the Closing — December 20, 2007.

6.    Amount of Purchase Price to be paid in Federal Funds — 100%.