## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

J.P. MORGAN SECURITIES LLC,       :

          Plaintiff,      :

v.           :         Case No. 14 Civ. 00429_____

QUINNIPIAC UNIVERSITY,       :

          Defendant.      :

                                        :

                                        :

## <u>DECLARATION OF JONATHAN K. YOUNGWOOD</u>

I, Jonathan K. Youngwood, make this declaration pursuant to 28 U.S.C. § 1746. I hereby state as follows:

1.      I am a member of the law firm of Simpson Thacher & Bartlett LLP and am admitted to practice before this Court. I respectfully submit this Declaration in support of the accompanying Memorandum of Law in Support of Plaintiff J.P. Morgan Securities LLC's Motion for Preliminary Injunction.

2.      Attached as Exhibit 1 is a true and correct copy of excerpts from Quinnipiac University's Official Statement, dated December 13, 2007, relating to its issuance of $116,350,000 of auction rate securities.

3.      Attached as Exhibit 2 is a true and correct copy of an order entered by the court in *UBS Sec. LLC v. Allina Health System*, No. 12-cv-2090 (D. Minn. Apr. 13, 2013) (Dkt. 52).

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  February 14, 2014                By:   _____

Jonathan K. Youngwood
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017-3954
(212) 455-3539

*Attorneys for Plaintiff J.P. Morgan Securities,
LLC*

# EXHIBIT 1

<u>NEW ISSUE</u>

**Ratings:** Moody's:  Aaa
S&P: AAA
(See "Ratings")

*In the opinion of Pullman & Comley, LLC, Bond Counsel to the Authority, under existing statutes and court decisions and assuming continuing compliance with certain tax covenants described herein, (i) interest on the Series K-1 Bonds is excludable from gross income for federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), and (ii) interest on the Series K-1 Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations. In the opinion of Bond Counsel, under existing statutes, interest on the Series K-1 Bonds is excludable from Connecticut taxable income for purposes of the Connecticut income tax on individuals, trusts and estates, and interest on the Series K-1 Bonds is excludable from amounts on which the net Connecticut minimum tax is based in the case of individuals, trusts and estates required to pay the federal alternative minimum tax. See "TAX MATTERS – Tax Exemption of Series K-1 Bonds."*

*In the opinion of Bond Counsel, under existing statutes, interest on the Series K-2 Bonds is includable in gross income for federal income tax purposes pursuant to the Code. In the opinion of Bond Counsel, under existing statutes, interest on the Series K-2 Bonds is excludable from Connecticut taxable income for purposes of the Connecticut income tax on individuals, trusts and estates, and interest on the Series K-2 Bonds is excludable from amounts on which the net Connecticut minimum tax is based in the case of individuals, trusts and estates required to pay the federal alternative minimum tax. See "TAX MATTERS – Tax Status of Series K-2 Bonds."*



**$116,350,000**
# STATE OF CONNECTICUT HEALTH AND EDUCATIONAL FACILITIES AUTHORITY REVENUE BONDS, QUINNIPIAC UNIVERSITY ISSUE
**$64,650,000 Series K-1**      **$51,700,000 Series K-2**
**(Tax Exempt)**           **(Taxable)**

## QUINNIPIAC UNIVERSITY

**Dated: Date of delivery**                                    **Due: July 1, as shown below**

The Series K-1 Bonds and the Series K-2 Bonds (together, the "Series K Bonds") will be special obligations of the State of Connecticut Health and Educational Facilities Authority (the "Authority") and will be secured under the provisions of the Trust Indenture, dated as of December 1, 2007 by and between the Authority and the Trustee (hereinafter defined), payable solely from the Revenues of the Authority paid to the Trustee for the account of the Authority by Quinnipiac University (the "Institution") in accordance with the provisions of the Loan Agreement, dated as of December 1, 2007 (the "Loan Agreement"), by and between the Authority and the Institution. The obligation of the Institution to make payments pursuant to the Loan Agreement is absolute and unconditional. The Series K Bonds are being sold separately by the Authority from the Series I Bonds (as hereinafter defined) but are being delivered concurrently with the delivery by the Authority for the benefit of the Institution of the $134,570,000 Series I Bonds and the $165,545,000 Series J Bonds as described herein. The Series I Bonds, the Series J Bonds and the Series K Bonds, together with the outstanding Series H Bonds, will be secured on a parity basis by a mortgage on the Institution's Main Campus and a pledge of the Institution's Gross Receipts. See "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES K BONDS."

The payment of the principal of and interest on the Series K-1 Bonds and Series K-2 Bonds when due (other than by reason of extraordinary or optional redemption or acceleration thereof) will be guaranteed by separate, but substantially identical, financial guaranty insurance policies to be issued by MBIA Insurance Corporation simultaneously with the delivery of the Series K Bonds.



The Series K Bonds initially will be issued as bonds that bear interest at the Auction Rate during an ARS Rate Period but may be converted by the Authority in whole or in part at the direction of the Institution, subject to certain restrictions, to bear interest at different interest rate modes including the Daily Rate, Weekly Rate, Flexible Rate, Term Rate or Fixed Rate, and will be subject to mandatory tender on the conversion date. The Series K Bonds will bear interest from their date of delivery for the respective initial periods for each series set forth on the inside front cover of this Official Statement at the initial rate for each series established by the Underwriter and thereafter at the seven-day Auction Period and at the Auction Rates determined pursuant to the Auction Procedures (defined herein) and set forth in Appendix J hereto. While the Series K Bonds are in the ARS Rate Period, a Beneficial Owner of a Series K Bond may sell, transfer or dispose of a Series K Bond only in accordance with the Auction Procedures.

The Series K Bonds are issuable only as fully registered bonds without coupons and when issued will be registered in the name of Cede & Co., as Bondowner and nominee for The Depository Trust Company ("DTC"), New York, New York. DTC will act as securities depository for the Series K Bonds. Purchases of beneficial interests in the Series K Bonds while bearing interest at Auction Rates will be made in book-entry-only form, in the denomination of $25,000 or any integral multiple thereof. Purchasers of beneficial interests will not receive certificates representing their interests in the Series K Bonds. So long as Cede & Co., as nominee of DTC, is the Bondowner, references herein to the Bondowners or registered owners will mean Cede & Co., as aforesaid, and will not mean the Beneficial Owners (as defined herein) of the Series K Bonds. See "THE SERIES K BONDS - Book-Entry-Only System."

Principal of, premium, if any, and interest on the Series K Bonds will be paid directly to DTC by U.S. Bank National Association, Hartford, Connecticut, as Trustee, so long as DTC or its nominee, Cede & Co., is the Bondowner. Disbursement of such payments to DTC's Direct Participants is the responsibility of DTC and disbursement of such payments to the Beneficial Owners is the responsibility of the Direct Participants and the Indirect Participants, all as defined and as more fully described herein.

Wilmington Trust Company will act as the initial Auction Agent and J.P. Morgan Securities Inc. will act as the initial Broker-Dealer for the Series K Bonds.

The Series K Bonds are subject to optional and mandatory redemption, including mandatory sinking fund redemption, and are subject to mandatory tender upon a change in the Interest Rate Mode, as more fully described herein. The Series K-2 Bonds also are subject to mandatory tender on or after April 3, 2008 upon conversion to bear interest at tax-exempt rates at the option of the Authority, as described herein.

**The Series K Bonds are not and shall not be deemed to constitute a debt or liability or a pledge of the faith and credit of the State of Connecticut or any political subdivision thereof, but shall be payable solely from the Revenues derived by the Authority under the Loan Agreement. Neither the faith and credit nor the taxing power of the State of Connecticut or any political subdivision thereof is pledged to the payment of the principal or purchase price of, premium, if any, or interest on the Series K Bonds. The State of Connecticut Health and Educational Facilities Authority Act does not in any way create a so-called moral obligation of the State of Connecticut to pay debt service on the Series K Bonds in the event of default by the Institution or the Authority. The Authority has no taxing power.**

---

**$64,650,000 Series K-1 Term Bonds due July 1, 2031; Price: 100%**
**$51,700,000 Series K-2 Term Bonds due July 1, 2028; Price: 100%**

---

The Series K Bonds are offered subject to the approval of the legality of the Series K Bonds by Pullman & Comley, LLC, Hartford, Connecticut, Bond Counsel to the Authority. Certain legal matters will be passed upon for the Authority by its Special Counsel, Shipman & Goodwin LLP, Hartford, Stamford and Greenwich, Connecticut; for the Institution by its counsel, Wiggin & Dana LLP, New Haven, Connecticut; and for the Underwriter by its counsel, Squire, Sanders & Dempsey L.L.P., New York, New York. It is expected that the Series K Bonds will be available for delivery to DTC in New York, New York on or about December 20, 2007.

## JPMorgan

Dated: December 13, 2007

$116,350,000
# STATE OF CONNECTICUT HEALTH AND EDUCATIONAL FACILITIES AUTHORITY
## REVENUE BONDS, QUINNIPIAC UNIVERSITY ISSUE

**$64,650,000 SERIES K-1**
**(Tax Exempt)**
**Dated:  Date of Delivery**

**Interest Payment Date:  The Business Day immediately following the Auction Period (except for Series K-1 Bonds in a Daily Auction Period or a Flexible Auction Period).**

**Auction Rate Bonds due July 1, 2031 - Price 100%**

**Initial Pricing Date:  December 19, 2007**
**Settlement Date:  December 20, 2007**
**Last Day of Initial Period:  January 7, 2008**
**First Interest Payment Date:  January 8, 2008**
**First Auction Date:  January 7, 2008**
**Auction Period:  7 days with Auction Dates generally each Monday and Interest Payment Dates generally each Tuesday**

---

**$51,700,000 SERIES K-2**
**(Taxable)**
**Dated:  Date of Delivery**

**Interest Payment Date:  The Business Day immediately following the Auction Period (except for Series K-2 Bonds in a Daily Auction Period or a Flexible Auction Period).**

**Auction Rate Bonds due July 1, 2028 - Price 100%**

**Initial Pricing Date:  December 19, 2007**
**Settlement Date:  December 20, 2007**
**Last Day of Initial Period:  January 7, 2008**
**First Interest Payment Date:  January 8, 2008**
**First Auction Date:  January 7, 2008**
**Auction Period: 7 days with Auction Dates generally each Monday and Interest Payment Dates generally each Tuesday**

No dealer, broker, salesperson or other person has been authorized by the Authority, the Institution, the Bond Insurer or the Underwriter to give any information or to make any representation with respect to the Series K Bonds, other than those contained in this Official Statement, and, if given or made, such other information or representation must not be relied upon as having been authorized by any of the foregoing. Certain information contained herein has been obtained from the Institution and other sources.  THE AUTHORITY HAS RELIED ENTIRELY ON THE INSTITUTION, DTC, THE BOND INSURER AND SUCH OTHER SOURCES FOR SUCH INFORMATION, INCLUDING THE INFORMATION PERTAINING TO DTC AND THE BOND INSURER, THE BOND INSURANCE POLICIES (INCLUDING APPENDIX H), THE INFORMATION INCLUDED IN APPENDICES A AND B AND THE OTHER INFORMATION HEREIN PERTAINING TO THE PROJECT AND THE INSTITUTION AND ITS FINANCIAL CONDITION.  The Authority makes no representation as to the accuracy or completeness of such information.  The information and expressions of opinion herein are subject to change without notice and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the parties referred to above since the date hereof.

The Underwriter has provided the following sentence for inclusion in this Official Statement.  The Underwriter has reviewed the information in this Official Statement in accordance with, and as part of, its responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriter does not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THE OFFERING OF THE SERIES K BONDS, THE UNDERWRITER MAY OVERALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF SUCH SERIES K BONDS AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET.   SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

THE SERIES K BONDS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER ANY STATE SECURITIES ACTS, NOR HAS THE INDENTURE BEEN QUALIFIED UNDER THE TRUST INDENTURE ACT OF 1939, IN RELIANCE UPON EXEMPTIONS CONTAINED IN SUCH ACTS.  THE SERIES K BONDS HAVE NOT BEEN REGISTERED UNDER ANY STATE SECURITIES LAW.  THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY.   THE FOREGOING AUTHORITIES HAVE NOT PASSED UPON THE MERITS OF THE SERIES K BONDS OR THE ACCURACY OR COMPLETENESS OF THIS OFFICIAL STATEMENT OR APPROVED THE SERIES K BONDS FOR SALE.  ANY REPRESENTATION TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

TABLE OF CONTENTS

Page

**INTRODUCTION** ................................................................................................................................ 1
**THE AUTHORITY** ............................................................................................................................. 4
**PLAN OF REFUNDING** ..................................................................................................................... 8
**SECURITY AND SOURCES OF PAYMENT FOR THE SERIES K BONDS** .................................. 9
**THE SERIES K BONDS** ...................................................................................................................... 13
**BOND INSURANCE** ........................................................................................................................... 43
**RIGHTS OF THE BOND INSURER** ................................................................................................... 47
**ANNUAL DEBT SERVICE REQUIREMENTS** .................................................................................. 47
**ESTIMATED SOURCES AND USES OF FUNDS** .............................................................................. 49
**BONDOWNERS' RISKS** ...................................................................................................................... 49
**TAX MATTERS** .................................................................................................................................. 54
**CONTINUING DISCLOSURE** ............................................................................................................ 57
**LEGALITY OF THE SERIES K BONDS FOR INVESTMENT AND DEPOSIT** ................................ 57
**NEGOTIABLE INSTRUMENTS** ......................................................................................................... 58
**STATE NOT LIABLE ON THE SERIES K BONDS** ........................................................................... 58
**COVENANT BY THE STATE** ............................................................................................................. 58
**RATINGS** ............................................................................................................................................ 58
**UNDERWRITING** ............................................................................................................................... 58
**LEGAL MATTERS** ............................................................................................................................. 59
**INDEPENDENT AUDITORS** .............................................................................................................. 59
**LITIGATION** ...................................................................................................................................... 59
**MISCELLANEOUS** ............................................................................................................................. 60

Appendix A -    Information Regarding Quinnipiac University ................................................................. A-1

Appendix B -    Audited Financial Statements of Quinnipiac University ................................................... B-1

Appendix C -    Definitions of Certain Terms ........................................................................................ C-1

Appendix D -    Excerpts from the Indenture ......................................................................................... D-1

Appendix E -    Excerpts from the Loan Agreement ............................................................................... E-1

Appendix F -    Indebtedness of the Authority ....................................................................................... F-1

Appendix G -    Proposed Form of Opinion of Bond Counsel .................................................................. G-1

Appendix H -    Specimen of Bond Insurance Policy .............................................................................. H-1

Appendix I -    Form of Continuing Disclosure Agreement ..................................................................... I-1

Appendix J -    Auction Procedures ...................................................................................................... J-1

## OFFICIAL STATEMENT

### Relating to

### $116,350,000
### State of Connecticut Health and Educational Facilities Authority
### Revenue Bonds, Quinnipiac University Issue

| $64,650,000 Series K-1 | $51,700,000 Series K-2 |
| (Tax Exempt) | (Taxable) |

## INTRODUCTION

The purpose of this Official Statement is to set forth certain information concerning the State of Connecticut Health and Educational Facilities Authority (the "Authority"), Quinnipiac University (the "Institution") and the $116,350,000 aggregate principal amount of State of Connecticut Health and Educational Facilities Authority Revenue Bonds, Quinnipiac University Issue, Series K, consisting of $64,650,000 Series K-1 (Tax Exempt) (the "Series K-1 Bonds") and $51,700,000 Series K-2 (Taxable) (the "Series K-2 Bonds"; together with the Series K-1 Bonds, the "Series K Bonds"), authorized by a resolution adopted by the Authority on October 23, 2007. The Series K Bonds will be secured by and issued in accordance with the provisions of the Trust Indenture, dated as of December 1, 2007 (the "Indenture") by and between the Authority and U.S. Bank National Association, as trustee (the "Trustee"), and the State of Connecticut Health and Educational Facilities Authority Act, Chapter 187 of the General Statutes of Connecticut, Revision of 1958, Sections 10a-176 to 10a-198, inclusive, as amended (the "Act"). The proceeds of the Series K Bonds will be loaned by the Authority to the Institution pursuant to the Loan Agreement, dated as of December 1, 2007 (the "Loan Agreement"), by and between the Authority and the Institution, and the Series K Bonds will be payable from Revenues derived by the Authority pursuant to the Loan Agreement. No additional bonds may be issued under the Indenture. Capitalized terms used in this Official Statement but not defined herein have the meanings ascribed thereto in Appendix C hereto.

The proceeds of the Series K-1 Bonds will be used to: (i) currently refund and defease the Authority's Revenue Bonds, Quinnipiac University Issues, Series F and Series G, and (ii) pay costs of issuance of the Series K-1 Bonds. The proceeds of the Series K-2 Bonds will be used to: (i) advance refund and defease the Authority's Revenue Bonds, Quinnipiac College Issue, Series E and (ii) pay costs of issuance of the Series K-2 Bonds.

The Series K Bonds initially will be issued as Auction Rate Bonds under the Indenture and will be dated their date of issuance and delivery and will bear interest at Auction Rates as described in this Official Statement. The Series K Bonds may be converted in whole or in part from the ARS Rate Period to bear interest at a Daily Rate, Weekly Rate, Flexible Rate, Term Rate or Fixed Rate as described herein.

The Auction Period for each series of the Series K Bonds will be a seven-day Auction Period unless and until a new Auction Period is determined pursuant to the Auction Procedures (the "Auction Procedures"), set forth in the Indenture and attached to this Official Statement as Appendix J, or a new Interest Rate Mode is determined for the Series K Bonds. The Initial Period for the Series K Bonds will commence on the date of delivery of the Series K Bonds and will end on the date set forth on the inside cover page of this Official Statement. The first Auction for the Series K Bonds and the first Interest Payment Date will be on the respective dates set forth on the inside cover page of this Official Statement and thereafter Auction Dates generally will be each Monday and Interest Payment Dates generally will be each Tuesday, unless and until changed in accordance with the Auction Procedures or the Series K Bonds are converted to a different Interest Rate Mode.

The Series K-2 Bonds are being issued initially bearing interest at taxable Auction Rates.  At the option of the Authority (exercised at the request of the Institution), on or after April 3, 2008, all or a portion of the Series K-2 Bonds may be converted to bear interest at tax-exempt Auction Rates.  The Series K-2 Bonds will be subject to mandatory tender for purchase on the conversion date at a purchase price of 100% of the principal amount thereof plus accrued interest.

The Series K Bonds are special obligations of the Authority payable, equally and ratably, from Revenues of the Authority received from the Institution under the terms of the Loan Agreement.  Pursuant to the Loan Agreement, the Institution is obligated to pay amounts sufficient to enable the Authority to pay the principal and purchase price of and premium, if any, and interest on the Series K Bonds, and other costs incurred by the Authority in connection with the Series K Bonds.

The Series K Bonds initially will be issued in the form of one registered bond for each series and will be delivered to Cede & Co., as the registered owner and nominee of The Depository Trust Company ("DTC"), New York, New York.  DTC will act as securities depository for the Series K Bonds, subject to its right to terminate its services and subject to the Authority's right to dismiss DTC as securities depository.  DTC, as securities depository, will maintain a book-entry system (the "Book-Entry System") for recording ownership interests in the Series K Bonds of its Participants.  The ownership interest of a purchaser of a beneficial interest in the Series K Bonds (the "Beneficial Owner") will be recorded through entries on the records of DTC's Participants. Beneficial Owners will not receive any certificates representing their interests in the Series K Bonds.  For a further description of the Book-Entry System, see "THE SERIES K BONDS - Book-Entry-Only System."

The Institution is a private, non-profit, tax-exempt, coeducational institution of higher education with its main campus located in Hamden, Connecticut.  In addition to the Institution's 123-acre core campus (the "Main Campus"), the Institution also is developing the nearby York Hill Campus (defined below), which will allow a significant expansion of the Institution's capacity to provide residence space for its student population.  Further, in September 2007, the Institution acquired a 104-acre site with four existing office buildings, containing approximately 600,000 square feet, located in North Haven, Connecticut (the "North Haven Campus").  Over approximately a 10-year development period, the Institution intends to move its graduate programs from the Main Campus to the North Haven Campus. For a description of the Institution, including the Main Campus, the York Hill Campus and the North Haven Campus, see Appendix A.

The Institution will secure its payment obligations under the Loan Agreement and the Series K Bonds by issuing its Series K Note (the "Note") and by the execution and delivery of the Mortgage (as hereinafter defined) to the Authority.  The Institution will grant to the Authority a mortgage on the Institution's Main Campus, as more fully described in the Open-End Mortgage (Security Agreement and Financing Statement) from the Institution to the Authority, dated as of December 1, 2007 (the "Mortgage").  The Mortgaged Premises under the Mortgage will not include the York Hill Campus or the North Haven Campus, although the Institution will agree in the Loan Agreement that, other than Permitted Encumbrances, in the event that the Institution subsequently grants a mortgage or security interest on the Premises, including the York Hill Campus or the North Haven Campus (or any equipment located thereon), it also must grant a parity lien to the Authority for the benefit of the holders of the Series K Bonds and any Parity Debt.

Concurrently with the delivery of the Series K Bonds, the Authority expects to deliver its $134,570,000 aggregate principal amount of State of Connecticut Health and Educational Facilities Authority Revenue Bonds, Quinnipiac University Issue, Series I (the "Series I Bonds") and its $165,545,000 aggregate principal amount of State of Connecticut Health and Educational Facilities Authority Revenue Bonds, Quinnipiac University Issue, Series J (the "Series J Bonds") to provide funds:

2

(a) to finance and refinance a portion of the costs of various capital projects of the Institution (collectively, the "Project"); (b) to fund capitalized interest on the Series I Bonds and Series J Bonds; and (c) to pay costs associated with the issuance of the Series I Bonds and Series J Bonds.  The Project is primarily comprised of the design, renovation, construction, equipping and furnishing of:  (a) student residence halls with approximately 2,000 beds, located on the York Hill Campus of the Institution in Hamden, Connecticut (the "York Hill Campus"); (b) an approximately 2,000 car parking garage on the York Hill Campus; (c) a student center and dining hall on the York Hill Campus; (d) a 250 car parking lot and the paving of an existing grass parking lot for 225 cars on the York Hill Campus; (e) the realignment of the access road and parking areas, connections for all utilities, grading and drainage, and sidewalks, stairs, lighting and landscaping on the York Hill Campus; and (f) miscellaneous construction, renovation, improvements, equipment and furniture acquisition and installation at the York Hill Campus and the Main Campus.  See "The Project" in Appendix A.  The Series I Bonds and the Series J Bonds will be secured by separate mortgages on the Main Campus, on parity with the Mortgage, and by a parity security interest in the Institution's Gross Receipts.

     *The Series I Bonds and the Series J Bonds are not being offered by this Official Statement but are being offered pursuant to separate offering documents.*

     After giving effect to the issuance of the Series K Bonds, the Mortgage and the mortgages securing the Series I Bonds and the Series J Bonds will be on a parity with the existing mortgage on the Main Campus from the Institution securing the Authority's Revenue Bonds, Quinnipiac University Issue, Series H, currently outstanding in the aggregate principal amount of $67,495,000 (the "Series H Bonds").  Pursuant to the Loan Agreement, the Institution will grant to the Authority a security interest in all of its Gross Receipts on a parity with the lien and pledge on the Institution's Gross Receipts securing the Series H Bonds, the Series I Bonds, the Series J Bonds and any future Parity Debt.  The Loan Agreement, the Mortgage and the Note will be assigned to the Trustee by the Authority pursuant to the Indenture and an Assignment of Mortgage and Note, dated as of December 1, 2007 (the "Assignment of Note") for the benefit of Bondowners and, to the extent that the Bond Insurer (identified below) makes payment with respect to the Series K Bonds pursuant to the Bond Insurance Policies, for the benefit of the Bond Insurer.  In addition, the Institution will covenant that it will not, without the prior written consent of the Authority and the Bond Insurer, create or permit to be created any Lien upon any of the Institution's Property now owned or subsequently acquired, except for Permitted Encumbrances.

     Payment of the principal of and interest on the Series K-1 Bonds and the Series K-2 Bonds when due (other than by reason of optional or special redemption or acceleration thereof) will be guaranteed by separate, but substantially identical, financial guaranty insurance policies (each a "Bond Insurance Policy" and collectively the "Bond Insurance Policies") issued by MBIA Insurance Corporation (the "Bond Insurer") simultaneously with the issuance of the Series K Bonds.  Such guaranty under each Bond Insurance Policy is irrevocable and unconditional.   The insurance premium on the Bond Insurance Policies will be fully paid on the date of the delivery of the Series K Bonds from proceeds thereof.  See "BOND INSURANCE," "RIGHTS OF THE BOND INSURER" and "BONDOWNERS' RISKS – Limitations on Rights and Remedies of Bondowners."  The Bond Insurer also will issue separate insurance policies to insure the Series I Bonds and the Series J Bonds.

     The Institution's payment obligations with respect to the Series K Bonds will be on a parity with the Institution's payment obligations with respect to the Series H Bonds, the Series I Bonds and the Series J Bonds.  Simultaneously with the issuance of the Series K Bonds, the bond insurer and the trustee for the Series H Bonds will enter into an Intercreditor Agreement (the "Intercreditor Agreement") with the Authority, the Trustee, the Bond Insurer and the bond insurers and the trustees for the Series I Bonds and the Series J Bonds and the standby bond purchaser for the Series J Bonds pursuant to which all indebtedness of the Institution in connection with its payment obligations relating to the Series K Bonds

will rank pari passu to its indebtedness in connection with its payment obligations relating to the Series H Bonds, the Series I Bonds and the Series J Bonds. See "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES K BONDS – Parity Debt and Intercreditor Agreement."

The Series K Bonds will not be secured by any funds deposited into the debt service reserve fund.

This Official Statement includes summaries of the terms of the Series K Bonds, the Indenture, the Loan Agreement, the Note, the Mortgage, the Bond Insurance Policies, the Auction Agreement, the Broker-Dealer Agreement, a description of the Book-Entry System, certain investment considerations relating to the Series K Bonds and descriptions of the Institution and the Bond Insurer. The summaries and descriptions of and references to any documents, statutes, reports and other instruments referred to herein do not purport to be complete, comprehensive or definitive, and each such summary, description and reference is qualified in its entirety by reference to each such document, statute, report or instrument. Copies of documents mentioned in this paragraph are on file at the office of the State of Connecticut Health and Educational Facilities Authority, 10 Columbus Boulevard, 7th Floor, Hartford, Connecticut 06106-1976, Attention: Executive Director.

## THE AUTHORITY

The Authority is a body politic and corporate of the State of Connecticut, (the "State") constituting a public instrumentality organized and existing under and by virtue of the Act. The purpose of the Authority, as stated in the Act, is essentially to assist certain health care institutions, institutions of secondary or higher education, nursing homes, child care and child development facilities and other qualified nonprofit organizations in the construction and financing of eligible projects.

### Authority Membership and Organization

The Act provides that the Board of Directors of the Authority shall consist of ten members, two of whom shall be the Treasurer of the State of Connecticut, *ex-officio*, and the Secretary of the Office of Policy and Management of the State of Connecticut, *ex-officio*, and eight of whom shall be residents of the State appointed by the Governor, provided not more than four of such appointed members may be members of the same political party. Three of the appointed members shall be associated with institutions of higher education, two members shall be associated with health care institutions, and one member shall be experienced in and knowledgeable of (by virtue of business or other activities) state and municipal securities. The terms of the members of the Authority, other than the State Treasurer and the Secretary of the Office of Policy and Management, are for five years, but the members continue to serve until their successors have been appointed and qualified. Each *ex-officio* member may designate a deputy or any staff member to represent the State Treasurer or the Secretary of the Office of Policy and Management, as the case may be, as a member of the Board of Directors at meetings of the Authority with full power to act and vote on behalf of such *ex-officio* member. All Authority members serve without compensation, but are entitled to reimbursement for expenses incurred in the performance of their duties in relation to the Authority. The Governor, with the advice and consent of both houses of the General Assembly, has power to appoint the Chairperson of the Board of Directors of the Authority from among its members. The Board of Directors annually elects one of its members to serve as Vice Chairperson.

The members of the Board of Directors of the Authority are as follows:

**Barbara Rubin, Chairperson**, term as member expires June 30, 2011.

Ms. Rubin, a resident of Glastonbury, is President of iStar Asset Services, Inc., a subsidiary of iStar Financial. Ms. Rubin has over 30 years experience in commercial real estate investments. Prior to

joining iStar, Ms. Rubin was an investment professional with Phoenix Home Life Mutual Insurance Company. She is currently a member of the Board of the VNA HealthCare Fund and the YWCA of Hartford.

**Patrick A. Colangelo, Vice Chairman**, term as member expired on June 30, 2007.

Mr. Colangelo will continue to serve on the Board pending his reappointment or the appointment of his successor.

Mr. Colangelo, a resident of Stamford, is the former Senior Vice President, Finance, and Treasurer of Stamford Health System, joining the executive staff in 1981 and retiring in 2002. Previously, Mr. Colangelo was the Chief Financial Officer of The Greenwich Hospital and Audit Manager with Peat Marwick Mitchell & Co. in New York City. Mr. Colangelo is past president of the Healthcare Association, Connecticut chapter, and currently is a member of the Board of Directors of St. Vincent's College.

**Denise L. Nappier,** *ex-officio*.

Ms. Nappier, a resident of Hartford, became Treasurer of the State of Connecticut on January 6, 1999. Prior to her election as Treasurer in November 1998, Ms. Nappier was Treasurer of the City of Hartford for nearly ten years. Previously Ms. Nappier has served as an analyst in the Hartford City Manager's office, consultant in the Connecticut Office of Policy and Management, Director of Institutional Relations for the University of Connecticut Health Center, and Executive Director of Riverfront Recapture, Inc. She was a member of the Hartford Redevelopment Agency for seven years, including five years as Chair of the Agency.

**Robert L. Genuario**, *ex-officio*.

Mr. Genuario, a resident of Norwalk, is the Secretary of the Office of Policy and Management of the State of Connecticut. Prior to his appointment, effective January 5, 2005, Mr. Genuario was a 14-year veteran of the state Senate and ranking Republican member of the Appropriations Committee. Mr. Genuario also served as a member of the Norwalk Board of Education from 1981 to 1990, and as its chairman in 1982, 1983, and 1990. Mr. Genuario serves on the Boards of Trustees of the Norwalk Maritime Aquarium, Steppingstones Children's Museum, the Child Guidance Center of Middle Fairfield County, and Honey Hill Nursing Home.

**John M. Biancamano,** term as member expires June 30, 2010.

Mr. Biancamano, a resident of Wethersfield, is Vice President, Finance and Chief Financial Officer of Hartford Health Care Corporation and Hartford Hospital. Prior to joining Hartford Hospital in 1990, he served as Vice President and Treasurer of Mount Sinai Hospital in Hartford from 1984 to 1990. Previous to 1984, Mr. Biancamano was an Audit Manager with Ernst & Whinney. Mr. Biancamano is a Certified Public Accountant and a member of the American Institute of Certified Public Accountants and Connecticut Society of Certified Public Accountants. In addition, he serves on the Advisory Board for the University of Connecticut Center for Health Care Management and the University of Connecticut, School of Business, Tri-Campus Advisory Board.

**Steven P. Blackburn, Ph.D.**, term as member expires June 30, 2008.

Rev. Dr. Steven Blackburn, a resident of Barkhamsted, is the Library Director at Hartford Seminary where he also serves as Faculty Associate in Semitic Scriptures. In addition, at Trinity College

he has been an Assistant Visiting Professor of Religion (2003-2005) and Lecturer in Arabic (1992-1999); he also chaired Trinity's Middle East Studies program *pro tempore* during a sabbatical term (Spring 1998). He has been a member of the Board of the New England Chamber Choir (Cromwell, Ct) since its inception, and has served on the Personnel Committee of the American Congregational Association, Boston.

**William J. Cibes, Jr., Ph.D.**, term as member expired on June 30, 2007.

Dr. Cibes will continue to serve on the Board pending his reappointment or the appointment of his successor.

Dr. Cibes, a resident of Hartford, recently retired as Chancellor of the Connecticut State University System, a position he had held since August 1994. Dr. Cibes served as the Secretary of the Office of Policy and Management ("OPM") for the State of Connecticut from 1991 to August 1994. Prior to becoming Secretary of the OPM, Dr. Cibes served as a State Representative from 1978 to 1991, during which time he served as Deputy Speaker in 1987 to 1988 and Chair of the Finance, Revenue and Bonding Committee in 1989 to 1990 as well as other leadership posts.

**Benson R. Cohn,** term as member expires June 30, 2009.

Mr. Cohn, a resident of East Windsor, is retired from a 31-year career with the State of Connecticut. His most recent positions were as Assistant State Treasurer for Debt Management from July 1987 through March 1994 and as the State's Executive Finance Officer in OPM thereafter until his retirement in November 2001.

**Bryan K. Pollard**, term as member expires June 30, 2010.

Mr. Pollard, a resident of Middletown, is Associate General Counsel at Otis Elevator Company. Prior to joining Otis, Mr. Pollard held various positions at United Technologies Corporation, Hamilton Standard, Day, Berry & Howard, and Crowell & Moring. He is currently a member of the Board of Directors of the YMCA of Northern Middlesex County and the Rushford Center, Inc., as well as Finance Committee Chairperson of St. Justin Parish, a member of the Insurance Committee and the Committee on Diversity and Opportunity of the University of Connecticut Alumni Association. He is a former Lay Advisory Committee Member of the Archbishop of Hartford's Annual Appeal, a Member and Chairperson of the City of Middletown Board of Ethics, and a Member of the Board of Directors of The Connection, Inc.

**Dori Taylor Sullivan, Ph.D.,** term as member expires June 30, 2011.

Dr. Sullivan, PhD, RN, BC, CNA, CPHQ, a resident of Chester, was appointed Chair and Associate Professor of Nursing Programs at Sacred Heart University in August of 2000. Dr. Sullivan has been active in professional nursing and healthcare within Connecticut for more than thirty years. She has worked as a national healthcare management consultant and researcher in organizational transformation, leadership, and organizational effectiveness - including clinical improvement and evidence-based practice. Dr. Sullivan was previously assistant Vice Chancellor at the University of Connecticut Health Center and has held positions as faculty, director, research project administrator, clinical nurse specialist, critical care instructor and staff nurse. Dr. Sullivan holds professional certifications in the areas of healthcare quality and nursing administration, and continuing education.

Richard D. Gray is Executive Director of the Authority. The Executive Director is appointed by, and serves at the pleasure of, the Board of Directors. In the performance of his duties as Executive

Director, Mr. Gray is responsible for the general management of the Authority's affairs. Jeffrey A. Asher is Managing Director/Chief Financial Officer of the Authority.

Pullman & Comley, LLC, attorneys of Hartford, Connecticut, is serving as Bond Counsel to the Authority and will submit its approving opinion with regard to the legality of the Series K-1 Bonds and Series K-2 Bonds on the date of delivery of the Series K Bonds, in substantially the form attached hereto as Appendix G.

Shipman & Goodwin LLP, attorneys of Hartford, Connecticut, is serving as Special Counsel to the Authority and will pass on certain matters with respect to this financing.

Public Financial Management, Inc., Boston, Massachusetts, has been retained as Financial Advisor to the Authority with respect to this financing.

In addition to the mentioned individuals, counsel and advisor, the Act provides that the Authority may appoint, retain, hire or employ such other staff, counsel, consultants, engineers, architects, accountants, construction companies or others as the Authority deems necessary in order to implement projects or to assist in the performance of its duties.

**Powers of the Authority**

Under the Act, the Authority is authorized and empowered with respect to health care institutions, nursing homes, institutions of secondary or higher education, child care and child care development facilities, and other qualified nonprofit organizations, among other things: to acquire real and personal property; to issue bonds, bond anticipation notes and other obligations and to refund the same; to acquire federally guaranteed securities or to make loans to acquire such securities in order to finance, refinance or refund projects; to charge and collect rentals for the use of projects or for services furnished in relation thereto; to construct, reconstruct, renovate, replace, maintain, repair, operate, lease, or regulate projects and to enter into contracts in order to provide, manage or operate such projects; to establish or cause to be established rules and regulations for the use of projects provided by the Authority; to receive, in relation to projects, loans or grants from any public agency or other source; to make loans for the cost of projects, including the refunding of obligations, mortgages or advances thereof; to finance or refinance certain items of equipment; to mortgage any project and the site thereof for the benefit of the owners of bonds issued to finance such project; to accept mortgages as security for project loans; and to do all things necessary to carry out the purposes of the Act.

**Indebtedness of the Authority**

The Authority as of September 30, 2007, had authorized and issued certain series of its general obligation and revenue bonds for eligible institutions under the Act in an aggregate principal amount of $9,932,670,000 of which $5,582,345,000 was outstanding as of September 30, 2007.

Appendix F annexed hereto contains a complete tabulation of all series of the Authority's bonds issued, retired and outstanding as of September 30, 2007.  In addition, the Authority has issued Revenue Bonds: Yale University Issue, Series Z in the principal amount of $600,000,000 on October 6, 2007; Masonicare Issue, Series C & D in the principal amount of $116,065,000 on October 31, 2007; Hoffman SummerWood Community Issue, Series B in the principal amount of $17,055,000 on November 7, 2007; Suffield Academy Issue, Series B in the principal amount of $12,640,000 on November 8, 2007; Westminster School Issue, Series E in the principal amount of $19,230,000 on November 9, 2007; and Windham Hospital Issue, Series D in the principal amount of $19,745,000 on November 15, 2007; and

has Board approval to issue Revenue Bonds: Health Care Capital Asset Program Issue, Series B-1 in a principal amount not to exceed $32,000,000.

With respect to subsequent bond or note issues, the Authority intends to enter into separate agreements with institutions of secondary or higher education, health care institutions, nursing homes, child care and child development facilities and other qualified nonprofit institutions in the State for the purpose of financing projects for such institutions, and each such series so issued will be issued pursuant to a resolution, a trust agreement or a bond indenture other than the Indenture.

The Authority has never defaulted in the payment of principal of or interest on its bonds or notes.

### PLAN OF REFUNDING

The proceeds from the sale of the Series K-1 Bonds will be used together with other available money:  (i) to currently refund and defease the Authority's outstanding Revenue Bonds, Quinnipiac University Issues, Series F and Series G (the "Series F Bonds" and the "Series G Bonds"), for redemption on January 2, 2008 at a redemption price of 100% of the principal amount thereof plus accrued interest thereon to the redemption date and (ii) to pay costs associated with the issuance of the Series K-1 Bonds, including the insurance premium on the Bond Insurance Policy related thereto.  The proceeds from the sale of the Series K-2 Bonds will be used together with other available money:  (i) to advance refund and defease the Authority's outstanding Revenue Bonds, Quinnipiac College Issue, Series E (the "Series E Bonds"; collectively with the Series F Bonds and the Series G Bonds, the "Refunded Bonds"), for redemption or to pay at maturity on July 1, 2008 at a redemption price of 100% of the principal amount thereof plus accrued interest thereon to the redemption date and (ii) to pay costs associated with the issuance of the Series K-2 Bonds, including the insurance premium on the Bond Insurance Policy related thereto.  See "ESTIMATED SOURCES AND USES OF FUNDS."

Upon delivery of the Series K-1 Bonds, a portion of the proceeds of the Series K-1 Bonds will be deposited in escrow with the U.S. Bank National Association, as escrow agent (the "Escrow Agent"), pursuant to a Refunding Escrow Deposit Agreement (the "Escrow Agreement") , dated as of December 1, 2007, between the Escrow Agent and the Authority, with respect to the refunding of the Series F Bonds and the Series G Bonds.  The Escrow Agent will deposit in an irrevocable trust fund designated as the Series F and G Escrow Deposit Fund a portion of the proceeds of the Series K-1 Bonds and other funds available, which will be held uninvested as cash and will provide amounts sufficient to pay the principal of and interest on the Series F Bonds and the Series G Bonds to the redemption date of January 2, 2008.  All amounts held in the Series F and G Escrow Deposit Fund and needed to pay the principal of and interest on the Series F Bonds and the Series G Bonds will be irrevocably deposited by the Escrow Agent for the payment of the Series F Bonds and the Series G Bonds.

Upon delivery of the Series K-2 Bonds, a portion of the proceeds of the Series K-2 Bonds will be deposited in a separate escrow with the Escrow Agent, pursuant to the Escrow Agreement, with respect to the refunding of the Series E Bonds.  The Escrow Agent will deposit in an irrevocable trust fund designated as the Series E Escrow Deposit Fund a portion of the proceeds of the Series K-2 Bonds and other funds available, which will be used to purchase United States Treasury Securities to be invested so that the principal of and interest on which, when due, along with the cash amounts on deposit in the Series E Escrow Deposit Fund, will provide amounts sufficient to pay the principal of and interest on the Series E Bonds to the redemption or maturity date of July 1, 2008.  All investment income on and maturing principal of the United States Treasury Securities held in the Series E Escrow Deposit Fund and needed to pay the principal of and interest on the Series E Bonds will be irrevocably deposited by the Escrow Agent for the payment of the Series E Bonds.

The Series K Bonds also are expected to be delivered concurrently with the Series I Bonds and the Series J Bonds. The proceeds of the Series I Bonds and the Series J Bonds are expected to be applied to finance the costs of the Project.

## SECURITY AND SOURCES OF PAYMENT FOR THE SERIES K BONDS

### Special Obligations of the Authority

The Indenture provides that the Series K Bonds will be special obligations of the Authority, payable solely from the sources of moneys pledged therefor under and pursuant to the Indenture. **The Series K Bonds are not and shall not be deemed to constitute a debt or liability or a pledge of the faith and credit of the State or any political subdivision thereof, but shall be payable solely from the Revenues derived by the Authority under the Loan Agreement. Neither the faith and credit nor the taxing power of the State or any political subdivision thereof is pledged to the payment of the principal or purchase price of, premium, if any, or interest on the Series K Bonds. The Act does not in any way create a so-called moral obligation of the State to pay debt service on the Series K Bonds in the event of default by the Institution or the Authority. The Authority has no taxing power.**

### Pledge of Revenues; Gross Receipts

<u>Revenues</u>. Under the Indenture, the Authority will pledge and assign to the Trustee, to secure the payment of the principal or purchase price of, premium, if any, and interest on the Series K Bonds, all of the Authority's interest in (i) the Loan Agreement, the Note, the Mortgage and the Revenues (as hereinafter defined) payable to the Authority or to the Trustee for the account of the Authority and all amounts on deposit in the funds and accounts created and established under the Indenture (excluding fees and expenses payable to the Authority, moneys and securities held in the Rebate Fund or in the Purchase Fund established under the Indenture, the Authority's right to enforce certain covenants of the Institution set forth in the Loan Agreement prior to an Event of Default under the Indenture, and the Authority's right to indemnification, to receive notices, to grant waivers and to give consents and approvals, and to otherwise take actions under certain circumstances), and (ii) any and all other property of every kind pledged, assigned or transferred as additional security for the Series K Bonds. "Revenues" are defined in the Indenture to include all amounts paid or payable to the Authority or to the Trustee for the account of the Authority (excluding fees and expenses payable to the Authority and the Trustee and the rights to indemnification of the Authority and the Trustee) under and pursuant to the Loan Agreement and the Note and as may be further described in a Supplemental Loan Agreement or a Supplemental Indenture. For a further description of the terms and provisions of the Indenture, see "EXCERPTS FROM THE INDENTURE" in Appendix D.

<u>Gross Receipts</u>. As security for its obligation to make payments required by the Loan Agreement and the Note, and the performance of the other obligations under such documents, the Institution will pledge, assign and grant to the Authority, for the equal and ratable benefit of the Holders of the Series K Bonds, a security interest in its Gross Receipts. The security interest in Gross Receipts will not prevent the expenditure, deposit or commingling of Gross Receipts by the Institution so long as no Event of Default constituting a payment default has occurred and is continuing under the Loan Agreement. Upon the occurrence of an Event of Default constituting a payment default under the Loan Agreement, any Gross Receipts which are then received and any Gross Receipts thereafter received will not be commingled or deposited but will immediately, or upon receipt, be transferred (giving recognition to any other Indebtedness secured on a parity basis by a pledge of Gross Receipts) by the Institution on a daily basis to the Trustee for deposit into the Gross Receipts Fund to be established under the Indenture. Such daily deposit will continue until such Event of Default has been fully cured.

All amounts deposited into the Gross Receipts Fund will be applied by the Trustee for application pro rata based upon the outstanding principal amount of the Series K Bonds and any Parity Debt with respect to Gross Receipts deposited with the Trustee or another party as security for Parity Debt, as if such deposited amounts were aggregated and without regard to the amount held by the Trustee or any such other party, (i) to the payment of the reasonable and necessary cost of operations of the Institution's facilities, including the Premises, all in accordance with budgeted amounts proposed by the Institution and approved by the Authority, (ii) to the payment of the principal of, Redemption Price of, and interest on the Series K Bonds and any other Parity Debt in accordance with their respective terms, and (iii) to such other purposes as may be required by the Loan Agreement, the Mortgage or the Indenture and approved by the Authority.  For a further description of the terms and provisions of the Loan Agreement, see "EXCERPTS FROM THE LOAN AGREEMENT" in Appendix E.

**Parity Debt and Intercreditor Agreement**

All outstanding Series H Bonds, Series I Bonds, Series J Bonds and Series K Bonds will be on a parity with one another as to the security provided by the Mortgage (and the mortgages securing the Series H Bonds, the Series I Bonds and the Series J Bonds), and the pledge of Gross Receipts.

Payment of principal of and interest on the Series H Bonds when due (other than by reason of optional or extraordinary redemption or acceleration thereof) are insured in accordance with the terms of an insurance policy issued by Ambac Assurance Corporation (the "Series H Bond Insurer"). Simultaneously with the delivery of the Series K Bonds, the Series H Bond Insurer will consent in the Intercreditor Agreement to permit the Institution's payment obligations with respect to the Series I Bonds, the Series J Bonds and the Series K Bonds to be on a parity with the Institution's payment obligations with respect to the outstanding Series H Bonds.  The Institution's pledge of Gross Receipts under the Loan Agreement will be on a parity with the pledge of Gross Receipts for the Series H Bonds, as well as the pledge of Gross Receipts for the Series I Bonds and the Series J Bonds.  In connection with the issuance of the Series J Bonds, the Institution is expected to enter into a standby bond purchase agreement to provide liquidity support for the Series J Bonds, which is expected to be secured by a parity pledge of Gross Receipts.

Upon the issuance of the Series K Bonds, the Authority, the Trustee and the Bond Insurer will enter into the Intercreditor Agreement with (i) the Series H Bond Insurer and the trustee for the Series H Bonds, (ii) the trustee and the bond insurer for the Series I Bonds (the "Series I Bond Insurer"), and (iii) the trustee, the bond insurer for the Series J Bonds (the "Series J Bond Insurer") and the standby bond purchaser for the Series J Bonds pursuant to which all indebtedness of the Institution in connection with its payment obligations relating to the Series K Bonds (the "Series K Debt") will rank pari passu to its indebtedness in connection with its payment obligations for the Series H Bonds (the "Series H Debt"), the Series I Bonds (the "Series I Debt") and the Series J Bonds (the "Series J Debt").  Under the Intercreditor Agreement, if the Institution defaults with respect to the Series H Debt, the Series I Debt, the Series J Debt or the Series K Debt, then the exercise of any right or remedy available to the Trustee, the trustees for the Series H Bonds, the Series I Bonds and the Series J Bonds, the Authority, the Bond Insurer, the Series H Bond Insurer, the Series I Bond Insurer or the Series J Bond Insurer, respectively, under the loan agreements, mortgages and indentures for the Series H Bonds, the Series I Bonds and the Series J Bonds, the Loan Agreement, the Mortgage or the Indenture, which the Series H Bond Insurer, the Series I Bond Insurer, the Series J Bond Insurer or the Bond Insurer is authorized to direct under any of said documents, will require the consent of the Series H Bond Insurer, the Series I Bond Insurer, the Series J Bond Insurer and the Bond Insurer; provided, however, that

> (i)      the consent of the Bond Insurer, the Series I Bond Insurer and the Series J Bond Insurer will not be required if the outstanding principal amount of the Series H Bonds equals or

exceeds 70% of the aggregate outstanding principal amount of the Series H Bonds, the Series I Bonds, the Series J Bonds and the Series K Bonds;

    (ii)    the consent of the Series H Bond Insurer, the Series J Bond Insurer and the Bond Insurer will not be required if the outstanding principal amount of the Series I Bonds equals or exceeds 70% of the aggregate outstanding principal amount of the Series H Bonds, the Series I Bonds, the Series J Bonds and the Series K Bonds;

    (iii)    the consent of the Series H Bond Insurer, the Series I Bond Insurer and the Bond Insurer will not be required if the outstanding principal amount of the Series J Bonds equals or exceeds 70% of the aggregate outstanding principal amount of the Series H Bonds, the Series I Bonds, the Series J Bonds and the Series K Bonds; and

    (iv)    the consent of the Series H Bond Insurer, the Series I Bond Insurer and the Series J Bond Insurer will not be required if the outstanding principal amount of the Series K Bonds equals or exceeds 70% of the aggregate outstanding principal amount of the Series H Bonds, the Series I Bonds, the Series J Bonds and the Series K Bonds.

Notwithstanding the foregoing, (x) the applicable bond insurer will have the sole right to determine whether the bonds it insures are accelerated upon an event of default under the applicable indenture for such bonds, and (y) the Bond Insurer will have the sole right to determine whether the Series K Bonds are accelerated upon an event of default under the Indenture.

Notwithstanding the priorities that might otherwise be established under the applicable law relating to the priority of security interests or liens with respect to any items of the collateral (the "Collateral") held under the various mortgages and the pledge of Gross Receipts, any proceeds realized by the Series H Bond Insurer, the Series I Bond Insurer, the Series J Bond Insurer, the Bond Insurer, the Authority, the Trustee and the trustees for the Series H Bonds, the Series I Bonds and the Series J Bonds from foreclosure, sale or other disposition of the Collateral or from any policies of insurance on or condemnation of properties included within the Collateral or from the revenues of the Institution included within the Collateral, after payment of all fees and expenses of the Authority and the respective trustees, will be shared by the Trustee and the trustees for the Series H Bonds, the Series I Bonds and the Series J Bonds *pro rata* in proportion to the outstanding principal amount of the Series H Bonds, the Series I Bonds, the Series J Bonds and the Series K Bonds, whether or not then due by acceleration or otherwise, for the benefit of the holders of the various bonds.

**Loan Agreement**

Pursuant to the Loan Agreement, the Authority will lend the proceeds of the Series K Bonds to the Institution, and the Institution will be obligated thereunder to repay such amounts with interest. The payments of principal and Redemption Price of and the interest on the Series K Bonds to be made by the Institution under the Loan Agreement will be pledged by the Authority to the Trustee to secure the payment of the Series K Bonds and any amounts due to the Bond Insurer as Bondowner.

The obligations of the Institution to make payments under the Loan Agreement will be absolute and unconditional and will constitute a general obligation of the Institution. The Institution will be obligated to make payments sufficient to pay when due the principal, Sinking Fund Installments and interest on the Series K Bonds. To evidence and secure such obligations and certain other amounts, the Institution will deliver the Note to the Authority, and the Authority will assign its right, title and interest therein (subject to certain exceptions) to the Trustee as security for the payment of the principal, Sinking Fund Installments and interest on the Series K Bonds.  For a further description of the terms and

11

provisions of the Loan Agreement, see "EXCERPTS FROM THE LOAN AGREEMENT" in Appendix E.

**The Note and the Mortgage**

Concurrently with the issuance and delivery of the Series K Bonds, the Institution will issue the Note to secure its obligations in respect of the Series K Bonds, and will grant to the Authority a mortgage on the Mortgaged Premises pursuant to the Mortgage. The Note issued by the Institution will be given to the Authority and assigned by the Authority to the Trustee pursuant to the Indenture with respect to the Series K Bonds, in a principal amount equal to the principal amount of the Series K Bonds, to evidence the loan to the Institution from the Authority of the proceeds of the Series K Bonds.

The Institution will grant the Mortgage as security to the Authority to secure the obligations of the Institution to the Authority under the Loan Agreement and the Note. To the extent permissible under the Loan Agreement, the Institution will be able to incur additional indebtedness, secured on a parity basis by a mortgage lien on the Mortgaged Premises, which additional indebtedness may be in the form of or evidenced by additional notes, or which additional indebtedness may be in some other form of Parity Debt, as such term is defined in the Loan Agreement, all of which may be secured on a parity basis by a mortgage lien on the Mortgaged Premises. See "EXCERPTS FROM THE LOAN AGREEMENT – Section 5.14. Permitted Encumbrances" and "Section 5.17. Permitted Indebtedness" in Appendix E.

The Mortgage will be an absolute, unconditional and general obligation of the Institution. The Mortgage is executed in part to induce the Authority to issue the Series K Bonds and to sell the Series K Bonds to the initial purchasers thereof. The Institution will pay the indebtedness evidenced by the Loan Agreement and the Note and secured by the Mortgage, and by any Parity Debt secured by a mortgage on the Mortgaged Premises, at the times and in the manner provided in the Note, the Loan Agreement and any instruments relating to such Parity Debt and will otherwise perform and abide by all the terms and conditions of the Mortgage, the Note, the Loan Agreement and any instruments relating to Parity Debt. Any default under the Loan Agreement is declared to be a default under the Mortgage. Upon the payment and discharge of the Series K Bonds or when adequate provision therefor has been made as provided in the Indenture, the Mortgage will be discharged and satisfied and all of the Authority's right, title and interest in the property constituting the Mortgaged Premises will revert to the Institution (subject to any rights that the Authority may retain relating to Parity Debt remaining outstanding).

**Deposit and Application of Revenues**

The Revenues received pursuant to the Loan Agreement and any other moneys required by any of the provisions of the Indenture to be paid or transferred to the Trustee will be applied pursuant to the provisions thereof. See "EXCERPTS FROM THE INDENTURE – Section 5.4. Deposit of Revenues and Allocation Thereof" in Appendix D and "EXCERPTS FROM THE LOAN AGREEMENT – Section 2.2. Payment Obligations" in Appendix E.

**Application of Moneys in the Debt Service Fund**

The Trustee will transfer moneys out of the Interest Account on each Interest Payment Date for the payment of interest then due on the Series K Bonds. The Trustee will pay out of such Interest Account any amounts required for the payment of accrued interest upon any redemption of the Series K Bonds. The Trustee will transfer moneys out of the Principal Account or the Sinking Fund Account on each principal maturity date or Sinking Fund Installment date for the payment of the principal amount of the Series K Bonds or Sinking Fund Installment then due. The Trustee will pay out of the Sinking Fund Account any amounts directed by the Authority for the purchase of Series K Bonds.

**Debt Service Reserve Fund**

Although the Indenture establishes a Debt Service Reserve Fund, the initial Debt Service Reserve Fund Requirement for the Series K Bonds will be zero.

**Covenants of the Institution**

The Institution will agree to certain covenants in the Loan Agreement, including:

(i)     maintenance for each Fiscal Year of a Long-Term Debt Service Coverage Ratio of at least 1.25 times (see "EXCERPTS FROM THE LOAN AGREEMENT – Section 5.13. Long-Term Debt Service Coverage Ratio" in Appendix E);

(ii)    restrictions on the creation or imposition of liens, except for Permitted Encumbrances or unless the Institution also grants a parity lien to the Authority for the benefit of the holders of the Series K Bonds and any Parity Debt (see "EXCERPTS FROM THE LOAN AGREEMENT – Section 5.14. Permitted Encumbrances" in Appendix E);

(iii)   restrictions on the sale, lease, conveyance or other disposition of any of the Institution's Property, except for Permitted Dispositions (see "EXCERPTS FROM THE LOAN AGREEMENT – Section 5.15. Permitted Dispositions" in Appendix E);

(iv)    restrictions on release of any portion of the Mortgaged Premises from the lien of the Mortgage or release of any of the Gross Receipts from the security interest created by the Loan Agreement and the Mortgage, except for Permitted Releases (see "EXCERPTS FROM THE LOAN AGREEMENT – Section 5.16. Permitted Releases" in Appendix E); and

(v)     restrictions on the incurrence of any Indebtedness, except for Permitted Indebtedness (see "EXCERPTS FROM THE LOAN AGREEMENT – Section 5.17. Permitted Indebtedness" in Appendix E).

In each case, the Authority and the Bond Insurer may consent in writing to the Institution's non-compliance with a covenant.

**Bond Insurance**

Payment of the principal of and interest on the Series K Bonds when due will be insured in accordance with the terms of the Bond Insurance Policies to be issued by the Bond Insurer. See "BOND INSURANCE" and Appendix H.

## THE SERIES K BONDS

**General**

All references to the Series K Bonds are qualified in their entirety by the definitive terms thereof and the information with respect thereto included in the Indenture, the Loan Agreement, the Mortgage and the Note. Except as otherwise described, all references in this Official Statement to the Series K Bonds should be read as separately referring to the Series K-1 Bonds and the Series K-2 Bonds. For so long as the interest on the Series K-2 Bonds remains taxable, any Opinion of Bond Counsel required to be given with respect to the Series K-2 Bonds will not address the federal tax status of interest on the Series K-2 Bonds.

The Series K Bonds initially will be issued as Auction Rate Bonds under the Indenture and will be dated their date of issuance and delivery and will bear interest at Auction Rates as described in this Official Statement. The Series K Bonds may be converted in whole or in part from the ARS Rate Period to bear interest at a Daily Rate, Weekly Rate, Flexible Rate, Term Rate or Fixed Rate as described herein.

The Auction Period for the Series K Bonds will be a seven-day Auction Period unless and until a new Auction Period is determined pursuant to the Auction Procedures set forth in the Indenture and attached to this Official Statement as Appendix J or a new Interest Rate Mode is determined for the Series K Bonds. The Initial Period for the Series K Bonds will commence on the date of delivery of the Series K Bonds and will end on January 7, 2008. The first Auction for the Series K Bonds will be held on January 7, 2008. The first Interest Payment Date will be on January 8, 2008. Thereafter, Auction Dates generally will be each Monday and Interest Payment Dates generally will be each Tuesday, unless and until changed in accordance with the Auction Procedures or the Series K Bonds are converted to a different Interest Rate Mode.

Interest borne by the Series K Bonds bearing interest at the Daily Rate, Weekly Rate or Flexible Rate will be calculated on the basis of the actual number of days elapsed over a year of 365 days or 366 days, as the case may be. Interest borne by the Series K Bonds bearing interest at a Term Rate or a Fixed Rate will be calculated on the basis of a 360 day year consisting of twelve 30-day months. Interest on Series K Bonds in the ARS Rate Period with an Auction Period of 180 days or less will be calculated on the basis of a 360 day year for the actual number of days elapsed to the Interest Payment Date. Interest on Series K Bonds in the ARS Rate Period with an Auction Period of more than 180 days will be calculated on the basis of twelve 30-day months. Interest will accrue from one Interest Payment Date to, but not including, the next Interest Payment Date. All provisions of the Indenture relating to interest on the Series K Bonds will refer separately to the Series K-1 Bonds and the Series K-2 Bonds.

The Series K Bonds initially will be issued as one fully registered bond for each series, each in the aggregate principal amount for such series as set forth on the cover page of this Official Statement and will be delivered to and initially registered in the name of Cede & Co., as registered owner and nominee for DTC. The principal of, premium, if any, and interest on the Series K Bonds will be paid by the Trustee. As long as DTC or its nominee, Cede & Co., is the registered owner of the Series K Bonds, such payments will be made directly to Cede & Co. **So long as Cede & Co. is the registered owner, all references to Bondowners or registered owner will mean Cede & Co. and not the beneficial owners of the Series K Bonds.** See "Book-Entry-Only System" below.

If for any reason the Book-Entry-Only System is discontinued, Series K Bond certificates will be delivered as described in the Indenture and the Beneficial Owner, upon registration of certificates held in the Beneficial Owner's name, will become the Bondowner. Thereafter, Series K Bonds may be exchanged for an equal aggregate principal amount of Series K Bonds in other authorized denominations and of the same maturity, upon surrender thereof at the principal office of the Trustee. The transfer of the Series K Bonds may be registered on the books maintained by the Trustee for such purpose only upon the surrender thereof to the Trustee with a duly executed assignment in form satisfactory to the Trustee. For every exchange or transfer of Series K Bonds, the Authority or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer. The Trustee will not be required to make any such transfer or exchange of any Series K Bond during the period from each Record Date to the next succeeding Interest Payment Date or during the 45 days next preceding the date of redemption, if such Series K Bond (or any part thereof) is eligible to be selected or has been selected for redemption.

Auction Agreement. The Trustee will enter into an agreement (the "Auction Agreement") with Wilmington Trust Company (together with any successor bank or trust company or other entity entering

into a similar agreement, the "Auction Agent"), at the direction of, and acknowledged by, the Institution, which provides, among other things, that the Auction Agent will follow the Auction Procedures for the purposes of determining the Auction Rate so long as the Auction Rate is to be based on the results of an Auction.

The Auction Agent is acting as non-fiduciary agent for the Trustee in connection with Auctions. In the absence of willful misconduct or gross negligence on its part, the Auction Agent will not be liable for any action taken, suffered or omitted or for any error of judgment made by it in the performance of its duties under the Auction Agreement and will not be liable for any error of judgment made in good faith unless the Auction Agent has been grossly negligent in ascertaining (or failing to ascertain) the pertinent facts necessary to make such judgment.

The Auction Agent may terminate the Auction Agreement upon written notice to the Trustee, the Institution, the Broker-Dealer, the Bond Insurer and the Authority in accordance with the Auction Agreement on a date no earlier than 90 days (30 days if the Auction Agent fee has not been paid for more than 30 days) after the date of delivery of the notice. The Auction Agent may be removed at any time by the Trustee if the Auction Agent is an entity other than the Trustee, acting at the written direction of (i) the Institution or (ii) the holders of a majority of the aggregate principal amount of the Auction Rate Bonds upon at least 90 days' written notice in accordance with the Auction Agreement. If the Auction Agent and the Trustee are the same entity, the Auction Agent may be removed as described in the preceding sentence, with the Institution acting in lieu of the Trustee. Upon any resignation or removal of the Auction Agent, the Institution will appoint a successor Auction Agent meeting the requirements set forth in the Auction Procedures and with the approval of the Bond Insurer.

Broker-Dealer Agreements. Each Auction requires the participation of one or more broker-dealers. The Auction Agent and the Institution will enter into an agreement with J.P. Morgan Securities Inc. (or an affiliate thereof) and may enter into similar agreements (collectively, the "Broker-Dealer Agreements") with one or more additional broker-dealers (collectively, the "Broker-Dealers") selected by the Institution with the approval of the Remarketing Agent (which approval will not be unreasonably withheld) which provide for the participation of Broker-Dealers in Auctions. Each Broker-Dealer will be paid a fee calculated as set forth in the Broker-Dealer Agreements. In the event that there is more than one Broker-Dealer, the Institution will specify which Broker-Dealer is to perform certain functions under the Indenture.

Remarketing Agreement. The Institution will enter into a Remarketing Agreement (the "Remarketing Agreement") with J.P. Morgan Securities Inc. with respect to the Series K Bonds (together with any successor as remarketing agent under the Indenture, the "Remarketing Agent"), which sets forth the Remarketing Agent's duties and responsibilities and provides for the remarketing of Series K Bonds bearing an interest rate other than an Auction Rate. For each Rate Period other than an ARS Rate Period, the interest rate for the Series K Bonds will be determined by the Remarketing Agent in accordance with the Indenture; provided that, the interest rate or rates borne by the Series K Bonds may not exceed the Maximum Rate.

Liquidity Facility. Under the Indenture, upon conversion from an ARS Rate Period to a Rate Period other than the Fixed Rate Period, a Liquidity Facility acceptable to the Bond Insurer must be delivered to the Trustee in accordance with the Indenture. The Series K Bonds will be subject to mandatory tender for purchase at a purchase price equal to 100% of the principal amount thereof on such Conversion Date. *No Liquidity Facility will be provided in connection with Auction Rate Bonds.*

**Certain Considerations Affecting Auction Rate Securities**

*Terms used as defined terms in this section and not otherwise defined in this Official Statement are used as defined in the Auction Procedures.*

Role of Broker-Dealer. J.P. Morgan Securities Inc. (the "Broker-Dealer") has been appointed by the issuers or obligors of various auction rate securities to serve as a dealer in the auctions for those securities and is paid by the issuers or obligors for its services. Broker-Dealer receives broker-dealer fees from such issuers or obligors at an agreed-upon annual rate that is applied to the principal amount of securities sold or successfully placed through Broker-Dealer in such auctions.

The Broker-Dealer is designated in the Broker-Dealer Agreement as the Broker-Dealer to contact Existing Owners and Potential Owners and solicit Bids for the Series K Bonds. The Broker-Dealer will receive Broker-Dealer Fees from the Institution with respect to the Series K Bonds sold or successfully placed through it in Auctions for the Series K Bonds. The Broker-Dealer may share a portion of such fees with other dealers that submit Orders through it that are filled in the Auction for the Series K Bonds.

Bidding by Broker-Dealer. The Broker-Dealer is permitted, but not obligated, to submit Orders in Auctions for the Series K Bonds for its own account either as a buyer or seller and routinely does so in the auction rate securities market in its sole discretion. If the Broker-Dealer submits an Order for its own account, it would have an advantage over other Bidders because Broker-Dealer would have knowledge of the other Orders placed through it in that Auction for the Series K Bonds and thus, could determine the rate and size of its Order so as to increase the likelihood that (i) its Order will be accepted in the Auction for the Series K Bonds and (ii) the Auction for the Series K Bonds will clear at a particular rate. For this reason, and because the Broker-Dealer is appointed and paid by the Institution to serve as a Broker-Dealer in the Auctions for the Series K Bonds, the Broker-Dealer's interests in serving as Broker-Dealer in an Auction for the Series K Bonds may differ from those of Existing Owners and Potential Owners who participate in Auctions for the Series K Bonds. See "Role of Broker-Dealer" below. The Broker-Dealer would not have knowledge of Orders submitted to the Auction Agent by any other firm that may in the future be appointed to accept Orders pursuant to a Broker-Dealer Agreement.

The Broker-Dealer is the only Broker-Dealer appointed by the Institution to serve as Broker-Dealer in the Auctions for the Series K Bonds, and as long as that remains the case it will be the only Broker-Dealer that submits Orders to the Auction Agent in the Auctions for the Series K Bonds. As a result, in such circumstances, the Broker-Dealer may discern the clearing rate before the Orders are submitted to the Auction Agent and set the clearing rate with its Order.

The Broker-Dealer routinely places bids in auctions generally for its own account to acquire securities for its inventory, to prevent an "Auction Failure" (which occurs if there are insufficient clearing bids and results in the auction rate being set at the maximum rate) or to prevent an auction from clearing at a rate that the Broker-Dealer believes does not reflect the market for such securities. The Broker-Dealer may place one or more Bids in an Auction for the Series K Bonds for its own account to acquire the Series K Bonds for its inventory, to prevent an Auction Failure or to prevent Auctions for the Series K Bonds from clearing at a rate that the Broker-Dealer believes does not reflect the market for the Series K Bonds. The Broker-Dealer may place such Bids even after obtaining knowledge of some or all of the other Orders submitted through it. When Bidding in an Auction for the Series K Bonds for its own account, the Broker-Dealer also may Bid inside or outside the range of rates that it posts in its Price Talk. See "Price Talk" below.

The Broker-Dealer routinely encourages bidding by others in auctions generally for which it serves as broker-dealer.[*] The Broker-Dealer also may encourage Bidding by others in Auctions for the

Series K Bonds, including to prevent an Auction Failure or to prevent an Auction for the Series K Bonds from clearing at a rate that the Broker-Dealer believes does not reflect the market for the Series K Bonds. The Broker-Dealer may encourage such Bids even after obtaining knowledge of some or all of the other Orders submitted through it.

Bids by the Broker-Dealer or by those it may encourage to place Bids are likely to affect (i) the Auction Rate — including preventing the Auction Rate from being set at the Maximum Rate or otherwise causing Bidders to receive a lower rate than they might have received had the Broker-Dealer not Bid or not encouraged others to Bid and (ii) the allocation of the Series K Bonds being auctioned — including displacing some Bidders who may have their Bids rejected or receive fewer Series K Bonds than they would have received if the Broker-Dealer had not Bid or encouraged others to Bid. Because of these practices, the fact that an Auction for the Series K Bonds clears successfully does not mean that an investment in the Series K Bonds involves no significant liquidity or credit risk. The Broker-Dealer is not obligated to continue to place such Bids or to continue to encourage other Bidders to do so in any particular Auction for the Series K Bonds to prevent an Auction Failure or an Auction for the Series K Bonds from clearing at a rate the Broker-Dealer believes does not reflect the market for the Series K Bonds. Investors should not assume that the Broker-Dealer will place Bids or encourage others to do so or that Auction Failures will not occur. Investors should also be aware that Bids by the Broker-Dealer or by those it may encourage to place Bids may cause lower Auction Rates to occur.

The statements herein regarding Bidding by a Broker-Dealer apply only to a Broker-Dealer's auction desk and any other business units of the Broker-Dealer that are not separated from the auction desk by an information barrier designed to limit inappropriate dissemination of bidding information.

In an Auction for the Series K Bonds, if all outstanding Series K Bonds are the subject of Submitted Hold Orders, the Auction Rate for the next succeeding Auction Period will be the All Hold Rate (such a situation is called an "All Hold Auction"). If the Broker-Dealer holds any Series K Bonds for its own account on an Auction Date, it is the Broker-Dealer's practice to submit a Sell Order into the Auction for the Series K Bonds with respect to such Series K Bonds, which would prevent that Auction for the Series K Bonds from being an All Hold Auction. The Broker-Dealer may, but is not obligated to, submit Bids for its own account in that same Auction for the Series K Bonds, as set forth above.

Price Talk.  Before the start of an Auction for the Series K Bonds, the Broker-Dealer, in its discretion, may make available to its customers who are Existing Owners and Potential Owners the Broker-Dealer's good faith judgment of the range of likely clearing rates for the Auction for the Series K Bonds based on market and other information. This is known as "Price Talk." Price Talk is not a guaranty that the Auction Rate established through the Auction for the Series K Bonds will be within the Price Talk, and Existing Owners and Potential Owners are free to use it or ignore it. The Broker-Dealer occasionally may update and change the Price Talk based on changes in the Institution's or the Bond Insurer's credit quality or macroeconomic factors that are likely to result in a change in interest rate levels, such as an announcement by the Federal Reserve Board of a change in the Federal Funds rate or an announcement by the Bureau of Labor Statistics of unemployment numbers. The Broker-Dealer will use its best efforts to communicate this information in a manner reasonably designed to make it available to all Existing Owners and Potential Owners that were given the original Price Talk. Existing Owners and Potential Owners should confirm with the Broker-Dealer the manner by which the Broker-Dealer will communicate Price Talk and any changes to Price Talk.

"All-or-Nothing" Bids.  The Broker-Dealer will not accept "all-or-nothing" Bids (i.e., Bids whereby the Bidder proposes to reject an allocation smaller than the entire quantity Bid) or any other type of Bid that allows the Bidder to avoid Auction Procedures that require the pro rata allocation of Series K Bonds where there are not sufficient Sell Orders to fill all Bids at the Winning Bid Rate.

No Assurances Regarding Auction Outcomes.  The Broker-Dealer provides no assurance as to the outcome of any Auction.  The Broker-Dealer also does not provide any assurance that any Bid will be successful, in whole or in part, or that the Auction for the Series K Bonds will clear at a rate that a Bidder considers acceptable.  Bids may be only partially filled, or not filled at all, and the Auction Rate on any Series K Bonds purchased or retained in the Auction for the Series K Bonds may be lower than the market rate for similar investments.

The Broker-Dealer will not agree before an Auction to buy Series K Bonds from or sell Series K Bonds to a customer after the Auction.

Deadlines.  Each particular Auction for the Series K Bonds has a formal deadline by which all Bids must be submitted by the Broker-Dealer to the Auction Agent.  This deadline is called the "Submission Deadline."  To provide sufficient time to process and submit customer Bids to the Auction Agent before the Submission Deadline, the Broker-Dealer imposes an earlier deadline for all customers — called the "Broker-Dealer Deadline" — by which Bidders must submit Bids to the Broker-Dealer.  The Broker-Dealer Deadline is subject to change by the Broker-Dealer.  The Broker-Dealer will use its best efforts to make this information available by means reasonably expected to reach Existing Owners and Potential Owners.  Existing Owners and Potential Owners should consult with the Broker-Dealer as to its Broker-Dealer Deadline.  The Broker-Dealer may correct Clerical Errors by the Broker-Dealer after the Broker-Dealer Deadline and prior to the Submission Deadline.  The Broker-Dealer may submit Bids for its own account at any time until the Submission Deadline and may change Bids it has submitted for its own account at any time until the Submission Deadline.  The Auction Procedures provide that until one hour after the Auction Agent completes the dissemination of the results of an Auction, new Orders can be submitted to the Auction Agent if such Orders were received by the Broker-Dealer or generated by the Broker-Dealer for its own account prior to the Submission Deadline and the failure to submit such Orders prior to the Submission Deadline was the result of force majeure, a technological failure or a Clerical Error.  In addition until one hour after the Auction Agent completes the dissemination of the results of an Auction, a Broker-Dealer may modify or withdraw an Order submitted to the Auction Agent prior to the Submission Deadline if the Broker-Dealer determines that such Order contained a Clerical Error.  In the event of such a submission, modification or withdrawal the Auction Agent will rerun the Auction, if necessary, taking into account such submission, modification or withdrawal.

Existing Owner's Ability to Resell Auction Rate Securities May Be Limited.  An Existing Owner may sell, transfer or dispose of a Series K Bond (i) in an Auction for the Series K Bonds, only pursuant to a Bid or Sell Order in accordance with the Auction Procedures, or (ii) outside an Auction for the Series K Bonds, only to or through the Broker-Dealer.

Existing Owners will be able to sell all of the Series K Bonds that are the subject of their Submitted Sell Orders only if there are Bidders willing to purchase all those Series K Bonds in the Auction for the Series K Bonds.  If Sufficient Clearing Bids have not been made, Existing Owners that have submitted Sell Orders will not be able to sell in the Auction for the Series K Bonds all, and may not be able to sell any, of the Series K Bonds subject to such Submitted Sell Orders.  As discussed above (see "Bidding by Broker-Dealer"), the Broker-Dealer may submit a Bid in an Auction for the Series K Bonds to avoid an Auction Failure, but it is not obligated to do so.  There may not always be enough Bidders to prevent an Auction Failure in the absence of the Broker-Dealer Bidding in the Auction for the Series K Bonds for its own account or encouraging others to Bid.  Therefore, Auction Failures are possible, especially if the Institution's or the Bond Insurer's credit were to deteriorate, if a market disruption were to occur or if, for any reason, the Broker-Dealer were unable or unwilling to Bid.

Between Auctions for the Series K Bonds, there can be no assurance that a secondary market for the Series K Bonds will develop or, if it does develop, that it will provide Existing Owners the ability to

resell the Series K Bonds on the terms or at the times desired by an Existing Owner. Broker-Dealer, in its own discretion, may decide to buy or sell the Series K Bonds in the secondary market for its own account from or to investors at any time and at any price, including at prices equivalent to, below, or above par for the Series K Bonds. However, the Broker-Dealer is not obligated to make a market in the Series K Bonds and may discontinue trading in the Series K Bonds without notice for any reason at any time. Existing Owners who resell between Auctions for the Series K Bonds may receive an amount less than par, depending on market conditions.

If an Existing Owner purchased a Series K Bond through a dealer which is not the Broker-Dealer for the Series K Bonds, such Existing Owner's ability to sell its Series K Bonds may be affected by the continued ability of its dealer to transact trades for the Series K Bonds through the Broker-Dealer.

The ability to resell the Series K Bonds will depend on various factors affecting the market for the Series K Bonds, including news relating to the Institution or the Bond Insurer, the attractiveness of alternative investments, investor demand for short term securities, the perceived risk of owning the Series K Bonds (whether related to credit, liquidity or any other risk), the tax or accounting treatment accorded the Series K Bonds (including U.S. generally accepted accounting principles as they apply to the accounting treatment of auction rate securities), reactions of market participants to regulatory actions (such as those described in "Securities and Exchange Commission Settlements" below) or press reports, financial reporting cycles and market conditions generally. Demand for the Series K Bonds may change without warning, and declines in demand may be short-lived or continue for longer periods.

<u>Resignation of the Auction Agent or the Broker-Dealer Could Impact the Ability to Hold Auctions</u>. The Auction Agent may terminate the Auction Agreement upon written notice to the Trustee, the Institution, the Broker-Dealer, the Bond Insurer and the Authority on the date specified in such notice, which date will be no earlier than 90 days (except in certain limited circumstances) after the date of delivery of such notice. The Auction Agreement does not require, as a condition to the effectiveness of such resignation, that a replacement Auction Agent be in place if its fee has not been paid. The Broker-Dealer Agreement provides that the Broker-Dealer thereunder may resign upon five business days' notice or suspend its duties immediately, in certain circumstances, and does not require, as a condition to the effectiveness of such resignation or suspension, that a replacement Broker-Dealer be in place. For any Auction Period during which there is no duly appointed Auction Agent or Broker-Dealer, it will not be possible to hold Auctions for the Series K Bonds, with the result that the interest on the Series K Bonds will be determined as described in the Auction Procedures.

<u>Securities and Exchange Commission Settlements</u>. On May 31, 2006, the U.S. Securities and Exchange Commission (the "SEC") announced that it had settled its investigation of fifteen firms, including the Broker Dealer, that participate in the auction rate securities market regarding their respective practices and procedures in this market. The SEC alleged in the settlement that the firms had managed auctions for auction rate securities in which they participated in ways that were not adequately disclosed or that did not conform to disclosed auction procedures. As part of the settlement, the Broker-Dealer agreed to pay a civil penalty. In addition, the Broker-Dealer, without admitting or denying the SEC's allegations, agreed to provide to customers written descriptions of its material auction practices and procedures, and to implement procedures reasonably designed to detect and prevent any failures by the Broker-Dealer to conduct the auction process in accordance with disclosed procedures.

In addition on January 9, 2007, the SEC announced that it had settled its investigation of three banks, including the Auction Agent (the "Settling Auction Agents"), that participate as auction agents in the auction rate securities market, regarding their respective practices and procedures in this market. The SEC alleged in the settlement that the Settling Auction Agents allowed broker-dealers in auctions to submit bids or revise bids after the submission deadlines and allowed broker-dealers to intervene in

auctions in ways that affected the rates paid on the auction rate securities. As part of the settlement, the Settling Auction Agents agreed to pay civil penalties. In addition, each Settling Auction Agent, without admitting or denying the SEC's allegations, agreed to provide to broker-dealers and issuers written descriptions of its material auction practices and procedures and to implement procedures reasonably designed to detect and prevent any failures by that Settling Auction Agent to conduct the auction process in accordance with disclosed procedures.

**Interest Rate Determination Methods**

Auction Rate. During the ARS Rate Period, the Series K Bonds will bear interest at the Auction Rate for each Auction Period determined as set forth in this paragraph and in the Auction Procedures. The initial Auction Period immediately after any change in the Interest Rate Mode to the ARS Rate Period will commence from and include the conversion date therefor and will expire on the date determined and certified to the Trustee (with a copy to the Broker-Dealer, the Auction Agent and the Liquidity Facility Provider (if any)) by the Authority (at the direction of the Institution) on or before the conversion date. The initial Auction Date immediately after any change in the Interest Rate Mode to the ARS Rate Period will be the date determined and certified to the Trustee (with a copy to the Broker-Dealer, the Auction Agent and the Liquidity Facility Provider (if any)) by the Authority (at the direction of the Institution) on or before the conversion date. The Auction Rate for any initial Auction Period immediately after any change in the Interest Rate Mode to the ARS Rate Period will be the rate of interest per annum determined and certified to the Trustee (with a copy to the Authority and the Liquidity Facility Provider (if any)) by the Remarketing Agent on a date not later than the conversion date as the minimum rate of interest which, in the opinion of the Remarketing Agent, would be necessary as of such date to market the Series K Bonds in a secondary market transaction at a price equal to the principal amount thereof; provided, however, that such interest rate will not exceed the Maximum Rate. After the initial Auction Period following a conversion to the Auction Rate, the Auction Period will be an Auction Period determined and certified by the Authority (at the direction of the Institution) to the Trustee, the Broker-Dealer and the Auction Agent. Thereafter, each Auction Period will be an Auction Period of the same duration, unless such Auction Period is changed to another Auction Period in accordance with the Auction Procedures. For any other Auction Period that is not an initial Auction Period, the Auction Rate will be the rate of interest determined in accordance with the Auction Procedures.

Daily Rate. The Daily Rate will be determined by the Remarketing Agent by 10:30 a.m., prevailing New York City time, on the Rate Determination Date and will be equal to the minimum rate that, in the judgment of the Remarketing Agent, taking into account prevailing market conditions, would enable the Remarketing Agent to sell all of the Series K Bonds on the Rate Determination Date at a price equal to the principal amount thereof, plus accrued interest, if any, thereon. The Daily Rate determined by the Remarketing Agent will remain in effect from such day until the day preceding the next Rate Determination Date. Interest on the Series K Bonds will be payable on each Interest Payment Date.

The Remarketing Agent will make the Daily Rate available (i) on the Rate Determination Date by Electronic Means or telephone to any Bondowner or Notice Party requesting such rate; and (ii) by Electronic Means to the Trustee and by telephone to the Liquidity Facility Provider not later than 11:00 a.m., prevailing New York City time, on the Rate Determination Date. Any Owner of the Series K Bonds may telephone the Remarketing Agent and receive notice of the Daily Rate applicable to the current Daily Rate Period.

If the Remarketing Agent cannot, or does not, determine the Daily Rate as described above, or if the Daily Rate determined by the Remarketing Agent is held to be invalid or unenforceable by a court of law or would have an adverse effect upon the exclusion of interest on the Series K Bonds from gross income for federal income tax purposes as evidenced by an Opinion of Bond Counsel, the Daily Rate for

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

-----------------------------------------------------------------x

UBS SECURITIES LLC,           :

                                  :   Case No.: 12-cv-2090 MJD/JJG

             Plaintiff,      :

                                  :

              v.           :

                                  :

ALLINA HEALTH SYSTEM,       :

                                  :

            Defendant.     :

-----------------------------------------------------------------x

## ORDER

In accordance with the Joint Stipulation of Dismissal ("Joint Stipulation") by and between Plaintiff UBS Securities LLC ("UBS") and Defendant Allina Health System ("Allina") dated April 3, 2013, IT IS HEREBY ORDERED as follows:

      1.      This action is dismissed without prejudice.

      2.      Allina shall dismiss the arbitration against UBS before the Financial Industry Regulatory Authority ("FINRA") captioned *Allina Health System v. UBS Securities LLC,* FINRA No. 12-000458 (the "FINRA Arbitration"),

without prejudice, within one week of the submission of the Joint Stipulation to this Court.

3.      UBS and Allina agree to resolve the claims asserted in the FINRA Arbitration before the American Arbitration Association ("AAA"), pursuant to the terms set forth in the parties' Bond Purchase Agreement ("BPA") subject to the following modifications:  (a) The arbitration shall be governed by the AAA Procedures for Large, Complex Commercial Disputes; (b) the arbitration panel shall consist of three members.  The Chairperson shall be an attorney admitted to the Bar of any state who shall have practiced for at least fifteen (15) years, and shall have primarily focused on complex litigation and each of the remaining two arbitrators shall be an attorney admitted to the Bar of the State of Minnesota who shall have practiced for at least fifteen (15) years, and shall have significant expertise in the areas of public and health care finance.  The parties will confer regarding the method to select the arbitrators and, to the extent that the parties are unable to reach agreement, the arbitrators will be selected by AAA pursuant to AAA rules; and (c) the arbitration shall take place in Minnesota unless otherwise agreed by the parties or designated by the arbitrators.

      4.     This Court shall retain jurisdiction to enforce the terms of the

Joint Stipulation.


DATED:  April 12, 2013                 s/Michael J. Davis_____
                                         Michael J. Davis
                                         Chief Judge
                                         United States District Court

## CERTIFICATE OF SERVICE

I, Peter Hartofilis, hereby certify under the penalty of perjury that on

February 14, 2014, I  personally served a true and correct copy of the attached:

### - NOTICE OF MOTION FOR PRELIMINARY INJUNCTION

### - DECLARATION OF JONATHAN K. YOUNGWOOD

### - MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF J.P. MORGAN SECURITIES LLC'S MOTION FOR PRELIMINARY INJUNCTION

By Federal Express Overnight Delivery upon:

Joseph C. Peiffer
Peiffer Rosca Abdullah & Carr
201 St. Charles Ave.
Suite 4610
New Orleans, LA 70170

Dated:  New York, New York
         February 14, 2014

Peter Hartofilis